FILED DATE: 4/16/2021 2:00 PM   2018L010475

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

FILED
4/16/2021 2:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

| | |
|---|---|
| **IN RE: WILLOWBROOK ETHYLENE OXIDE LITIGATION** | **Consolidated for Pretrial and Discovery Purposes Under:**<br><br>**No. 2018-L-010475**   2018L010475 |
| **This filing applies to: ALL ACTIONS CONSOLIDATED FOR PRETRIAL AND DISCOVERY PURPOSES** | **Judge Christopher E. Lawler** |

## PLAINTIFFS' FOURTH AMENDED MASTER COMPLAINT

Plaintiffs, by and through their attorneys, for their Complaint at Law[1] against Defendants

STERIGENICS U.S., LLC, SOTERA HEALTH, LLC, BOB NOVAK, ROGER CLARK, GTCR, LLC,

and GRIFFITH FOODS INTERNATIONAL, INC.,[2] allege as follows:

---

[1] Plaintiffs submit this Fourth Amended Master Complaint in accordance with prior Court orders, including CMO-1. In so doing, Plaintiffs maintain their position that this consolidated matter is not a mass action under 28 U.S.C. § 1332. In no way should this complaint be taken to mean that any Plaintiff is proposing any joint trials and/or joint decision of one or more issues in one or more cases. These matters have been consolidated for discovery and pretrial only based on certain Defendants' motion and the Court's own orders. Plaintiffs further submit this Fourth Amended Master Complaint in accordance with the Court's August 17, 2020 Order on Defendants' Motions to Dismiss, which dismissed certain counts of Plaintiffs' First Amended Complaint without prejudice. Plaintiffs hereby preserve Counts X (Sotera-Negligent Supervision), XII (Sotera-Strict Liability), XIII (Sotera-Battery), XXI (GTCR-Strict Liability), and XXII (GTCR-Battery) from their First Amended Master Complaint previously dismissed on August 17, 2020 for appeal, disclaim any waiver, and explicitly reserve the right to amend those counts as provided by the Court's dismissal without prejudice.

[2] Plaintiffs previously named Griffith Foods, Inc., Griffith Foods Worldwide, Inc., and Griffith Foods Group, Inc. as defendants in their Third Amended Master Complaint. The first two entities moved to dismiss that complaint pursuant to 735 ILCS 5/2-619 and produced a Declaration from William Frost stating, in relevant part, that these two entities never possessed any ownership interest in the Willowbrook facilities or in any entity owning any interest in the Willowbrook facilities, and that neither entity had any involvement with EtO sterilization services. *See* Frost Decl. at ¶¶ 17-18. Mr. Frost also attested that Griffith Foods Group, Inc. was merely the parent to Griffith Foods International, Inc., formerly known as Griffith Laboratories, U.S.A., Inc. *Id.* at ¶¶ 3-4. Plaintiffs have no reason to believe that Griffith's and Mr. Frost's representations to this effect are untrue and Plaintiffs are reasonably relying upon these representations

FILED DATE: 4/16/2021 2:00 PM   2018L010475

### I.   Prefatory Statement on Griffith Foods

1.    In this Fourth Amended Complaint, Plaintiffs sue **only one Griffith entity**, referred to herein as "Griffith Labs." Today, Griffith Labs is known as "Griffith Foods International, Inc."; it was formerly known as "Griffith Laboratories U.S.A., Inc."

2.    Plaintiffs sue Griffith Labs **only for its own independent acts and omissions** between 1984 and 1999, detailed extensively in this complaint. Plaintiffs do not sue Griffith Labs for the conduct of any other entity.

3.    Sterigenics **has not assumed liability for the conduct of Griffith Labs.** (This is contrary to the Court's understanding at page 6 of its March 16, 2021 dismissal order). Indeed, in Stipulation No. 1, entered on June 12, 2020, Sterigenics assumed the liabilities of certain entities explicitly identified in the Stipulation, **but Griffith Labs is not one of them**.[3]

4.    In this complaint, Plaintiffs specifically allege that Griffith Labs' misconduct persisted throughout the entirety of the period from 1984 to May 14, 1999, when Griffith Labs sold its sterilization business. *See* Paragraphs 33 – 104. Plaintiffs further describe how Griffith Labs' misconduct satisfies the elements of Plaintiffs various causes of action. *See* Paragraphs 275 – 324.

5.    In summary, as alleged in this complaint, Griffith Labs' independent acts and omissions throughout the entirety of the period between 1984 and 1999, which caused or contributed to Plaintiffs' injuries, include:

---

in electing not to name Griffith Foods, Inc. Griffith Foods Worldwide, Inc. and Griffith Foods Group, Inc. in their Fourth Amended Master Complaint.

[3] Stipulation No. 1 only applies to the approximate 70 plaintiffs who had filed suit at the time the stipulation was entered on June 12, 2020; it does not apply to the hundreds of plaintiffs who filed suit after, all of whom expressly disclaimed that stipulation in their respective complaints.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

a.  Locating, and then for the next 16 years operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing at all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses.

b.  Never warning its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs knew that the emissions threatened their health and that they had no ability to protect themselves because they had no idea that EtO was even being emitted into their community. Griffith Labs failed to warn the Willowbrook community even though it provided warnings to residents living near other Griffith Labs' EtO sterilization facilities in other states.

c.  Deciding and mandating that the Willowbrook facility operate without essentially any emission control equipment whatsoever for its first four years of operation (1984 – 1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time.

d.  Deciding to operate the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control over EtO emissions from, e.g., the facility's back-vents, aeration rooms, and work aisles, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those emissions alleged in subparagraph (c), above) during that time.

e.  Designing in 1984, and then from 1984 to 1999 mandating the use of, a sterilization/emissions process that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility.

f.  Throughout the period from 1984 to 1999, itself directly purchasing, using, and mandating the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility.

3

FILED DATE: 4/16/2021 2:00 PM    2018L010475

g. Failing to use emission control equipment in Willowbrook that it (Griffith Labs) was using in its other EtO facilities in the United States and other countries. This resulted in EtO emissions from the Willowbrook facilities that were sometimes as much as 100x higher, and more dangerous, than those at Griffith Labs' other facilities.

h. Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs knew those concentrations would be health threatening, and IEPA had specifically and directly required Griffith Labs to conduct extensive ambient air testing in 1984 to 1986 as a special condition for granting Griffith Labs' permit to operate the Willowbrook facility.

i. Misleading the State's regulator, IEPA, by, *inter alia*, failing to inform IEPA as to what it (Griffith Labs) knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA to grant it (Griffith Labs) the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions that were based on assumptions Griffith Labs knew had no basis or were false.

j. Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities.

k. Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies in order to understate those health dangers and create a justification for emissions it knew endangered the health of those living near the Willowbrook (and other) sterilization facilities.

6. The above misconduct of Griffith Labs persisted well past its October 1984 nominal transfer to Micro Biotrol Company of certain (though far from all) assets and liabilities and at least until May 14, 1999. Indeed, as alleged above and throughout this complaint, this

4

FILED DATE: 4/16/2021 2:00 PM    2018L010475

October 1984 transaction did nothing to diminish Griffith Labs' substantive participation in the Willowbrook facility's operations and emissions.

7.    In summary, Plaintiffs sue Griffith Labs because its actions and failures to act caused them to suffer the cancers and other serious illnesses that Griffith Labs specifically foresaw, when, in 1984, it purposely directed that an EtO sterilization facility be located in Plaintiffs' residential community that it (Griffith Labs) knew would endanger the community's health and safety, and then, for the next 15 years, directed that the facility be operated without the means necessary—indeed, for many years without any means at all—to protect the unsuspecting Plaintiffs against the facility's nearly one million pounds of carcinogenic emissions during that time. Griffith Labs may be held liable for this conduct, despite the fact that its subsidiaries were nominally operating the Willowbrook facility for portions of that 15 year period because, as the Illinois Supreme Court has determined, "[i]f a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290 (2007).

## II.    Introduction

8.    For decades, tens of thousands of people have lived in the quiet but densely populated suburbs of Cook and DuPage Counties—Willowbrook, Burr Ridge, Darien, and Hinsdale—believing that their neighborhoods were safe and their air free from dangerous toxins. Not so. Defendants' Willowbrook sterilization facilities were emitting massive and unnecessary amounts of ethylene oxide ("EtO")—an invisible, odorless carcinogen—into their air.

5

FILED DATE: 4/16/2021 2:00 PM   2018L010475

9.     There is no safe level of EtO; its carcinogenic effects have been widely known since the 1940s and known to Defendants since at least 1984. Notwithstanding, Defendants chose to operate their business and emit EtO in a densely populated area full of children, houses, parks, schools, and businesses.

10.     Even further, although technologies to control EtO have been available—and widely used—since the 1980s, Defendants operated for years in Willowbrook without using the best practices and control technologies available to reduce their emissions; and as a direct and proximate result, the Willowbrook area has become one of the most toxic in the U.S. The people who have lived and worked in the area have inhaled EtO on a routine and continuous basis for years, unknowingly. Defendants never warned them about the danger it posed.

11.     In August 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released to the public a report titled "Evaluation of Potential Health Impacts for Ethylene Oxide Emissions."[4] That report, documenting the public health impacts of Defendants' emissions on the Willowbrook area, revealed the area's staggering and disproportionate risks of cancer.

12.     In February 2019, the Illinois Environmental Protection Agency ("IEPA") ordered Defendants' Willowbrook facilities to stop using EtO. In the months that followed, Sterigenics U.S. announced a plan to install equipment to reduce emissions of EtO to 85 lbs. per year — a *drastic* reduction from the thousands of pounds of EtO emitted in the years prior. Before

---

[4] https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf

FILED DATE: 4/16/2021 2:00 PM    2018L010475

implementing the plan, however, Sterigenics U.S. announced the permanent closure of its Willowbrook facilities effective September 30, 2019.

13.     Plaintiffs lived and/or worked near Defendants' Willowbrook facilities. They unknowingly breathed the excessive and dangerous amounts of EtO emitted from the facilities on a routine and continuous basis for years. As a result, they have been diagnosed with serious — sometimes fatal — diseases or conditions, and/or have sustained severe personal injuries causing them to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and loss of normal life.

14.     Plaintiffs bring these personal injury claims against Sterigenics U.S., LLC ("Sterigenics U.S."), Sotera Health, LLC ("Sotera"), Griffith Labs, two managers, and a private equity firm GTCR, LLC ("GTCR).

15.     In addition, since 2016, Sterigenics U.S. and Sotera, and their corporate investors and parents (including GTCR), have pursued a plan to escape accountability to those who have been sickened or have lost their lives, and thereby to cynically render this Court proceeding a sham. That is, they have funneled nearly $1.3 billion in cash out of the Sterigenics U.S. / Sotera companies in just the last 34 months for distribution to wealthy venture-capitalist investors, such that the funds could never be used to compensate the victims who have come to this Court to seek justice. And they have made certain that even those assets not siphoned away would never be available to those victims, by pledging the assets to banks to guarantee repayment of billions in corporate borrowings, so that even if the companies failed, they would be used to pay the banks, not the plaintiffs who had proven their cases.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

16.     By these actions, Sterigenics U.S., Sotera, and GTCR *admit* culpability for the toxic exposure suffered by Plaintiffs, but intend never to be held accountable for it.

**III.    Parties and Venue**

17.     This is an Illinois controversy. This Complaint is brought by or on behalf of individuals who are or were citizens of Illinois, for injuries that occurred in Illinois, as a result of ethylene oxide emissions in Illinois, that were caused by Illinois Defendants' negligence and other wrongful conduct, all of which took place in the State of Illinois. This court is a proper venue under 735 ILCS 5/2-101.

18.     Greater than two-thirds of Plaintiffs to this Complaint are Illinois citizens.

19.     All Plaintiffs to this Complaint were exposed to and inhaled EtO from Defendants' Willowbrook facilities on a routine and continuous basis.

20.     Plaintiffs did not have notice that the injuries and damages at issue were wrongfully caused or that they were caused by Defendants' emissions of EtO until, at the earliest, August 21, 2018, when the ATSDR report was issued.

21.     Defendant Sterigenics U.S., LLC, is a wholly-owned subsidiary of Sotera Health, LLC, and is a limited liability company organized under the laws of Delaware with its headquarters and principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois 60523.

22.     Defendant Sterigenics U.S., under its current name and previously under other names, operated EtO sterilization facilities at 7775 Quincy Street in Willowbrook, Illinois (the "Willowbrook facility") and 830 Midway Drive in Willowbrook, Illinois, continuously and at all

FILED DATE: 4/16/2021 2:00 PM    2018L010475

relevant times. (The two facilities are referred to collectively herein as "the Willowbrook facilities" or "the facilities.")

23.     Sterigenics U.S.'s predecessors who operated the Willowbrook facilities include: Micro-Biotrol Company, Micro-Biotrol, Inc., Griffith Micro Science, Inc., IBA S&I, Inc., and Sterigenics EO, Inc. Through a series of acquisitions, mergers, and name changes, Sterigenics U.S. has assumed the liabilities of these predecessor entities for their respective involvement in the operation of the Willowbrook facilities. (Sterigenics U.S. and its predecessors are referred to collectively herein as "Sterigenics U.S.".)

24.     Defendant Griffith Foods International, Inc., was previously known as Griffith Laboratories U.S.A, Inc. ("Griffith Labs"). During certain times prior to May 14, 1999, which are detailed below, Griffith Labs operated the Willowbrook facilities. At all times prior to May 14, 1999, Griffith Labs directed and controlled the sterilization operations at the Willowbrook facilities. Further, at all times prior to May 14, 1999, Griffith Labs directly participated in the operation of the Willowbrook facilities. Defendant Griffith Foods International, Inc. is responsible for all acts and omissions of Griffith Labs as alleged herein. At all relevant times, Griffith Labs, now Griffith Foods International, Inc., had its headquarters and principal place of business in Alsip, Illinois, which is in Cook County. To be clear, Plaintiffs allege that Griffith Labs committed independent injurious acts and omissions separate and apart from, though alongside of, Sterigenics' acts and omissions.

25.     Defendant Sotera Health, LLC, under its current name and previously under other names (first as Sterigenics International, Inc. and then as Sterigenics International, LLC), and as the sole owner, member, and "manager" of Sterigenics U.S., operated, managed, and/or

FILED DATE: 4/16/2021 2:00 PM   2018L010475

maintained and otherwise participated directly in Sterigenics U.S.'s operation of the Willowbrook facilities. (Defendant Sotera Health, LLC and its predecessors are referred to collectively herein as "Sotera.")

26.     For example, Sotera took responsibility for, and participated directly in, the following functions in connection with the facilities' operations:

    a.  Preparing and implementing risk management plans regarding health, safety, and other risks posed by the facilities' use and storage of EtO to human health and the environment;

    b.  Conducting hazard reviews at the facilities;

    c.  Developing written operating procedures for training and guiding the work of operators;

    d.  Training operations employees;

    e.  Evaluating whether the facilities' systems and equipment were in proper working condition;

    f.  Implementing a program to monitor the physical condition of process equipment;

    g.  Investigating incidents;

    h.  Conducting safety audits;

    i.  Determining potential impacts on the surrounding community from worst-case and alternative-case releases of EtO;

    j.  Evaluating the facilities' accident history;

    k.  Developing procedures for notifying local, state and federal emergency planning and response agencies about chemical spills;

    l.  Developing an incident prevention program that includes the following:

        i.  Process Safety Information;
        ii.  Process Hazard Analysis;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

      iii.     Employee Training;

      iv.     Mechanical Integrity;

      v.     Pre-Startup Review;

      vi.     Compliance Audits;

      vii.     Employee Participation; and

      viii.     Hot Work Permit.

m.  Developing plans to address accidental release that includes the following:

      i.     Computer controls;

      ii.     Door interlock system;

      iii.     EtO leak detection monitors;

      iv.     Emission Control Systems to destroy residual EtO;

      v.     Pressure Relief Valves;

      vi.     Process Safety Information for employees;

      vii.     Written SOPs for training and instructions to employees; and

      viii.    New hire and annual refresher training.

n.  Applying for IEPA construction permits to allow structural modifications at the facilities, including modifications impacting the volume of EtO emitted;

o.  Holding the facilities' construction permit, as permittee, authorizing it to:

      i.     Modify EtO emissions controls including sterilization chamber exhaust vents;

      ii.     Operate the sterilization chamber exhaust vents without any EtO emissions controls; and

      iii.     Modify the operation of its sterilization equipment, such as aeration rooms, by allowing EtO emissions controls to be bypassed.

p.  Holding the facilities' construction permit, as permittee, requiring it to:

      i.     Operate EtO emission controls in a manner that complies with local, state and federal law;

      ii.     Conduct operational monitoring for the EtO emissions controls to ensure compliance with plans previously submitted to EPA;

      iii.     Enhance operational monitoring to address the effects of modification of EtO emissions controls;

      iv.     Keeping records for operational monitoring for the EtO emissions controls affecting certain aeration rooms; and

      v.     Notifying IEPA promptly of permit deviations including identifying the date, time, duration, description of the deviation, its

FILED DATE: 4/16/2021 2:00 PM    2018L010475

probable cause, corrective actions, if taken, and preventative measures, if taken.

q. Certifying the facilities' permit compliance (or non-compliance) to the IEPA;

r. Communicating with IEPA regarding permit violations and uncontrolled emissions events;

s. Communicating with IEPA about its emission control equipment, including its plans to exhaust EtO from its chamber back vents to the atmosphere;

t. Monitoring and reviewing of the facilities' emission data to analyze the duration and quantity of EtO emissions released, including any excess emissions;

u. Reporting to IEPA on the volume of the facilities' EtO emissions;

v. Monitoring the facilities' emissions control equipment;

w. Assessing the capacity of the EtO sterilization chambers at the Willowbrook facilities as compared to customer demand for its sterilization services;

x. Deciding to add EtO sterilization chambers at the facilities to meet customers' demand;

y. Inventorying hazardous chemicals stored at the facilities, including EtO; and

z. Communicating with state and local emergency response groups about such hazardous chemicals, including EtO.

27.     Sotera undertook these responsibilities and functions even though, as alleged elsewhere in this complaint, it failed to ensure implementation adequate to keep the community safe.

28.     With respect to the Willowbrook facilities, the activities of Sterigenics U.S. and Sotera have been intertwined. Sterigenics U.S. and Sotera have routinely and publicly held

FILED DATE: 4/16/2021 2:00 PM 2018L010475

themselves out as a single entity – "Sterigenics" – engaged in operating EtO sterilization facilities throughout the country, including the Willowbrook facilities; and others, including Moody's Investor Services, for example, has always treated the Sterigenics entities as a single entity and issued them a single "Corporate Family Rating." Indeed, Sterigenics U.S. and Sotera have shared the same Chairman and CEO, the same Vice President, the same General Counsel & Secretary, the same President and COO, and the same Vice President for Environmental, Health & Safety. And they have shared a complete unity of interest, with Sterigenics U.S. acting as an instrumentality of Sotera to accomplish Sotera's business mission.

29.     Defendant Bob Novak was the Operations Manager at the Willowbrook facilities since August 2003. He was responsible throughout this period for coordinating and overseeing the operation of the facilities, directing personnel at the facilities, implementing procedures, and ensuring overall safety at the facilities. Upon information and belief, Mr. Novak resides in Illinois.

30.     Defendant Roger Clark was the Maintenance Supervisor at the Willowbrook facilities from the late 1980s until approximately 2015. Mr. Clark was responsible throughout this period for calibrating the internal EtO monitors and overseeing the maintenance activities at the facilities which included, among other responsibilities, monitoring and replacing emissions systems equipment. Mr. Clark resides in Cook County, Illinois.

31.     In 2011, a private equity trust managed by GTCR acquired Sterigenics International, LLC (now Sotera), along with its subsidiaries (including Sterigenics U.S.) and parent companies, for $675 million.[5] From 2011 through the present, GTCR, with its principal

---

[5] https://www.gtcr.com/gtcr-announces-agreement-to-acquire-sterigenics-international-inc/

FILED DATE: 4/16/2021 2:00 PM   2018L010475

place of business at 300 N. LaSalle Street, Suite 5600, Chicago, Illinois, has owned, operated, managed, and/or maintained Sterigenics U.S. and Sotera.

32.     Defendants Sterigenics U.S., Griffith Labs, Sotera, and GTCR do regular and substantial business in Cook County, Illinois.

### IV. Griffith Labs is responsible for EtO emissions from the Willowbrook facility up until at least May 14, 1999, when it sold its sterilization business

#### A. Griffith Labs decided to locate an EtO Sterilization facility in Willowbrook notwithstanding its knowledge that exposure to EtO is harmful to human health and can cause cancer

33.     Griffith Labs claims to have pioneered the development and use of EtO as a sterilant in the 1930s. In the 1940s, Griffith Labs received patents for the EtO sterilization of hospital and medical supplies. Beginning in the 1950s, Griffith Labs began offering contract EtO sterilization to third-party customers. Griffith Labs continued its contract sterilization business for decades, and in or around 1984, it opened and operated an EtO sterilization facility in the Village of Willowbrook — a suburban community located roughly 20 miles southwest of Chicago with a population of approximately 8,500.

34.     Before 1984, Griffith Labs knew or should have known that it was too dangerous to locate an EtO sterilization facility in or near a residential community, and indeed that any sterilization facility anywhere should be equipped with emission control equipment adequate to ensure that no one outside the facility was exposed to EtO.

35.     Griffith Labs' decision to locate its EtO sterilization facility in Willowbrook was driven by logistical and financial self-interest, such as Griffith Labs' belief that Willowbrook would be an optimal location because it is centrally located in the Midwest near highways and

FILED DATE: 4/16/2021 2:00 PM    2018L010475

railroads and because it was able to secure favorable lease terms. Griffith Labs' decision was also driven by a desire to expand its ethylene oxide sterilization services to the commercial sterilization of medical supplies. In making its decision, Griffith Labs ignored its knowledge that placing an EtO sterilization facility in or near a residential community would cause significant risk to human health. Griffith Labs could have secured a facility far enough away from a residential population to drastically reduce and/or minimize the danger to residents, but consciously chose not to.

36.    On or about April 12, 1984, Griffith Labs, through its unincorporated division, Micro-Biotrol, Co[6]., leased a 44,939 square foot facility at 7775 Quincy Street in Willowbrook for the stated purpose of: "Sterilization process of various products." The lease terms were originally for five years, with multiple options to renew for another five years thereafter. In this way, Griffith Labs ensured that a dangerous EtO sterilization facility would operate next to a residential neighborhood in Willowbrook for many years to come.

**B. Griffith Labs' dealings with IEPA in securing a permit to operate an EtO sterilization facility in Willowbrook**

37.    On or about May 31, 1984, in anticipation of constructing and operating the sterilization facility in Willowbrook, Griffith Labs created the plot below:

---

[6] Sterigenics U.S. has also not assumed the liabilities for Micro-Biotrol, Co. Because Micro-Biotrol Co., was an unincorporated division of Griffith Labs, Griffith Labs is directly responsible for its conduct.

FILED DATE: 4/16/2021 2:00 PM   2018L010475



GRIFFITH LABORATORIES U.S.A., INC.
12200 SOUTH CENTRAL AVE, ALSIP, IL 60658

MICRO-BIOTROL CO. MIDWEST REGION
PLOT/PLAN WILLOW BROOK PLANT

PROJECT NO.:

| DRAWN BY: J. FENDERSON DATE: 5-31-84 | APP'D. BY: | DATE: |
| CHECKED BY:          DATE: | APP'D. BY: | DATE: |
| SCALE: NONE | APP'D. BY: | DATE: |
| JOB AND LOCATION: | DRAWING NO. MB-145-B | REV. |

38.     In making this plot, Griffith Labs marked off the distances from its EtO facility in Willowbrook to various schools, and therefore knew its facility would be located within ½ mile of Gower Elementary; one mile of Hinsdale South High School; two miles of Gower West Elementary; ¼ mile of the nearest residence to the west; ½ mile of the nearest residence to the south; and otherwise in the immediate proximity of many homes, parks, schools, and small businesses.

39.     Griffith Labs further knew that EtO emissions from its Willowbrook facility could and would migrate to each of the locations on the plot, including those listed on the plot, in concentrations that would endanger human health.

40.     Notwithstanding this knowledge, Griffith Labs elected to move forward with its plans to open an EtO sterilization facility in Willowbrook and, on or about June 1, 1984, applied for a construction and operating permit from IEPA.

41.     Griffith Labs' permit application to IEPA included the above plot and also included a representation to IEPA that its maximum emissions of EtO would be 40 tons (80,000 lbs.) per year.

42.     On or about July 6, 1984, Griffith Labs received the following letter from IEPA concerning the environmental impact of its proposed EtO emissions (highlighting added):

***

FILED DATE: 4/16/2021 2:00 PM    2018L010475

 Illinois Environmental Protection Agency · 2200 Churchill Road, Springfield, IL 62706

217/782-2113

I.D. No.: 043110AAC
Application No.: 84060002

July 6, 1984

Griffith Laboratories
12200 South Central Avenue
Alsip, Illinois 60658

Attention: John Kjellstrand

This is in response to a telephone call from Mr. Dickinson to Mr. Cobb on
July 3, 1984, concerning the environmental impact of ethylene oxide
emissions from the six proposed sterilizers included in the above
mentioned construction permit application.

According to the information provided by your company in the application,
the maximum emissions of ethylene oxide were 40 tons per year during
1983.   The data you provided included a building which may cause a
downwash effect, therefore, the ISCST model was used in the analysis.
ISCST utilized one year of meteorology (1975 Midway), the urban
dispersion mode and the building downwash option.  Model results were
obtained at 180 receptors located on five rings surrounding the source.
Each ring contained 36 receptors spaced at $100^{\circ}$ intervals.  The rings
were spaced at radial distances of 100, 400, 810, 1205, and 1609 meters
from the source.  According to the modeling run, the maximum annual
ground level concentrations of ethylene oxide will vary from 3.120
micrograms per cubic meter at 100 meters to 0.09883 micrograms per cubic
meter at one mile outside the plant boundary line.  A copy of the modeled
annual concentrations is attached.

The ethylene oxide (ETO) toxicity data was derived from different
literature references.  One such document is a USEPA draft publication --
"Health Assessment Document - Ethylene Oxide - EPA 600-8-84-009A."  A
copy of this document can be obtained by calling USEPA at phone number
513/684-7562.

The toxicity data provides evidence of human cancers of the pancreas,
bladder, brain, central nervous system and stomach associated with ETO
exposure.  Various animal studies have shown carcinogenic, mutagenic,
leukogenic and teratogenic effects.  These studies indicate that the
acceptable ground level concentrations of ETO is 0.007 micrograms per
cubic meter.  While the Agency does not have any established standards
for ETO at this time, nor are we suggesting that the acceptable
concentrations referenced above are necessarily the numbers that we are
committed to using, in our opinion the emissions from the Micro Biotrol
facility appear to be several magnitudes higher than desirable.

18

FILED DATE: 4/16/2021 2:00 PM    2018L010475



Illinois Environmental Protection Agency · 2200 Churchill Road, Springfield, IL 62706

Page 2

We request a meeting as soon as possible to be able to better explain our evaluation and concerns.  In our opinion, there are several methods by which emissions of ETO at this facility can be reduced.  At our meeting, we wish to also discuss steps that can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level.

We are looking forward to hearing from you in the near future.  In the meantime, should you have any questions, please feel free to call Jim Cobb, Harish Desai or me at 217/782-2113.

Very truly yours,

Bharat Mathur, P.E.
Manager, Permit Section
Division of Air Pollution Control

BM:JDC:sd/1392d/24-25

cc: Warren Dickinson, Griffith Laboratories
    Dennis Lawler
    Permit File
    Region 1

43.     This July 6, 1984 letter from IEPA specifically addressed the ***"environmental impact"*** of ethylene oxide emissions from the sterilization chambers Griffith Labs sought to operate in Willowbrook. As Griffith Labs' Project Engineer for the Willowbrook facility later testified, the "environmental impact" from the facility included the neighboring residents' exposure to EtO and their resulting risk of contracting cancer.

44.     By way of this July 6, 1984 letter, Griffith Labs was expressly advised by the state regulatory authority that its EtO sterilization operation posed significant adverse health risks to humans in that: (i) EtO exposure is associated with human cancers; and (ii) EtO has carcinogenic, mutagenic, leukogenic, and teratogenic effects. Griffith Labs thus had knowledge that its EtO

emissions would cause harm to humans in neighboring communities long before it exposed any Plaintiff or Plaintiff's decedent to EtO emissions.

45.    As Griffith Labs' Project Engineer later testified, IEPA was warning Griffith Labs by this letter that at least two of the schools and two residential areas on the plot (*see* Paragraph 37) were within the area where IEPA had determined that EtO concentrations from the Willowbrook facility would be "several magnitudes higher than desirable".

46.    Indeed, Griffith Labs was already aware of the toxic and deadly effects of EtO when it received the July 6, 1984 letter from IEPA. Even before that date, and before any Plaintiff or Plaintiff's decedent was exposed to EtO emissions, Griffith Labs knew that:

a.    there was "no safe level" of EtO, *i.e.*, there was no concentration of EtO that could be safely breathed without risk of serious damage to health;

b.    "ethylene oxide has also been found to pose a serious health risk";

c.    the very attribute which made EtO so lethally effective as a sterilant— *e.g.*, its ability to inactivate DNA—also made EtO very dangerous for human beings exposed to it;

d.    the state of Illinois recognized EtO as one of the 19 most dangerous chemicals (a "priority" pollutant);

e.    EtO was suspected to cause cancer in humans, and threaten reproductive harm;

f.    "the highly toxic nature of ethylene oxide and its classification as a suspect carcinogen";

g.    any exposure to EtO that threatened to cause even one additional cancer in a population of 1,000,000 was unacceptable;

h.    those exposed to EtO emitted from a sterilization facility were significantly more likely to contract cancer and other serious illnesses;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

    i.   EtO was a "mutagen", *i.e.*, that it damaged human DNA in a way that promoted the development of cancer;

    j.   "[t]here has been widespread recognition of the mutagenic potential of ethylene oxide";

    k.   once emitted from a sterilization facility, EtO would be breathed by those living, working, and attending school near the facility; and

    l.   "human receptors outside of the building may unknowingly come into contact with ethylene oxide before it has been sufficiently dispersed in the ambient atmosphere."

47.    As a result, and well before it began operations in Willowbrook, Griffith Labs was acutely aware of the catastrophic risk to human health that inhalation exposure to EtO would create.

48.    In addition to warning Griffith Labs about the health risks of EtO, the IEPA letter expressly told Griffith Labs that IEPA's air modeling raised substantial concerns that the surrounding Willowbrook community would be adversely impacted by Griffith Labs' EtO emissions. In particular, it informed Griffith Labs that: (i) emissions from the Willowbrook facility appear to be **"several magnitudes higher than desirable"**; and (ii) steps should be taken to "minimize emissions in order to reduce the ambient impacts to an acceptable level."

49.    Moreover, Griffith Labs knew or should have known when it received IPEA's letter that IEPA's modeling results vastly understated the risk to Griffith Labs' neighbors that the Willowbrook emissions would pose. According to the letter, IEPA had based its EtO modeling in part on Griffith Labs' representation that its maximum emissions would be 40 tons (80,000 lbs.) per year. Upon information and belief, Griffith Labs knew that its emissions going forward would be significantly more than 80,000 pounds per year. In fact, in 1985, the Willowbrook facility

FILED DATE: 4/16/2021 2:00 PM    2018L010475

emitted more than 125,000 pounds of EtO. In each of 1986 and 1987, it emitted more than 160,000 pounds of EtO.

50.     Further, Griffith Labs' representation to IEPA that it had emitted 40 tons of EtO during the year of 1983 was itself understated. In an internal memorandum dated May 3, 1984, Griffith Labs discloses that it had actually emitted approximately 50 tons in 1983. Griffith Labs never corrected its misrepresentation to IEPA.

pollutant constitutes a major stationary emission source. Since our total emissions are approxiamtely 50 tons per year (calendar 1983) and our anti-cipated growth is to 65 tons per year in 5 years, the part 203 does not

51.     The same internal memo also predicted that Griffith Labs would grow to emit 65 tons per year. Griffith Labs did not disclose this fact to IEPA either.

52.     As a result, Griffith Labs knew or should have known that IEPA's opinion that its emissions would be "several magnitudes higher than desirable" was based on modeling that only accounted for about half of what Griffith Labs actually intended to emit. Griffith Labs never corrected IEPA's modeling assumptions at any point prior to receiving its permit.

53.     Separately, upon information and belief, Griffith Labs misinformed IEPA about the height of the stack it would use at Willowbrook to release EtO emissions. The height of the stack is important because, in general, the higher the stack, the greater the EtO concentrations will be diminished before they descend to the zone in which they are breathed by, e.g., residents, workers, and schoolchildren. In connection with its 1984 permit application, Griffith Labs told IEPA that the stack exhaust point would be 40-50 feet above grade. However, upon information and belief, the actual exhaust point was only 28 feet above grade.

22

54.     As a result, Griffith Labs knew or should have known that IEPA's opinion that its emissions would be "several magnitudes higher than desirable" was based upon modeling that used a falsely inflated stack height. Griffith Labs never corrected IEPA's modeling assumptions at any point prior to receiving its permit.

55.     Even further, Griffith Labs took essentially no action in connection with IEPA's stated concerns about its "minimiz[ing] emissions in order to reduce the ambient impacts to an acceptable level." Instead, once Griffith Labs received its permit, it operated without any emission controls designed to remove or eliminate EtO from emissions and thereby caused massive unfiltered emissions of EtO into the Willowbrook community 24 hours a day, 7 days a week, 365 days a year. Griffith Labs did so notwithstanding its knowledge that: (a) toxicity data showed that EtO exposure was associated with human cancers and other harms; (b) the facility was located within the immediate proximity of homes, parks, schools, and small businesses; and (c) IEPA's (understated) modeling predicted emissions "several magnitudes higher than desirable."

56.     Indeed, by no later than 1982, Griffith Labs knew that emission control technology was available that could remove up to 99% of EtO from the Willowbrook facility's exhaust before it was allowed to enter Willowbrook's air. Despite knowing of the availability of this technology before operating in Willowbrook, Griffith Labs specifically declined to use it for essentially the first four years of Willowbrook operations.

**C. Griffith Labs' received an operating permit for the Willowbrook facility that was subject to special conditions with which Griffith Labs failed to comply**

57.     On July 30, 1984, IEPA issued Griffith Labs a Joint Construction and Operating Permit to construct and operate sterilization chambers 1, 3, 4, 5, 9, and 10 at the Willowbrook facility.

 Illinois Environmental Protection Agency · 2200 Churchill Road, Springfield, IL 62706

217/782-2113              JOINT CONSTRUCTION AND OPERATING PERMIT

PERMITTEE

Griffith Laboratories, U.S.A., Inc.
12200 S. Central Avenue
Alsip, Illinois  60658

Attention:    John Kjellstrand


Application No.: 84060002              I.D. No.: 043110AAC
Applicant's Designation: STERILIZER   Date Received: June 1, 1984
Subject: Gas Sterilization System
Date Issued: July 30, 1984             Operating Permit Expiration
                                       Date: July 31, 1986
Location: 7775 Quincy St., Willowbrook, Illinois

58.     The permit was issued to "Griffith Laboratories, U.S.A., Inc." (i.e., Griffith Labs) for its operation of the Willowbrook facility. The permit had a two-year term, expiring on July 31, 1986. Griffith Labs never attempted to amend or correct this permit in any way, including to substitute any other entity as the permit holder.

59.     The 1984 permit, as well as all permits relating to the Willowbrook facility issued thereafter, expressly warned Griffith Labs the permit did *not* release it from liability for harm to its neighbors. They stated:

    a.  the permit "does not release the permittee from any liability for any loss due
        to damage to person or property caused by, resulting from, or arising out

24

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

of, the design, installation, maintenance, or operation of" the Willowbrook facility.

b.  the permit "in no manner implies or suggests that the [IEPA] . . . assumes any liability, directly or indirectly, for any loss due to damage, installation, maintenance or operation" of the Willowbrook facility.

c.  the Willowbrook facility could not be operated in such a manner as to "cause a violation of the Environmental Protection Act or Regulations promulgated thereunder," all of which forbid air pollution in the State of Illinois.

60.  As the permittee for the Willowbrook facility, Griffith Labs was responsible for the following operations:

a.  sterilization processes for the six chambers for which it received a permit;

b.  emissions of EtO and other volatile organic materials from the facility;

c.  the acquisition, installation, and operation of pollution controls at the facility;

d.  testing and monitoring for levels of EtO both in the facility and the environment;

e.  monitoring, testing, maintenance, and repair of all equipment involved in the sterilization processes at the facility;

f.  maintaining emission records and reporting to IEPA and as otherwise required by law;

g.  ensuring that its emissions and emission controls were compliant with local, state, and federal law;

h.  monitoring and reviewing the facility's emission data to analyze the duration and quantity of EtO emissions released, including any excess emissions;

i.  assessing the capacity of the EtO sterilization chambers at the Willowbrook facility as compared to customer demand for its sterilization services;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

     j.    inventorying hazardous chemicals stored at the facilities, including EtO; and

     k.    communicating with state and local emergency response groups about such hazardous chemicals, including EtO.

61.    Griffith Labs undertook these responsibilities and functions even though, as alleged elsewhere in this complaint, it failed in its duty to ensure that its implementation of these responsibilities and functions was adequate to keep the community safe.

62.    In addition, as part of the 1984 operating permit issued to Griffith Labs by IEPA, several special conditions were imposed on Griffith Labs to address IEPA's concerns about the environmental impact of Griffith Labs' EtO emissions, including that:

     a.    Griffith Labs was required to conduct ambient air monitoring for a one-year period and submit a final report by December 1, 1985; and

     b.    Griffith Labs was required to "investigate the availability of emission reduction measures for ethylene oxide."

63.    Griffith Labs failed to comply with either special condition and, upon information and belief, misled IEPA as to both.

64.    Griffith Labs' obligation to monitor EtO concentrations in the ambient air outside the Willowbrook facility required that monitoring be conducted at locations in between the facility and the local residents, workers, and schoolchildren. The plain intent of this requirement was so that Griffith Labs and IEPA would know the concentrations of EtO that were being emitted from the facility and carried by air currents into the surrounding neighborhoods. Ultimately, the monitoring would determine the extent of the threat to the health of Griffith Labs' neighbors posed by the facility's EtO emissions.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

65.    Despite its obligation to conduct such monitoring, and its knowledge that the purpose of the monitoring was to provide critical information about the seriousness of threats posed to its neighbors' health by its EtO emissions, Griffith Labs never monitored the ambient air nor ever made any effort to determine the ambient air EtO concentrations, such as by modeling them.

66.    Instead, Griffith Labs told IEPA that the monitoring equipment it purchased was not dependable and was malfunctioning. But instead of trouble-shooting the equipment with the supplier or getting new equipment (which was readily available), Griffith Labs simply ignored the requirement that it conduct ambient air monitoring, thereby also ignoring the serious threat to human health posed to those who lived and worked near its Willowbrook facility.

67.    Due to Griffith Labs' initial failure to comply with the ambient air monitoring requirement and submit a final report by December 1, 1985, IEPA "extended" Griffith Labs' deadline to do so until July 31, 1986. Griffith Labs, however, did not perform ambient air monitoring or submit a final report by that date, either. Throughout Griffith Labs' 15-year control of facility operations, it *never* performed the ambient air monitoring it had been told was necessary to perform back in 1984.

68.    Upon information and belief, Griffith Labs made a decision not to conduct ambient air monitoring because (i) it did not care about the harm its EtO emissions would cause those who lived and worked in the Willowbrook community; and (ii) it knew that actual monitoring would reveal to regulators that its EtO emissions were too dangerously high to warrant continued operation of the facility—either at all, or without installing significant and expensive emission control equipment.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

69.     Griffith Labs' decision in this regard – a classic example of "profits over people" – exhibited reckless indifference and conscious disregard for the health and safety of its neighbors in the Willowbrook community.

70.     Griffith Labs also failed to comply with and/or misled IEPA about the requirement that it "investigate the availability of emission reduction measures for ethylene oxide." Griffith Labs was told in March 1983 – over one year before it submitted its permit application for the Willowbrook facility – that a Deoxx emission reduction system was certified as "Best Available Control Technology" and that the system was available for about $118,000. Even though Griffith Labs was well aware of the availability of this emission reduction technology for ethylene oxide when it applied for and received its permit, it stalled compliance with the requirement to purchase and implement it by falsely telling IEPA that it would have to "investigate [its] availability."

**D. Griffith Labs' own independent acts and omissions contributed to cause Plaintiffs' injuries**

71.     Illinois law recognizes that multiple parties may contribute to cause a given injury. 735 ILCS 5/2-1117; *Sperl v. Henry*, 2018 IL 123132, ¶¶ 24-25 (2018).

72.     At all times between 1984 and May 14, 1999, Griffith Labs was obligated to comply with the Illinois Environmental Protection Act and its supporting regulations, which prohibited "the emission of any contaminant into the environment so as to cause or tend to cause air pollution in Illinois;" defined as "emissions sufficient "to be injurious to human life [or] health."

73.     Griffith Labs' conduct, as detailed in the paragraphs immediately below, breached its duty in this regard and was a substantial contributing factor in causing injury to every Plaintiff

or Plaintiff's decedent who lived and/or worked in the immediate vicinity of the Willowbrook facility up until May 14, 1999, when Griffith Labs sold the company.

*Griffith Labs greatly enhanced the danger to its neighbors by expanding its EtO operations in Willowbrook*

74.    As discussed above, in 1984, Griffith Labs located an EtO sterilization facility in a residential community, knowing that area residents, workers, and schoolchildren would be exposed to the facility's EtO emissions, and as a result would be significantly more likely to contract cancer and other serious illnesses.

75.    In 1999, Griffith Labs authorized and funded the establishment, construction, and operation of an additional EtO sterilization facility in Willowbrook (Willowbrook II), despite knowing that the first Willowbrook facility had never been operated safely, and that Willowbrook II could not be operated safely. The impact of Willowbrook II was to further inundate the Willowbrook area and its residents with thousands of pounds of unnecessary and dangerous EtO emissions, in addition to the EtO emitted from the first Willowbrook facility.

76.    Griffith Labs also authorized and funded the use of several "off-site" facilities in the Willowbrook area, including facilities at: (i) 407 Heathrow Court in Burr Ridge; (ii) 417 Heathrow Court in Burr Ridge; (iii) 261 Shore Drive in Burr Ridge; (iv) 7409 Quincy Street in Burr Ridge; and (v) 16 W 151 Shore Court in Burr Ridge. Upon information and belief, these facilities were used to store or treat sterilized products that were still off-gassing EtO. Upon further information and belief, these facilities had no emission controls such that all residual EtO from the off-gassing products at those facilities was emitted directly into the atmosphere.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

*Griffith Labs failed to monitor and model ambient air concentrations*

77.     Griffith Labs never monitored or modelled to determine the concentrations of EtO from the Willowbrook facility that those in the Willowbrook area would be breathing, even though Griffith Labs was obligated to do so by its permit, as described in Paragraphs 62 – 67, above.

78.     Griffith Labs knew that these monitoring results were very important to provide to IEPA so that it could do its job and determine whether the company was operating safely or unnecessarily dangerously.

79.     In fact, it had conducted and/or authorized ambient air modeling and monitoring at other of its EtO facilities.

80.     Griffith Labs consciously chose ***not*** to do the same in Willowbrook.

*Griffith Labs failed to timely or reasonably implement emission controls*

81.     At all times between July 1984 and May 14, 1999, Griffith Labs owned and controlled the sterilization and emission control equipment that was utilized at the Willowbrook facility. By participating in and authorizing the Willowbrook facility's decisions about the use of that equipment, Griffith Labs had the responsibility to ensure the adequacy of such equipment to protect its neighbors in the Willowbrook community. This is demonstrated, *inter alia,* by the following:

> a.   All expenditures for sterilization and emission control equipment used in the operation of the Willowbrook facility had to be authorized before purchase by Griffith Labs. Without such authorization, the equipment could not have been purchased or used at the Willowbrook facility. Simply, the facility could not have operated without Griffith Labs' specific authorization.

b. Griffith Labs purchased and authorized for use at the Willowbrook facility sterilization and emission control equipment without which the facility could not function. Griffith Labs accomplished this via "Griffith Laboratories U.S.A. Purchase Order[s]" which it directed to specific Griffith Labs' vendors. An example of the purchase orders used by Griffith Labs is depicted immediately below, with emphasis added to show that the entity ordering and paying for the equipment was Griffith Labs:



c. Under its own "Griffith Laboratories U.S.A. Purchase Order[s]," Griffith Labs ordered equipment from its vendors, and directed the vendors to invoice Griffith Labs for payment thereon. Griffith Labs, in turn, paid the vendors for the equipment. For example:

  i. In 1986, Griffith Labs direct its vendor, Phillips Electric, Inc., to supply and install one complete computer control system for the 12-pallet EtO sterilization chamber No. 2 at the Willowbrook facility.

  ii. In 1986, Griffith Labs directed its vendor, Midwest Mechanical, Inc., to install one complete ventilation system for EtO sterilization chamber No. 2 at the Willowbrook facility.

  iii. In 1986, Griffith Labs directed its vendor Midwest Mechanical, Inc., to install all mechanical equipment and pipe that equipment according to a specific drawing for EtO sterilization chamber No. 2 at the Willowbrook facility.

  iv. In 1990, Griffith Labs direct its vendor, Midwest Mechanical, Inc., to install one complete nitrogen system for

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

sterilization chamber No. 2 with piping and mechanical work at the Willowbrook facility.

v. In 1991, Griffith Labs directed its vendor Midwest Mechanical, Inc., to supply labor and material and install purging systems for gassing stations 1, 2, 3, 5, 6, 7, 8, 9, and 10 at the Willowbrook facility.

d. At all times between 1984 and 1999, Griffith Labs owned all sterilization and emission control equipment utilized at the Willowbrook facility.

e. On multiple occasions during the 1980s and 1990s, and after October 1984, Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking permits to construct or operate the Willowbrook facility, represented to IEPA that Griffith Labs was the "Plant Owner." For example, a 1988 application for a permit to construct and operate the EtO sterilizer system in Willowbrook identifies Griffith Labs as the Willowbrook "Plant Owner."

f. On multiple occasions during the 1980s and 1990s, and after October 1984, Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking permits to construct or operate the sterilization system at the Willowbrook facility, represented to IEPA that the "Owner" of the sterilization system was Griffith Labs. The same 1988 application to IEPA referenced above identifies Griffith Labs as the owner of the EtO sterilizer system which needed the IEPA permission for construction and operation.

g. It was the Board of Directors of Griffith Labs which, on multiple occasions in the 1980s and 1990s, and after October 1984, supplied IEPA with the corporate resolution authorizing the operation of the Willowbrook sterilization system. Such authorization was legally required before IEPA could award a permit for the operation of a sterilization system at the Willowbrook facility. Indeed, the application specifically provides that:

THIS APPLICATION MUST BE SIGNED IN ACCORDANCE WITH PCB REGS., CHAPTER 2, PART 1, RULE 103(a)(4) OR 103(b)(5) WHICH STATES: "ALL APPLICATIONS AND SUPPLEMENTS THERETO SHALL BE SIGNED BY THE OWNER AND OPERATOR OF THE EMISSION SOURCE OR AIR POLLUTION CONTROL EQUIPMENT, OR THEIR AUTHORIZED AGENT, AND SHALL BE ACCOMPANIED BY EVIDENCE OF AUTHORITY TO SIGN THE APPLICATION."

IF THE OWNER OR OPERATOR IS A CORPORATION, SUCH CORPORATION MUST HAVE ON FILE WITH THE AGENCY A CERTIFIED COPY OF A RESOLUTION OF THE CORPORATION'S BOARD OF DIRECTORS AUTHORIZING THE PERSONS SIGNING THIS APPLICATION TO CAUSE OR ALLOW THE CONSTRUCTION OR OPERATION OF THE EQUIPMENT TO BE COVERED BY THE PERMIT.

Thus, pursuant to the legal requirements set forth in the permit application, any corporation that owned or operated "the emission source or air pollution control equipment," had to file a certified copy of a board resolution authorizing the construction or operation of the equipment. The *only* board of directors to supply such a resolution, or authorize the use of

the sterilization equipment at the Willowbrook facility, was Griffith Labs' (see below).



CERTIFIED COPY OF RESOLUTION

I, Gregory L. Schmidt, Secretary of Griffith Laboratories, US Inc., a Delaware Corporation, having custody of the corporate records thereof, do hereby certify that the Board of Directors adopted the following resolution during a Meeting of the Board of Directors, on May 23, 1984, which is in accordance with the law and the by-laws of said corporation.

RESOLVED, by the Board of Directors of the Company that it authorize Ralph A. Sair, its Senior Vice President or Donald E. Alguire or John Kjellstrand, respectively, President and Vice President of the Company's division, Micro-Biotrol Company, to cause or allow the construction or operation of the equipment to be covered by the Illinois Environmental Protection Agency permit to construct and operate such equipment at the Micro-Biotrol facilities at 7775 Quincy Street, Willowbrook, Illinois 60521.

In witness whereof, I have hereunto subscribed my name as Secretary and have caused the corporate seal of said corporation to be hereunto affixed, this 31st day of May, 1984.

_____ Secretary

Applications submitted to IEPA for Willowbrook facility permits in the 1980s and 1990s — and after October 1984 — included the above Griffith Lab's board resolution. No operator — not Micro-Biotrol or Griffith Micro Science — supplied such a board resolution.

h.   On multiple occasions during the 1980s and 1990s, and after October 1984, Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking permits to construct or operate the Willowbrook facility, represented to IEPA that the design of the facility's sterilization system was that of Griffith Labs'. Indeed, in the 1988 application to the IEPA for example, Griffith Labs' Process Flow Diagram, illustrating the EtO sterilization system process in order to obtain the permit, was submitted.

i.   Griffith Labs paid all permit and other regulatory fees relating to Willowbrook operations thereby, on each occasion, authorizing and

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM 2018L010475

funding the Willowbrook facility's continued operation and emission of dangerous amounts of EtO into the Willowbrook community.

j.   Griffith Labs mandated an operating strategy of seeking a competitive advantage by purchasing and directing the use of sterilization equipment designed to protect its workers and customers from exposure to EtO at the expense of exposing neighboring residents to even more EtO. Specifically, EtO concentrations inside the Willowbrook facility that were too dangerous for workers and customers to breathe were intentionally vented into the Willowbrook community, where they were breathed by area residents, workers, and schoolchildren.

82.    When the Willowbrook facility first began operating, Griffith Labs decided not to use any emission controls whatsoever even though it knew such controls were available and necessary. Thus, despite its knowledge that EtO emissions from its Willowbrook facility would make it significantly more likely that area residents, workers, and schoolchildren would contract cancer and other serious illnesses, Griffith Labs designed the Willowbrook facility without the emission controls that Griffith Labs knew were necessary to prevent such catastrophic outcomes.

83.    After about three years of operating without any controls, Griffith connected one of nine chambers to emission controls in July 1987. But, for the next nine months, until April 1988, Griffith Labs continued to operate eight of its sterilization chambers without any emission controls. As a result, for approximately the first four years of operation, close to 100% of all EtO used at the Willowbrook facility was emitted into the atmosphere.

84.    Griffith Labs made this decision despite its knowledge that it would result in the unnecessary emission of hundreds of thousands of pounds of EtO during over these four years, and gravely endanger its neighbors' health.

85.    Further, at all times between 1984 and May 14, 1999, Griffith Labs made a decision not to control EtO emissions from the Willowbrook facility's back-vents, aeration rooms, and

work aisles—three principal areas within the facility where EtO would collect after the products were sterilized.

86.     As Griffith Labs knew or should have known, this failure to control emissions from, e.g., back-vents, aeration rooms, and work aisles resulted in the unnecessary emission of EtO into the surrounding community of at least 25,000 pounds each year, or a total of at least 400,000 pounds between 1984 and 1999.

87.     Griffith Labs knew that these emissions, too, would gravely endanger its neighbors' health, but allowed them to occur anyway.

88.     As a result of Griffith Labs' decisions, at no time between 1984 and 1999 was the emission control equipment at Griffith Labs' Willowbrook facility adequate to protect the health of its neighbors.

*Griffith Labs' failure to warn those in the Willowbrook community that they were being exposed to a deadly carcinogen*

89.     As detailed above, Griffith Labs knew before it opened the Willowbrook facility that (a) toxicity data showed that EtO exposure was associated with human cancers and other harms; (b) the facility was located within the immediate proximity of homes, parks, schools, and small business; and (c) IEPA's (understated) modeling showed emissions were "several magnitudes higher than desirable."

90.     Nevertheless, Griffith Labs made the conscious and purposeful decision not to warn those living and working in the Willowbrook community that they would be exposed to and caused to inhale a carcinogen on a routine and continuous basis.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

91.     As a result of Griffith Labs' failure in this regard, those who lived and worked in the Willowbrook community were not able to adequately protect themselves or avoid the emissions and were forced to unknowingly inhale a potent human carcinogen for years on end.

*Griffith Labs failed to adhere to its own standard of care*

92.     Between 1984 and 1999, Griffith Labs made decisions at other EtO sterilization facilities in both the Unites States and other countries to use emissions control equipment far more effective at protecting the facilities' neighbors than the equipment it authorized for use at its Willowbrook facility.

93.     As examples, in 1996 and 1997, Griffith Labs' EtO facilities in Willowbrook and Santa Teresa, NM, used roughly the same amount of EtO, but the emissions in Willowbrook were about 90-100x higher:

| 1996 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
|---|---|---|---|---|---|
| Willowbrook | Controlled | Atmosphere | Atmosphere | 423,721 lbs. | **21,567 lbs.** |
| Santa Teresa | Controlled | Controlled | Controlled | 401,875 lbs. | **239 lbs.** |
| 1997 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
| Willowbrook | Controlled | Atmosphere | Atmosphere | 516,187 lbs. | **25,985 lbs.** |
| Santa Teresa | Controlled | Controlled | Controlled | 442,726 lbs. | **260 lbs.** |

94.     In 1998, Griffith Labs' EtO facility in Willowbrook used a little more than twice as much EtO as its facilities in Charlotte, NC, Glen Falls, NY, and Ontario, CA, but emitted 50 to 80 times more EtO into the atmosphere.

| 1998 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
|---|---|---|---|---|---|
| Willowbrook | Controlled | Atmosphere | Atmosphere | 595,203 lbs. | **30,829 lbs.** |
| Charlotte | Controlled | Controlled | Controlled | 234,572 lbs. | **562 lbs.** |
| Glen Falls | Controlled | Controlled | Controlled | 262,318 lbs. | **380 lbs.** |
| Charlotte | Controlled | Controlled | Controlled | 277,249 lbs. | **401 lbs.** |

95.     These actions by Griffith Labs prove that, between 1984 and 1999, Griffith Labs was not only aware of technology that would dramatically reduce the EtO to which the neighbors

of its sterilization facilities would be exposed, but was already using that technology at its own facilities. There was no legitimate justification for its failure to use the same technology at Willowbrook.

*Griffith Labs failed to properly consider science and medicine in making operational decisions*

96.     Throughout the entirety of the 1980s and 1990s, Griffith Labs continued to learn that respected public health agencies and organizations had concluded that EtO was extremely dangerous to human health. For example:

   a.  Between 1981 and 1994, the National Institute for Occupational Safety and Health ("NIOSH"); the US Department of Health and Human Services ("HHS"); US EPA; State of California; and World Health Organization ("WHO") concluded that EtO was, respectively, a potential occupational human carcinogen, with no safe level; "reasonably anticipated to be a human carcinogen"; "probably carcinogenic to humans"; "a carcinogen"; and "carcinogenic to humans".

   b.  In 1986, Griffith Labs learned that the state of California had modelled EtO emissions from Griffith Labs' facility in Southern California, and concluded that those emissions would cause a significant increase in EtO-related cancers for residents in the LA Basin.

97.     Despite this information about the human health dangers associated with EtO, Griffith Labs took no significant precautions to protect its Willowbrook neighbors. To the contrary, throughout the 1980s and 1990s, Griffith Labs worked—independently and through EtO industry organizations, lobbyists, lawyers, and public relations agents—to improperly dispute and distort independent studies showing the dangers of EtO, and to cause EtO to appear to be less dangerous than it really was. These efforts resulted in the allowance of greater emissions from the Willowbrook facility, further endangering the area's residents, workers, and schoolchildren. Among other tactics, Griffith Labs and the EtO industry:

FILED DATE: 4/16/2021 2:00 PM    2018L010475

    a.   successfully opposed implementation of back vent emission controls that would reduce EtO emissions;

    b.   opposed limits on the EtO concentrations to which workers in sterilization facilities could be exposed; such workplace concentrations impact the health of the workers, of course, but also serve as the source of "fugitive" EtO emissions, which escape the facility, and expose the facility's neighbors; and

    c.   funded scientifically baseless "studies," aimed at influencing independent public health studies on the health dangers of EtO with the ultimate purpose being to make EtO appear less dangerous to human health than Griffith Labs knew it to be.

*Griffith Labs misled IEPA*

98.   Between 1984 and May 14, 1999, Griffith Labs misrepresented to IEPA, or omitted

from disclosing to IEPA, the following significant information:

    a.   what Griffith Labs knew to be the dangers to human health caused by EtO emissions from sterilization facilities;

    b.   that Griffith Labs had emitted more EtO in 1983 than it told IEPA;

    c.   that Griffith Labs intended on emitting more EtO from the Willowbrook facility than IEPA modeled for;

    d.   that Griffith Labs' stack height where EtO would be released into the community was lower that what it told EPA;

    e.   that emissions control equipment to reduce EtO emissions were available to Griffith Labs when the Willowbrook facility was opened and for years thereafter before such equipment was installed;

    f.   that Griffith Labs was using emissions control equipment at its other EtO facilities that was far more protective of neighboring communities than the equipment its board of directors authorized for use at Willowbrook;

    g.   that the reporting of emissions from the Willowbrook facility was based on false assumptions about the effectiveness of Griffith Labs' emissions control equipment;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

h.  that fugitive EtO emissions from the Willowbrook facility were far greater than reported;

i.  that Griffith Labs was working with the EtO industry to improperly influence science and make EtO appear less dangerous to human health than it actually is, with the purpose of influencing regulators to permit unsafe levels of EtO emissions.

99.  By misleading IEPA on these issues, Griffith Labs was able to evade further regulatory scrutiny of the Willowbrook facility and its operations such that far more EtO was emitted into the Willowbrook community.

*Griffith Labs failed to properly train the operators of the Willowbrook Facility*

100.  Between 1984 and May 14, 1999, Griffith Labs mandated that all EtO operations at the Willowbrook facility be conducted in strict compliance with its procedures and activity engaged with Willowbrook facility employees to ensure that those procedures were being followed.

101.  As a result, up until the point where it sold the company on May 14, 1999, it was incumbent upon Griffith Labs to train on-site employees at the Willowbrook facility how to properly operate the facility so as to minimize EtO emissions to the Willowbrook community.

102.  Griffith Labs failed to train those employees on how to operate the Willowbrook facility in a manner that would protect Willowbrook area residents, workers, and schoolchildren from the extraordinary health dangers posed by exposure to EtO emissions. Among other things, Griffith :abs:

a.  failed to train employees to run aeration room emissions through the emission control system;

b.  failed to train employees to run back-vent emissions through the emission control system;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

    c.   failed to train employees to keep chamber doors, aeration doors, and exterior doors closed and sealed so as to prevent EtO from escaping directly into the atmosphere; and

    d.   failed to train employees to prevent and/or minimize off-gassing of sterilized products in areas that were not ventilated to emission controls.

*Griffith Labs failed to responsibly audit the Willowbrook Facility*

103.    Between 1984 and May 14, 1999, Griffith Labs was responsible for conducting safety audits of the Willowbrook facility, and did in fact conduct such audits.

104.    Griffith Labs, however, failed to conduct those safety audits in a manner that ensured that Willowbrook area residents, workers, and schoolchildren would be protected from the extraordinary health dangers posed by exposure to EtO emissions.

**E.  Micro-Biotrol Company's involvement at the Willowbrook facility does not negate Griffith Labs' liability.**

105.    On October 4, 1984, Griffith Labs formed a nominal corporate subsidiary, Micro Biotrol Company ("MBC"). On that date, Griffith Labs also purported to transfer certain, but not all, assets to MBC.

106.    However, these events of October 4, 1984 do not negate Griffith Labs' liability for its own conduct as set forth above. Instead, Griffith Labs may be held liable as a joint tortfeasor under Illinois law.

107.    The formation of MBC did not lead or cause Griffith Labs to reduce its involvement in the operations of the Willowbrook facility, or in the decision-making that caused and authorized the EtO emissions that in turn caused and contributed to Plaintiffs' cancers and other

FILED DATE: 4/16/2021 2:00 PM    2018L010475

illnesses. *Indeed, the great majority of the Griffith Labs' conduct described in Paragraphs 33 –*

*104, occurred <u>after</u> October 4, 1984.*

108.    Further, Griffith Labs' purported asset transfer agreement with MBC did **<u>not</u>**

transfer either (i) Griffith Labs' status or obligations relative to any permit issued by IEPA; or (ii)

any liability for injury to Willowbrook area residents caused by emissions from the Willowbrook

facility.

109.    While MBC and its successors nominally operated the Willowbrook facility

(hereinafter "Operators"), Griffith Labs' participation in facility operations exceeded the accepted

norms of parental oversight, and Griffith Labs mandated and directed an overall course of action

for the facility's operators which surpassed the control exercised as a normal incident of

ownership.  Facts relevant to this conclusion include, *inter alia:*

    a.  Griffith Labs' independent obligations and tortious conduct set forth
        above.

    b.  At all times through May 14, 1999, Griffith Labs was the 100% owner of the
        facility's operators.

    c.  While the facility's operators were nominally corporations themselves,
        upon information and belief, the boards of directors of these operators
        never met to consider matters related to the Willowbrook facility. Instead,
        all such board-level decisions were made by the Griffith Labs' board of
        directors.

    d.  There was no separate identity between Griffith Labs and the facility's
        operators. There was no arms-length relationship between them, including
        the fact that there was no documentation of the contracts and agreements
        between them, and no separate bank accounts. Griffith Labs and the
        facility's operators commingled funds in bank accounts that Griffith Labs
        controlled.

    e.  Griffith Labs required the facility's operators to conduct Willowbrook
        sterilization operations in strict compliance with Griffith Labs' procedures,

FILED DATE: 4/16/2021 2:00 PM   2018L010475

which, as stated above, were grossly deficient in protecting Willowbrook area residents from exposure to health endangering EtO concentrations, violated emissions standards established by the State of Illinois and Village of Willowbrook, and indeed caused and contributed to cause Plaintiffs' cancers and other illnesses.

f.  Griffith Labs provided the facility's operators its intellectual property, trade-secrets, and sterilization know-how to operate the Willowbrook facility.

g.  Griffith Labs directly participated in operational decisions that impact environmental health and safety.

h.  Griffith Labs controlled all operating funds; the facility's operators had no funds of their own, and could not have existed independently of Griffith Labs. The facility's operators had no access to funds without first requesting them, or borrowing them, from Griffith Labs.

i.  Griffith Labs paid for, or had to approve payment of, any expenditure related to the Willowbrook facility.

j.  Griffith Labs provided the facility's operators with financial and administrative services for essentially every aspect of Willowbrook operations, including information systems, finance and accounting, treasury, legal, insurance and risk management, taxation, human resources and employee benefits, strategic planning, management services, and systems and procedures.

110.  Griffith Labs even dealt with regulators on behalf of the operators when it was determined sterilization facilities were not in compliance with statute or regulation. For example, in 1993, Griffith Labs' Chairman, Dean Griffith, *personally* corresponded with the FDA regarding Griffith Labs' New Mexico EtO sterilization facility's failure to meet FDA regulations. Mr. Griffith personally directed operator employees on how to respond to the regulatory issues and informed the FDA that he was personally involved, personally directing the operator's plan of action to remedy violations, and requiring that operator personnel report to him directly regarding progress.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

### V.    Ethylene Oxide as a Known Carcinogen

111.    At the center of this case is that from approximately July 1984 to February 2019, Defendants emitted EtO, a known carcinogen, into the Willowbrook community. Before the Willowbrook facility ever began operation, Griffith Labs knew that its EtO emissions would be harmful to the communities surrounding its facility whose residents and workers would breathe the ambient air.

112.    The DNA-damaging properties of EtO have been studied since the 1940s. For more than 40 years, EtO has been consistently recognized as dangerous, toxic, and carcinogenic.

113.    In a 1977 report, the National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in human populations. The report recommended that EtO be considered as mutagenic and potentially carcinogenic to humans and therefore that alternative sterilization processes be used whenever available. Occupational exposure studies like this one and others were and are relied upon by medical, scientific, and industry experts to determine the risk of harm of inhalation exposure to non-workers, like Plaintiffs and their decedents. Similarly, studies involving animals were and are relied upon by medical, scientific, and industry experts to determine the risk of harm of inhalation exposure to humans, like Plaintiffs and their decedents. Griffith Labs was or should have been aware of such studies which gave them the knowledge long before opening the Willowbrook facility that its EtO emissions would foreseeably harm persons in the neighboring communities.

114.    In 1981, NIOSH released a new bulletin focusing on new evidence of the carcinogenic, mutagenic, and reproductive hazards associated with EtO, reiterated that EtO was

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a potential occupational carcinogen, and reported that no safe levels of EtO exposure had been demonstrated.

115.     In 1985, the U.S. Department of Health and Human Services ("U.S. HHS") Fourth Annual Report on Carcinogens classified EtO as "reasonably anticipated to be a human carcinogen."

116.     Also beginning in 1985, the U.S. Environmental Protection Agency ("U.S. EPA") categorized EtO as "probably carcinogenic to humans."

117.     In 1987, the State of California (home to at least two Sterigenics EtO sterilization facilities) officially designated EtO a carcinogen.

118.     In the early 1990s, NIOSH published a high quality, long-term research study on EtO's carcinogenic impacts on humans. It tracked the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and the 1980s at sterilizer facilities much like the Willowbrook facilities. (According to Sterigenics Senior Vice President of Global Environmental, Health, and Safety, Kathleen Hoffman, the studied facilities included more than one operated by Sterigenics.[7])

119.     The study found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. It has since been heavily cited and relied on by major regulatory organizations including the World Health Organization ("WHO") and the U.S. EPA.

---

[7] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf

FILED DATE: 4/16/2021 2:00 PM    2018L010475

120.    In 1994, the WHO International Agency for Research on Cancer ("IARC") found that "Ethylene Oxide is carcinogenic to humans," designating EtO as a Group 1 human carcinogen (the agency's highest risk classification for cancer).

121.    In 2000, the U.S. HHS Ninth Annual Report on Carcinogens classified EtO as "known to be a human carcinogen."

122.    In 2002, a U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") fact sheet on EtO stated that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[8]

123.    In 2016, the EPA's Integrated Risk Information System ("IRIS") reclassified EtO as "carcinogenic to humans," and increased its estimate of EtO's cancer potency by 30 times.[9] The U.S. EPA concluded that EtO is carcinogenic to humans by the *inhalation route of exposure* with a stated confidence level of "HIGH."

124.    Acute exposure to EtO can result in nausea, vomiting, neurological disorders, bronchitis, pulmonary edema, and emphysema.

125.    Chronic exposure to EtO can irritate the eyes, skin, nose, throat, lungs, and can cause harm to the brain and nervous system leading to headaches, nausea, memory loss, and numbness.

126.    Chronic inhalation exposure to EtO can also cause reproductive and developmental impairments. Evidence recognized by the U.S. EPA indicates that inhalation

---

[8] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf
[9] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf

exposure to EtO can cause an increased rate of miscarriages in females. Evidence also indicates that EtO inhalation exposure can cause decreased sperm concentration and testicular degeneration in males.

127.    Additionally, inhalation exposure to EtO can cause mutations and chromosomal damage that can lead to birth defects and cancer. Even when exposure to EtO diminishes or ceases, the frequency of sister chromatid exchanges (mutations/chromosomal alterations) have been found to remain elevated.

128.    Chronic inhalation exposure to EtO also causes cancer. Evidence recognized by the U.S. EPA indicates that inhalation exposure to EtO causes various cancers including but not limited to lymphatic cancers, leukemia, and breast cancer. There is also evidence that EtO causes tumors in the body and reproductive issues in both men and women, as well as birth defects.

129.    At all relevant times during their respective operations and/or direct participation with the Willowbrook facilities, Defendants knew or should have known that EtO is toxic and dangerous to human health and well-being. In addition, Defendants knew or should have known that EtO is classified as a carcinogen and has been determined to cause the various illnesses and ailments described above.

130.    At all relevant times during their respective tenures at Sterigenics, Defendants Bob Novak and Roger Clark knew or should have known that EtO is toxic and dangerous to human health and well-being. In addition, Mr. Novak and Mr. Clark knew or should have known that EtO is classified as a carcinogen and has been determined to cause the various illnesses and ailments described above.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

131.     As described above, as early as in July 1984, Griffith was told by the IEPA that "the toxicity data provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure. Various animal studies have shown carcinogenic, mutagenic, leukogenic, and teratogenic effects." In the same letter, the IEPA opined that there were "several methods" to reduce EtO emissions and requested a meeting to "discuss steps that can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level." That same information was known or should have been known by all Operators of the Willowbrook Facilities and all Defendants.

132.     Accordingly, based on Griffith Labs' industry expertise as the pioneer of EtO sterilization, and all Defendants' knowledge of medical and scientific studies and reports dating back to the 1940s relating to the effects of EtO inhalation exposure (all of which scientific, medical, and industry professionals relied and rely upon to determine the risk of harm to persons like Plaintiffs and their decedents from inhalation exposure to EtO), and direct communications and warnings from IEPA, it was reasonably foreseeable to Defendants that their EtO emissions would far exceed levels safe for those in neighboring communities. Therefore, it was at all times reasonably foreseeable to Defendants that their Willowbrook operations would pose an unreasonable risk of harm to Plaintiffs and their decedents.

133.     Notwithstanding Defendants' respective knowledge concerning the dangers of the sterilization operations in Willowbrook and the adverse health impacts of chronic inhalation exposure to EtO, Defendants chose to operate the facilities in a densely populated residential area and emitted hundreds of thousands of pounds of EtO into the environment without so much as

FILED DATE: 4/16/2021 2:00 PM    2018L010475

warning those who lived and worked in the Willowbrook area that they were being exposed to and inhaling EtO on a routine and continuous basis.

## VI. Defendants' Operations and Conduct in Willowbrook

134. At all relevant times, the Willowbrook sterilization facilities were operated in a densely populated metropolitan area with 19,271 people living within one mile. Dense residential areas are located within approximately 0.3 miles to the immediate west, 0.6 miles to the southeast, 0.9 miles to the southwest, 0.7 miles to the north, 0.8 miles to the northeast, and 1.0 miles to the east.

135. At all relevant times, the Willowbrook facilities were close to numerous schools, daycare facilities, parks, government buildings, and businesses, including, at some point during operations, the following:

a. **Schools:** Gower Middle School (0.42 miles); Conev's Cradle Infant Care, Inc. (0.70 miles); St. Mark Christian Montessori (0.70 miles); Hinsdale South High School (0.76 miles); Gower West Elementary School (0.79 miles); Kingswood Academy (0.87 miles); KinderCare (1.0 mile); Our Lady of Peace School (1.22 miles); Concord Elementary (1.62 miles); Ready Set Grow (1.76 miles); Burr Ridge Middle School (1.86 miles).

b. **Parks and Government Buildings:** Willowbrook Police Department and Mayor's Office (0.07 miles); Willowbrook Community Park (0.45 miles); Indian Prairie Library (0.97 miles); Harvester Park (1.0 mile); Whittaker Park (1.03 miles); Burr Ridge Police Department (1.19 miles).

c. **Businesses:** Dance Duo Studio (0.1 miles); Dell Rhea's Chicken Basket (0.16 miles); Denny's (0.18 miles); Target (0.19 miles); La Quinta Inn (0.29 miles); Red Roof PLUS+ (0.3 miles); Diamond Edge Training (0.3 miles); BIG Gymnastics (0.68 miles); Darien Sportsplex (1.0 mile).

136.    In addition, Willowbrook Town Center, which has nearly 200,000 square feet of retail stores, restaurants, and other businesses, is located 1.1 miles from the Willowbrook facilities.

137.    Figure 1, below, depicts the area surrounding the Willowbrook facilities, in addition to a third facility that Defendants used for aerating products, and a lab Defendants used to test its sterilization process.

**Figure 1**



138.    Upon information and belief, the aeration facility Defendants used, which was located at 7409 Quincy Street in Willowbrook and referred to as "Willowbrook III," did not have any pollution controls and, therefore, all EtO emissions from the facility went directly into the atmosphere. Further, upon information and belief, Defendants did not include their emissions from Willowbrook III in their reporting to the government.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

139.    Upon information and belief, the lab Defendants used, which was located at 16 W. 151 Shore Court in Burr Ridge, was used to test sterilization runs and, accordingly, involved the use of EtO. Upon information and belief, the lab did not have any pollution controls and, therefore, all EtO emissions from the lab went directly into the atmosphere. Further, upon information and belief, Defendants did not include its emissions from the lab in their reporting to the government.

140.    From 1984 through their permanent closure in 2019, the Willowbrook facilities released EtO into the air in the Willowbrook area. The facilities stored EtO and sprayed it into gas chambers to sterilize medical equipment and pharmaceuticals. The Willowbrook facility on Quincy Street (built in 1984) holds fifteen gas chambers. The facility on Midway Drive holds four chambers (some built during the facility's original construction in 1999, some later in 2012).

141.    The facilities operated 24 hours per day, emitting toxic, cancerous gas on a steady and continuous basis. As a result, EtO has been a constant element in the air inhaled by those who lived and worked near the facilities.

142.    The half-life of EtO in the atmosphere has been reported at up to 211 days.[10] Neither rain nor absorption into aqueous aerosols is capable of removing EtO from the atmosphere.

143.    Table 1 depicts the facilities' *self-reported* EtO emissions from point sources and *self-reported* amounts of EtO treated on site:

---

[10] https://publications.iarc.fr/115

FILED DATE: 4/16/2021 2:00 PM    2018L010475

Table 1

| Year | Pounds of EtO Emissions | Pounds of EtO Treated On-site |
|------|------------------------|-------------------------------|
| 1984 | Unreported | Unreported |
| 1985 | Unreported | Unreported |
| 1986 | Unreported | Unreported |
| 1987 | Unreported | Unreported |
| 1988 | 169,996 | Unreported |
| 1989 | 97,518 | Unreported |
| 1990 | Unreported | Unreported |
| 1991 | Unreported | Unreported |
| 1992 | Unreported | Unreported |
| 1993 | Unreported | Unreported |
| 1994 | 18,407 | 420,069 |
| 1995 | 18,423 | 420,441 |
| 1996 | 22,000 | 400,000 |
| 1997 | 27,000 | 480,000 |
| 1998 | 31,000 | 560,000 |
| 1999 | 2,700 | 598,000 |
| 2000 | 7,627 | 565,086 |
| 2001 | 8,113 | 521,257 |
| 2002 | 6,686 | 535,109 |
| 2003 | 6,909 | 550,984 |
| 2004 | 5,313 | 540,797 |
| 2005 | 2,910 | 572,547 |
| 2006 | 4,280 | 573,961 |
| 2007 | 3,965 | 532,245 |
| 2008 | 3,858 | 517,941 |
| 2009 | 3,690 | 493,418 |
| 2010 | 6,595 | 512,570 |
| 2011 | 7,160 | 557,437 |
| 2012 | 7,091 | 553,083 |
| 2013 | 6,121 | 470,159 |
| 2014 | 5,241 | 404,681 |
| 2015 | 4,899 | 381,213 |
| 2016 | 4,205 | 388,288 |

144. There is little emissions data publicly available from before 1995. However, the ATSDR report notes that the available data suggests that "substantially higher ambient releases

51

FILED DATE: 4/16/2021 2:00 PM    2018L010475

prior to 1995 were likely." Indeed, emissions from 1988 and 1989 – approximately 170,000 pounds and 100,000 pounds respectively—are far more than the highest amount recorded in the contiguous 1995 – 2016 data set (31,000 pounds in 1998) and over 20 times more than emissions levels in 2016 (4,205 pounds). It is therefore reasonable to infer that the pre-1995 emissions of EtO were, at best, similar to those from 1998 and, at worst, closer to the colossal emissions in 1988 and 1989.

145.    In addition to the reported point source emissions (EtO emitted through stacks), the facilities released significant volumes of fugitive (nonpoint source) emissions into the air.

146.    Effective technologies to reduce EtO emissions to levels low enough to make the emissions a "non-significant contributor" to cancer risk have been available, cost-effective, and widely known since the 1980s; and on information and belief, Defendants have known it.

147.    Despite the availability of these technologies, on information and belief, there have been periods during which the Willowbrook facilities had no pollution controls in place, had inadequate controls in place, and/or had pollution controls in place that failed to work due to the acts and omissions of the defendants.

148.    On information and belief, there have also been periods during which the Willowbrook facilities, despite having some pollution controls in place, vented EtO directly into the air. Upon information and belief, since at least 2006 and up until July 27, 2018, the facilities allowed uncontrolled emissions of EtO from backvent valves in the sterilization chambers.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

## VII.    A Pattern of Reckless Conduct

149.    Sotera predecessor Sterigenics International, Inc. ("Sterigenics International") has been the subject of regulatory and administrative enforcement action relative to its EtO emissions in Europe. Beginning in 1992, Sterigenics International (now Sotera) operated a sterilization facility in Zoetermeer, a city in the western Netherlands. The Zoetermeer facility was located in an area with residential housing and numerous small business. In 2009, it was determined that Sterigenics International had been knowingly releasing amounts of EtO that exceeded the local Maximum Permissible Risk concentration into the air for years, was penalized, yet continued with its excessive emissions until it ultimately relocated its facility in 2010. According to the Public Prosecutor, Sterigenics International knew the emissions were unauthorized, but failed to act or even warn local residents about them or the associated dangers.

150.    Sterigenics has also been faulted for neglecting safety in the United States. For example, after a major explosion in August 2004 at a sterilizing plant in Ontario, California, injuring four employees and forcing the evacuation of the plant and neighboring facilities, the U.S. Chemical Safety and Hazard Investigation Board (hereinafter "CSB") found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. And it faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.

151.    Current and former Sterigenics employees elsewhere have raised safety concerns. For example, on the company's Glassdoor page, one former employee noted on June 25, 2013 that

FILED DATE: 4/16/2021 2:00 PM    2018L010475

"[t]here is a minimum attention to quality & safety which will backfire eventually."[11] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[12] Similarly, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "The maintenance team cuts a lot of corners."[13]

152.    Former employees at the Willowbrook facilities have raised the same concerns, reporting, among other things, that Sterigenics and its predecessors:

  a.  routinely permitted chamber doors, aeration doors, and exterior doors to be left open, thereby allowing EtO to escape directly into the environment;

  b.  manipulated the EtO detection systems in the facilities to allow for an increased tolerance of EtO;

  c.  told employees to ignore warning lights in the facilities indicating high levels of EtO, and fired employees who complained about the warning lights;

  d.  directed employees to dump or wash toxic chemicals, including EtO and ethylene glycol, into the sewer system;

  e.  told an employee to take a leaking drum of EtO outside the facilities;

  f.  used off-site warehouse facilities without any pollution control or ventilation systems to store sterilized products that were still off-gassing EtO while, at the same time, leaving the exterior doors of those facilities open, causing the off-gassing EtO to go directly into the environment.

153.    Key operational managers at the Willowbrook facilities actively participated in dangerous and harmful activities, which resulted in extraordinary uncontrolled emissions of EtO into the environment.

---

[11] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm.
[12] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm.
[13] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm.

154.     Defendant Novak routinely ignored warning systems in the Willowbrook facilities indicating the presence of unsafe levels of EtO. When Mr. Novak received employee complaints regarding such warning systems, he ignored them and instructed employees to ignore them as well. Mr. Novak permitted and/or directed chamber doors, aeration doors, and exterior doors in the Willowbrook facilities to remain open allowing uncontrolled EtO emissions into the environment. Mr. Novak also approved of inaccurate EtO monitoring and testing results, effectively hiding the actual EtO emissions within the facilities and into the environment and ensuring that the facilities would continue to operate in dangerous fashion.

155.     In addition, Defendant Roger Clark recalibrated EtO monitoring systems at the Willowbrook facilities to permit increased tolerance of EtO. As a result, Mr. Clark caused and/or permitted consistently elevated levels of EtO in the facilities. Mr. Clark did this knowing that doors within the facilities as well as exterior doors were routinely left open and thereby caused or permitted uncontrolled EtO emissions into the environment.

156.     Mr. Clark and Mr. Novak also routinely participated in and/or directed the operation of all chamber sterilization units in the facilities at the same time, which they knew or reasonably should have known would overload emissions control systems. As a result, both Mr. Clark and Mr. Novak caused excessive uncontrolled EtO emissions into the environment.

157.     Mr. Clark and Mr. Novak also bore responsibility for monitoring, maintenance, and replacement of emissions systems equipment. They routinely failed to replace emissions system equipment, including filters, such that they caused excessive levels of EtO emissions into the environment.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

158.    Taken together, these facts demonstrate a pattern of Defendants consistently failing to implement company-wide safety measures across all their facilities despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Defendants failed for decades to install available emission control technology to limit emissions of EtO from their Willowbrook facilities.

**VIII. EtO's Human Impact**

159.    EtO is a highly potent human carcinogen relative even to other carcinogens. For example, chronically inhaled EtO is 385 times more potent a carcinogen in comparison with benzene (pound for pound), and 231 times more potent in comparison with formaldehyde.[14] In terms of excess cancer risk effect, 6,000 pounds per year of EtO air emissions are roughly as harmful to humans as 2,300,000 pounds of benzene or 1,380,000 pounds of formaldehyde.

160.    The Willowbrook area has an extremely high cancer risk relative to other parts of the country. U.S. EPA's 2014 update to the National Air Toxics Assessment documented cancer risks in 76,727 census tracts across the country. Of these, 106 had cancer risk scores above U.S. EPA's acceptable limits. The area surrounding the Willowbrook facilities was among those tracts. Most of the remaining 106 tracts were located in "Cancer Alley" (the notoriously polluted, highly industrial area along the Mississippi River between Baton Rouge and New Orleans).

161.    Figure 2 lists the top 19 tracts, which also include the Willowbrook area tract— Tract No. 17043845902.

---

[14] https://www.epa.gov/sites/production/files/2014-05/documents/table1.pdf

FILED DATE: 4/16/2021 2:00 PM    2018L010475

**Figure 2**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | State | EPA Region | County | FIPS | Tract | Population | Total Cancer Risk (per million) |
| 2 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070800 | 2,537 | 1,505.1167 |
| 3 | LA | EPA Region 6 | St. Charles | 22089 | 22089060100 | 1,937 | 808.7227 |
| 4 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070900 | 3,115 | 616.6193 |
| 5 | PA | EPA Region 3 | Lehigh | 42077 | 42077005902 | 1,571 | 596.4609 |
| 6 | CO | EPA Region 8 | Jefferson | 08059 | 08059010902 | 2,310 | 525.5596 |
| 7 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070700 | 4,348 | 511.3240 |
| 8 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095071000 | 2,840 | 490.2785 |
| 9 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095000000 | 45,924 | 413.3152 |
| 10 | WV | EPA Region 3 | Kanawha | 54039 | 54039013400 | 2,222 | 366.6597 |
| 11 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095071100 | 3,398 | 363.1912 |
| 12 | TX | EPA Region 6 | Harris | 48201 | 48201343100 | 4,629 | 348.2016 |
| 13 | PA | EPA Region 3 | Lehigh | 42077 | 42077000101 | 3,661 | 346.5181 |
| 14 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070500 | 6,229 | 329.2657 |
| 15 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070100 | 2,685 | 303.0079 |
| 16 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070300 | 6,258 | 296.3112 |
| 17 | TX | EPA Region 6 | Harris | 48201 | 48201343200 | 4,944 | 296.1831 |
| 18 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070400 | 4,381 | 286.5417 |
| 19 | LA | EPA Region 6 | St. Charles | 22089 | 22089062700 | 4,753 | 284.5145 |
| 20 | IL | EPA Region 5 | DuPage | 17043 | 17043845902 | 3,411 | 281.8075 |

Twelve of these top 19 tracts are located in Cancer Alley. Another five, like the Willowbrook area tract, have sterilization facilities that emitted massive amounts of EtO. The Assessment shows that sterilization facilities were responsible for the extraordinarily high cancer risks reported for three of the top 19: DuPage County, Illinois, Jefferson County, Colorado, and Lehigh County, Pennsylvania.

162.    For the Willowbrook area tract, the U.S. EPA assessment found a cancer risk of 281.8075 in 1 million—nearly three times higher than U.S. EPA's acceptable upper limit and the highest in Illinois. The Willowbrook area tract is in the top 99.98% tracts in terms of cancer risk in the country.

163.    The U.S. EPA assessment attributed 88.98% of the elevated cancer risk to EtO emissions. Thus, the Willowbrook facilities—the sole emitter of EtO anywhere in the

Willowbrook area tract—were almost entirely responsible for the Willowbrook area tract having the 19th highest cancer risk in the country.

164.     Later data revealed an even higher risk. The August 2018 ATSDR report, based on air measurements collected from 29 discrete locations around the Willowbrook facilities, concluded that the facilities' emissions were exposing Willowbrook-area residents and workers to elevated airborne EtO concentrations, and that these concentrations created a cancer risk of 6,400 in 1 million (or 64 in 10 thousand)—64 times the U.S. EPA acceptable limit of just 1 in 10 thousand.[15] The report also concluded that these elevated risks created a public health hazard and called for Sterigenics to reduce emissions immediately.

165.     According to U.S. EPA, each year of exposure to EtO creates even higher cancer risk for children than it does for adults because EtO can damage DNA and children have more years ahead of them to develop other cancer risk factors that lead to the formation of malignant cells.[16] Children are also at greater risk than adults because children receive larger doses per body weight compared to adults, so they have greater lung surface area and increased lung volume per body weight and they inhale in more air per body weight.

166.     According to U.S. Census data, 3,494 children ages five and under lived within three miles of the facilities in 2010, including 250 children who lived within one mile of the facilities.

---

[15] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions
[16] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-ethylene-oxide

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

167.    Neither the volume of the facilities' EtO emissions nor their impact on Willowbrook-area residents and workers was made known to the general public until the release of the ATSDR report on August 21, 2018.

168.    In February 2019, IEPA issued a seal order against Sterigenics U.S. "to prevent the commencement of any new sterilization cycles using EtO until measures are in place to prevent emissions of EtO . . . which present a public health hazard to residents and off-site workers . . . in the Willowbrook community."

IX.    **Sterigenics Under GTCR's Control and Leadership**

169.    GTCR knew of the inherently dangerous nature of the EtO sterilization business: that this danger was driving medical companies to outsource sterilization to firms like Sterigenics is what made Sterigenics attractive for investment.

170.    Indeed, GTCR knew, from its pre-acquisition due diligence of the Sterigenics purchase, about of the risks and dangers posed by EtO.

171.    GTCR also knew that medical companies were beginning to outsource sterilization to firms like Sterigenics in order to avoid the risks of injury and potential for liability EtO posed; and this trend is what made Sterigenics an attractive target for investment to GTCR.

172.    All of this — the inherent risk, the danger, and the outsourcing trend — was publicly available as early as 1998 (well before GTCR's 2011 acquisition of Sterigenics), when Sterigenics U.S. and Sotera's predecessors, Griffith and Sterigenics International disclosed it in prospectuses they filed with the United States Securities and Exchange Commission in anticipation of issuing publicly traded securities.

173.     The Griffith prospectus warned that "[e]thylene oxide is a toxic and hazardous chemical which is flammable and explosive. It has been identified as a cancer and reproductive hazard" and that "[t]he cancer and reproductive hazards associated with exposure to ethylene oxide subject the Company to the risk of liability claims being made against it by workers and others who are exposed to ethylene oxide."[17]

174.     Both prospectuses expressly identified the dangers, potential liabilities and new government regulations concerning EtO as catalysts for a sterilization outsourcing trend that was increasing demand for services from medical sterilization contractors like Sterigenics.

175.     The Sterigenics International prospectus stated that "[b]eginning in the 1970's, several governmental limitations were placed on gas fumigation due to the discovery that EtO was a mutagenic substance with possible carcinogenic properties…" and that "increased costs" and "exposure" concerns led many device manufacturers to outsource their sterilization processes.[18]

176.     The Griffith prospectus stated that "the significant capital required to construct and maintain an in-house sterilization facility and the need to comply with dynamic environmental and health and safety regulations" has contributed to "increased volume of outsourced sterilization to contract processors."[19]

177.     On information and belief, GTCR learned both as part of its pre-acquisition due diligence investigation of Sterigenics' business and in the course of providing management services after the acquisition, about Sterigenics' use of EtO in its sterilization process, Sterigenics'

[17] https://www.sec.gov/Archives/edgar/data/1066622/0000950124-98-006256.txt
[18] https://www.sec.gov/Archives/edgar/data/1009988/0000891618-98-000926.txt
[19] *Id.*

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

permitting history, the levels of its emissions of EtO, alternative sterilization processes, methodologies to capture EtO emissions and the cancer risks Sterigenics' EtO emissions posed to the neighboring community. GTCR also learned that the use of emissions control equipment required to reduce emissions of EtO was expensive and required substantial amounts of capital to operate.

178.    GTCR purchased Sterigenics to capitalize on the risk-avoidant trend of companies outsourcing sterilization to outfits like Sterigenics. GTCR's website admits this: "Based on extensive diligence, GTCR believed that Sterigenics was well positioned to capitalize on the consistent industry growth fueled by increasing med tech procedure volumes and continued outsourced sterilization trends." In other words, GTCR chose to capitalize on the potential for growth fueled by danger—the danger of EtO and client-companies' fear of liability.

179.    GTCR in turn used Sterigenics to execute a GTCR-focused investment strategy favoring growth and acquisition at the expense of safety.

180.    GTCR did this utilizing a hand-picked executive team it had worked with many times in the past. This was GTCR's core business strategy, which it has actually trademarked as "The Leaders Strategy."[20]

181.    GTCR's pitch books for the GTCR Funds it would use for the Sterigenics investment make the Leaders Strategy clear: "As in previous GTCR funds, [the Fund's] investment strategy is to team with strong executive teams to build companies in fragmented industries. These 'management startups' – where GTCR will first team up with a management

---

[20] https://www.gtcr.com/the-leaders-strategy/

FILED DATE: 4/16/2021 2:00 PM    2018L010475

group and then purchase a platform on which to build the company – are expected to make up approximately 60% of the deals in [the Fund]."

182.    Consistent with the Leaders Strategy, GTCR viewed its involvement with Sterigenics as a partnership with the new Sterigenics CEO and executive team to grow the Sterigenics business and profits.

183.    Thus, as part of the Sterigenics transaction, GTCR hand-picked Michael Mulhern, whom GTCR had worked with in the past, to serve as Sterigenics CEO.[21] "Together, GTCR and Mr. Mulhern identified several initiatives to improve Sterigenics' operational and growth initiatives, enhance its market leadership and drive incremental earnings growth."[22]

184.    In pursuit of the strategy, GTCR directed Sterigenics' free cash flow to be used to pay interest on high yield bonds, acquire other companies, and only be used for capital investments that drove incremental earnings growth – *not* investments in safety and/or the maintenance or installation of emissions control equipment. GTCR knew or should have reasonably foreseen that the high yield bonds used in the leveraged buyout acquisitions left Sterigenics with extremely high interest expenses that would deplete its free cash flow and prevent its investing in emissions capture and control systems. Indeed, GTCR directed Sterigenics to borrow up, increasing the debt that required high interest payments.

185.    In other words, GTCR acquired Sterigenics in order to actively expand the Sterigenics' geographic footprint through acquisitions that depleted its free cash flow and

---

[21] https://www.prnewswire.com/news-releases/amri-names-michael-mulhern-as-chief-executive-officer-300577662.html
[22] https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/

required it to pledge its assets as collateral for high yield debt financed leveraged buy-outs, including the acquisition of two sterilization facility add-ons and "the transformative acquisition" of Nordion, a key supplier to Sterigenics.[23]

186.    In a March 8, 2011 report following the GTCR buy-out, Moody's expressed concerns about Sterigenics' free cash flow, capital expenditures, high interest expenses and EtO liability. It assigned Sterigenics debt and probability of default as "B2" or "highly speculative," explaining that "Sterigenics has very high fixed operating costs and capital expenditures, which limits free cash flow and can lead to significant volatility in profit margins based on variation in revenue," and specifically noting that "[t]he ratings also reflect the potential for event risk associated with the highly sensitive nature of the company's raw materials, including radioactive isotopes and toxic gases." "Because of some of the inherent risks in the business," Moody's wrote, "Moody's believes available liquidity, such as cash balances and revolver access, is of particular importance to Sterigenics."[24]

187.    Despite Sterigenics' struggles with free cash flow and its expensive capital structure, however, GTCR was determined to use Sterigenics as a platform to earn high returns through acquisitions of companies in the commercial sterilization industry. By using Sterigenics' free cash flow and assets to finance a leveraged buy-out of Nordion, the world's largest supplier of Cobalt 60, making Sterigenics the only vertically integrated commercial sterilization company

---

[23]https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/
[24]https://www.moodys.com/research/Moodys-assigns-B2-CFR-to-STHI-Holdings-Sterigenics-outlook-stable--PR_215182

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

in the world, in combination with its cost cutting and incremental earnings growth strategy, GTCR was able to begin selling its interest in Sterigenics at a higher price.

188.    Sterigenics CEO, Michael Mulhern, crows about the Nordion acquisition on the GTCR website, explaining: "It came to our knowledge that a company was about to come to market to be sold. If that company got into the wrong hands, it would put at risk our source of supply. GTCR just kicked it into high gear and said we must own this asset, and today we're the only vertically integrated sterilization company in the world and in large part because GTCR made the decision and committed the resources [i.e., *Sterigenics*' resources] to get it done."

189.    Thus, the Nordion acquisition further depleted Sterigenics free cash flow and forced Sterigenics to cut costs. After the acquisition, Sterigenics was forced to pay the interest on the high interest junk bond debt that GTCR had secured with Sterigenics' and Nordion's assets. On July 17, 2015 Moody's wrote "[t]he total transaction is valued at $826 million and will be funded using a combination of new debt facilities and Nordion and Sterigenics' cash on hand"[25] and that most of the "cash on hand" was Sterigenics'. Moody's observed, "Nordion's business profile is weak" and "that around two-thirds of the combined company's gross profit will be generated by the legacy Sterigenics sterilization business."[26]

190.    The degree of control GTCR exercised over Sterigenics – in service of GTCR's own interests and disregard of Sterigenics interests and potential liability – surpassed the control exercised as a normal incident of ownership.

---

[25]https://www.moodys.com/research/Moodys-assigns-B2-to-STHIs-new-bank-debt-confirms-B2--PR_304313
[26]https://www.moodys.com/research/Moodys-assigns-B2-to-STHIs-new-bank-debt-confirms-B2--PR_304313

FILED DATE: 4/16/2021 2:00 PM    2018L010475

191.     GTCR's relationship with Sterigenics executive team is evidence of this. At least four of GTCR's ten managing directors served as Sterigenics directors, acting (upon information and belief) for the protection of GTCR's interest.[27] Mulhern, GTCR's designated Sterigenics CEO, had previously been hired by GTCR as CEO of at least four GTCR-controlled portfolio companies.[28] The others had worked with GTCR as well.

192.     Indeed, during an Illinois Venture Capital Association (IVCA) award ceremony on May 7, 2015, GTCR Managing Director Sean Cunningham made these connections clear when he thanked the new Sterigenics executives team for their work in the past. He thanked "long time management collaborator, Phil McNabb, who has been in several GTCR deals" for his role at Sterigenics. He thanked Kevin Theriot, stating "I don't know what your title is at Sterigenics but you played just about every role in now three GTCR portfolio companies. He is our [GTCR's] client problem solver."[29] He waxed on about GTCR's long employment relationship with Mulhern: "Michael and GTCR have a very long history together. We actually initially recruited Michael in 2002 to run AmSan [American Sanitary]." "We partnered with Michael [again] in 2008 and asked him to become the CEO of Fairmont Food Group, which he did with Phil and Kevin nearly tripling the EBITDA from 2008 to 2011." "The very same week we sold Fairmont Food … we acquired Sterigenics with Michael, Phil and Kevin and the team." And he thanked the team

[27] https://www.gtcr.com/team-member/sean-l-cunningham/;
https://www.gtcr.com/gtcr-promotes-aaron-d-cohen-and-sean-l-cunningham-to-principal/;
https://www.gtcr.com/team-member/benjamin-j-daverman/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=66077&privcapId=20801;
https://www.gtcr.com/team-member/david-a-donnini/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=1155789&privcapId=20801
https://www.gtcr.com/team-member/constantine-s-mihas/
[28] https://www.prnewswire.com/news-releases/amri-names-michael-mulhern-as-chief-executive-officer-300577662.html
[29] https://drive.google.com/file/d/0B1vewN8DYsfDei1nM2diWnJ1X28/view?pref=2&pli=1

for growing Sterigenics EBITDA (profitability ratio) from $90 million to $250 million, allowing GTCR to recapitalize Sterigenics and recoup its investment.

193.    Mulhern, at the same award ceremony, in turn acknowledged his long-term working relationship with GTCR: "I've had the great pleasure to work with [GTCR], as Sean pointed out, for thirteen years;" "Sterigenics is the third company that I have run for GTCR;" "I've described [GTCR] as very forward leaning in terms of doing acquisitions to grow the company and move it forward."

194.    GTCR operated, managed, and controlled Sterigenics U.S. through its hand-picked team of Mulhern, McNabb and Theriot, whose interests and loyalty were to GTCR, which had provided them with executive employment for almost two decades, not Sterigenics. Based on their past experiences with GTCR, Mulhern, McNabb, and Theriot could expect that if they were able to drastically cut costs and invest in incremental earnings growth to increase Sterigenics' EBITDA in the short run, GTCR would be able to sell the company at a higher price, and they would have new employment opportunities to lead new GTCR projects.

195.    Sterigenics U.S.' own employees raised concerns about the safety of its operations under GTCR's management, budgetary, and operational control. On Sterigenics U.S.' Glassdoor page one employee on June 25, 2013 wrote, after GTCR made Mulhern CEO, that: "Since new management was installed by the investment company that owns them, doubling customer prices and massive cost cutting are paramount. There is minimum attention to quality & safety which

will backfire eventually. Only profitability counts to boost the company's value. Btw, new CEO was installed some time ago."[30]

196.    Another employee expressed his concerns with Sterigenics U.S.' lack of independence under GTCR's control, writing on February 21, 2012, that: "No education is given. No chance to expand kno[w]ledge. Owned by capital investment f[u]nd meaning that Sterigenics can [m]ake no independent decisions."[31]

197.    Another wrote on February 24, 2015 that: "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners. Managers aren't involved in what goes on during off shifts. A lot of our training is just a paperwork exercise. We learn very quickly how to cover our butts." That employee further addressed his concerns about safety under GTCR's management and recommended "[l]ock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system." On October 9, 2015 another employee wrote "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."

198.    GTCR knew that the only feasible way to acquire other companies in the commercial sterilization industry, like Nordion, without investing additional capital, would be to implement budget cuts or invest in projects that would drive incremental earnings growth to increase Sterigenics' free cash flow and EBITDA. GTCR also knew or should have reasonably foreseen that the budget cuts and investment in projects that only drove incremental earnings

---

[30] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm
[31] https://www.glassdoor.com/Reviews/Sterigenics-Reviews-E107174_P3.htm

would stop Sterigenics from spending on safety, maintenance and training and prevent Sterigenics' use, addition and/or maintenance of EtO emission control equipment, and cause continued injury to Plaintiffs and others exposed to the facilities' toxic emissions of EtO.

## X. Systematic Distribution of Money to Shareholders to Avoid Accountability to Creditors

199.    As discussed above, GTCR knew about the dangers of EtO and the liability risks before and after acquiring Sterigenics. One of the ways GTCR sought to limit its own investment risk and recoup its investment was by using dividend recapitalizations to pay itself dividends.

200.    GTCR knew that if it continually pulled cash out of Sterigenics with dividend recapitalizations and pledged any increase in the value of Sterigenics' assets for bonds used to fund acquisitions of other companies in the commercial sterilization industry, it could limit any liability stemming from Sterigenics' EtO emissions.

201.    Investopedia states: "A dividend recapitalization (also known as a dividend recap) happens when a company incurs a new debt in order to pay a special dividend to private investors or shareholders. This usually involves a company owned by a private investment firm, which can authorize a dividend recapitalization as an alternative to the company declaring regular dividends, based on earnings." "The dividend recap has seen explosive growth, primarily as an avenue for private equity firms to recoup some or all of the money they used to purchase their stake in a business. The practice is generally not looked upon favorably by creditors or common shareholders as it reduces the credit quality of the company, while benefiting only a select few." "The dividend reduces risk for PE firms by providing early and immediate returns to shareholders but increases debt on the portfolio company's balance sheet."

FILED DATE: 4/16/2021 2:00 PM   2018L010475

202.     Shortly after it acquired Sterigenics in March of 2011, GTCR issued $95 million in additional debt as part of a dividend recapitalization, pulling $95 million out of Sterigenics.

203.     After the buy-out, GTCR continually sought to increase Sterigenics' EBITDA by investing capital in projects that would drive incremental earnings growth and acquiring other companies using high yield debt. Between 2011 and 2016, acquisitions included Food Technology Service, Inc[32]; Gammarad[33]; Companhia Brasileira de Esterilização[34]; Nordion; Gibraltar Laboratories; Nelson Laboratories; and REVISS Services[35].

204.     In December 2016, when the US EPA altered EtO's cancer weight of evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans" and changed its adult based inhalation unit risk to 0.0001 $\mu g/m^3$ from 0.003 $\mu g/m^3$ (a thirty fold increase), GTCR recognized that its investment in Sterigenics had become substantially more risky and drastically increased its efforts to recover its money.

205.     Sterigenics U.S., Sotera and GTCR each played indispensable roles in a carefully-orchestrated funneling of nearly $1.3 billion to shareholders over 27 months beginning in 2016, with the intention of ensuring that these funds will not be available to compensate Plaintiffs when they secure judgments against them in this Court. By these transfers, Sterigenics U.S. and Sotera effectively admit, but hope to avoid accountability for, their culpability in exposing Willowbrook

---

[32] https://www.businesswire.com/news/home/20131206005135/en/Food-Technology-Service-Acquired-Sterigenics-International-LLC
[33] https://www.businesswire.com/news/home/20141031005705/en/Sterigenics-International-Continues-Growth-Acquisition-Leading-Italian
[34] https://sterigenics.com/sterigenics-acquires-companhia-brasileira-de-esterilizacao-cbe/
[35] https://www.ots.at/presseaussendung/OTE_20160816_OTE0004/sterigenics-international-and-its-subsidiary-nordion-enter-into-agreement-to-acquire-reviss-services

area residents (including Plaintiffs) to the extraordinarily dangerous EtO, which seriously damaged the health of many, and even claimed the lives of some.

206.     Specifically, during those 27 months, Sterigenics U.S. and Sotera executives were learning:

   a.  in 2016, that the US EPA would reclassify ethylene oxide as a "known" (from "probable") human carcinogen, and that the chemical was 30 times more likely to cause cancer than US EPA had previously recognized;

   b.  in 2018, that this information would soon be reported to the public, including and especially Willowbrook area residents;

   c.  in 2018, that cancer-stricken plaintiffs had begun to file lawsuits, some of them wrongful death lawsuits; and

   d.  in 2019, that the first of these plaintiffs had successfully obtained the remand to this Court of their lawsuits which had been baselessly removed by defendants to federal court.

207.     Yet, throughout these months, Sterigenics U.S. and Sotera executives were working with their corporate parents to make sure that virtually all available cash and other assets would be funneled away from these unsecured-creditor-Plaintiffs — and instead to their venture-capitalist investors and their banks in the form of massive distributions, pledged assets, and hundreds of millions in interest payments on borrowings undertaken to fund these payments. For example:

   a.  In October 2016, Sterigenics-Nordion Topco, LLC ("Topco"), a parent of defendants Sterigenics U.S. and Sotera, borrowed $350 million, for the purpose of funding a $340 million cash distribution to GTCR and other shareholders. Sterigenics U.S. and Sotera were necessary to this borrowing, upon information and belief, as they each guaranteed its repayment by granting the lender group a security interest in their tangible and intangible assets, thus making these assets unavailable to Plaintiffs, as Sterigenics U.S.' and Sotera's unsecured creditors.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

b. In October 2017, Sotera Health Holdings, LLC ("Health Holdings"), also a parent of Sterigenics U.S. and Sotera, with Topco, together increased their borrowings by $175 million and added to these increased borrowings some $28 million in free cash to fund a $203 million distribution to their shareholders, including GTCR. As with the October 16 transactions, upon information and belief, the repayment of these borrowings was guaranteed by Sterigenics U.S. and Sotera, thus granting the lender group a security interest in their tangible and intangible assets, making the pledged assets unavailable to pay the judgments Plaintiffs will secure.

c. In August 2018, Sotera itself made a $95 million cash distribution to investors, including GTCR, thus making this cash unavailable to Plaintiffs.

d. In July 2019, Health Holdings borrowed an additional $320 million, which was used in its entirety to fund a $320 million cash distribution to Sterigenics' investors (including GTCR). Upon information and belief, once again, Sterigenics U.S. and Sotera each facilitated this distribution by guaranteeing repayment of Health Holdings' borrowing, thus granting the lender group a security interest in their tangible and intangible assets, thus making these assets unavailable to Plaintiffs as Sterigenics U.S. and Sotera's unsecured creditors.

e. Just last month, in December 2019, Health Holdings completed a refinancing of, *inter alia*, previous borrowings, obtaining nearly $3.28 billion in new debt financing. This borrowing was used, in part, to fund a $309 cash million distribution to investors in December of 2019. As with previous borrowings by their parents, Sterigenics U.S. and Sotera guaranteed the repayment of this new borrowing, thus granting to the lender group security interests in their tangible and intangible assets.

208. Sterigenics U.S., Sotera and GTCR's central role in this orchestrated and intentional effort has effectively placed the companies' cash and other assets out of Plaintiffs' reach, prevented Sterigenics from investing in emission control equipment, and dangerously de-stabilized the Sterigenics companies, thereby jeopardizing the companies' viability and the likelihood that Plaintiffs will receive just compensation for their injuries. As Moody's has observed, after the 2019 transactions noted above, these companies have "a high degree of

FILED DATE: 4/16/2021 2:00 PM    2018L010475

environmental risk[,]" and will have "limited ability to absorb unforeseen setbacks or cash demands on the business…"

209.    Neither Sterigenics U.S. nor Sotera received reasonably equivalent value for any of the guarantees they gave to enable dividends to be paid to GTCR to facilitate the dividend recapitalizations, notwithstanding that the guarantees increased their debt load and/or placed additional assets out of the reach of Plaintiffs as their unsecured creditors. The dividend recapitalizations and secured debt financing benefited only GTCR.

210.    On June 21, 2019, Illinois enacted Public Act 101-0022. Public Act 101-0022 prohibits EtO sterilization facilities from operating in Illinois unless: (a) the facility captures 100 percent of all fugitive EtO emissions within the facility; and (b) the facility reduces EtO emissions to the atmosphere from each exhaust point by at least 99.9 percent or to 0.2 parts per million.

211.    On June 24, 2019, Sterigenics applied to the IEPA for a construction permit to install or update its emissions control systems to ensure that it satisfies Public Act 101-0022's EtO emission requirements.

212.    In September of 2019, Sterigenics entered into an agreed final consent order prohibiting the operation of its Willowbrook EtO sterilization facilities before installing and testing new emissions capture and control equipment to reduce its EtO emissions in compliance with Public Act 101-0022 and reduce its EtO emissions below 85 pounds a year.

213.    Other companies in the commercial sterilization industry have limited their EtO emissions with capital investments. In 2019, Medline, a competing EtO commercial sterilization company, invested several million dollars in equipment to comply with Illinois Public Act 101-

0022, and on January 7, 2020, Medline released a press report stating that it was in compliance with the regulation.

214.     Sterigenics U.S. and Sotera declined to take measures to improve their emissions control systems due to the debt and dividend payments orchestrated by GTCR and on October 2019, when faced with the cost of capital improvement to reduce emissions, decided not to reopen the Willowbrook facilities.[36]

## COUNT 1
### Negligence – Sterigenics U.S., LLC

215.     Plaintiffs incorporate by reference all allegations contained herein.

216.     Sterigenics U.S. owned and operated the facilities during a material portion of time since 1984.

217.     Sterigenics U.S. managed, controlled, and supervised sterilization operations at the facilities during a material portion of time since 1984.

218.     Sterigenics U.S. had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the Willowbrook facilities.

219.     At all relevant times, Sterigenics U.S. knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

220.     Sterigenics U.S. breached its duty and failed to exercise ordinary care in one or more of the following ways:

---

[36] https://www2.illinois.gov/epa/topics/community-relations/sites/ethylene-oxide/Documents/04OCT19.cvrltr.pdf

FILED DATE: 4/16/2021 2:00 PM   2018L010475

a. by choosing to operate within a densely populated residential area and thereby expose Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

b. by emitting massive and unnecessary amounts of EtO into the air from the Willowbrook facilities;

c. by using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

d. by placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

e. by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

f. by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

g. by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

h. by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i. by failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air; and

j. by failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities.

221.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 2
### Negligent Training – Sterigenics U.S., LLC

222.    Plaintiffs incorporate by reference all allegations contained herein.

223.    Sterigenics U.S. had a duty to properly train its employees to control and dispose of hazardous substances including EtO and its byproducts, including but not limited to ethylene glycol.

224.    At all relevant times, Sterigenics U.S. knew that failing to properly train its employees to control, monitor, and dispose of hazardous materials would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it.

225.    Sterigenics U.S. breached its duty to properly train its employees in one or more of the following ways:

   a.   by failing to train its employees about the carcinogenic effects of EtO;

   b.   by failing to train its employees about the proper procedures to control and store EtO and its byproducts such that it would prevent unintended leaks, spills, or emissions;

   c.   by failing to train its employees about the proper procedures to monitor EtO emissions;

   d.   by failing to train its employees about the proper procedures for recording EtO emissions;

   e.   by failing to train its employees about the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

FILED DATE: 4/16/2021 2:00 PM  2018L010475

f.  by failing to train its employees about the proper procedures for repairing and/or replacing defective EtO emissions equipment;

g.  by failing to train its employees about the proper procedures for reporting uncontrolled emissions; and

h.  by failing to properly train its employees about the proper procedures for disposing of EtO and its byproducts.

226.  As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 3
### Negligent Supervision – Sterigenics U.S., LLC

227.  Plaintiffs incorporates by reference all allegations contained herein.

228.  Sterigenics U.S. had a duty to properly supervise its employees to prevent a creation of danger or harm to others.

229.  At all relevant times, Sterigenics U.S. knew that failing to properly supervise its employees in their control, monitoring, and disposal of hazardous materials including EtO and its byproducts would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

230.  Sterigenics U.S., LLC breached its duty to supervise its employees in one or more of the following ways:

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a.  by failing to recognize when the proper procedures to control and store EtO and its byproducts were violated, resulting in unintended leaks, spills, or emissions;

b.  by failing to reprimand and/or discipline employees when the proper procedures to control and store EtO and its byproducts were violated, resulting in unintended leaks, spills, or emissions;

c.  by retaining employees who repeatedly violated the proper procedures to control and store EtO and its byproducts, resulting in unintended leaks, spills, or emissions;

d.  by failing to recognize when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities were violated, resulting in unintended leaks, spills, or emissions;

e.  by failing to reprimand and/or discipline employees when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities were violated, resulting in unintended leaks, spills, or emissions;

f.  by retaining employees who repeatedly violated the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities, resulting in unintended leaks, spills, or emissions;

g.  by failing to recognize when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

h.  by failing to reprimand and/or discipline employees when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

i.  by retaining employees who repeatedly violated the proper procedures for repairing and/or replacing defective EtO emissions equipment;

j.  by failing to recognize when the proper procedures for reporting uncontrolled emissions were violated;

k.  by failing to reprimand and/or discipline employees when the proper procedures for reporting uncontrolled emissions were violated;

l.  by retaining employees who repeatedly violated the proper procedures for reporting uncontrolled emissions;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

m.  by failing to recognize when the proper procedures for disposing of EtO or its byproducts were violated;

n.  by failing to reprimand and/or discipline employees when the proper procedures for disposing of EtO or its byproducts were violated;

o.  by retaining employees who repeatedly violated the proper procedures for disposing of EtO or its products;

p.  by failing to recognize when the proper procedures to monitor EtO emissions were violated;

q.  by failing to reprimand and/or discipline employees when the proper procedures to monitor EtO emissions were violated;

r.  by retaining employees who repeatedly violated the proper procedures to monitor EtO emissions;

s.  by failing to recognize when the proper procedures for recording EtO emissions were violated;

t.  by failing to reprimand and/or discipline employees when the proper procedures for recording EtO emissions were violated; and

u.  by retaining employees who repeatedly violated the proper procedures for recording EtO emissions.

231.  As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

## COUNT 4
### Willful and Wanton Conduct – Sterigenics U.S., LLC

232.     Plaintiffs incorporate by reference all allegations contained herein.

233.     Sterigenics U.S. had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

234.     At all relevant times, Sterigenics U.S. knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

235.     Sterigenics U.S. breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

   a.  by choosing to operate within a densely populated residential area and thereby expose Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

   b.  by emitting massive and unnecessary volumes EtO into the air from the Willowbrook facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   c.  by placing its own economic interests above the health, safety, and well-being of Plaintiffs, their decedents, and others who lived or worked near the facilities;

   d.  by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   e.  by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO

79

FILED DATE: 4/16/2021 2:00 PM    2018L010475

notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

f.  by emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

g.  by deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

236.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 5
### Ultrahazardous Activity / Strict Liability – Sterigenics U.S., LLC

237.    Plaintiffs incorporate by reference all allegations contained herein.

238.    Sterigenics U.S. use and emission of EtO from the facilities constitutes an ultra-hazardous activity.

239.    Sterigenics U.S.'s use and emission of EtO created a high degree of risk to Plaintiffs, their decedents, and others who lived or worked near the facilities such that the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

240.     Sterigenics U.S.'s use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

241.     While the activities conducted by Sterigenics U.S. are exceedingly dangerous, it offers little to no value to the surrounding community.

242.     Because the activities of Sterigenics U.S. are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

243.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

### COUNT 6
### Civil Battery – Sterigenics U.S., LLC

244.     Plaintiffs incorporate by reference all allegations contained herein.

245.     At all relevant times, Sterigenics U.S. knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

246.     Notwithstanding this knowledge, Sterigenics U.S. caused and/or set in motion events that caused EtO to come in contact with Plaintiffs and their decedents.

247.     Plaintiffs and their decedents' contact with EtO was offensive and harmful.

248.     Sterigenics U.S. intended to emit EtO into the air despite its knowledge that it would contact people who lived or worked near the facilities.

249.     Plaintiffs and their decedents did not consent to contact with EtO emitted from the facilities.

250.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 7
## Public Nuisance – Sterigenics U.S., LLC

251.     Plaintiffs incorporate by reference all allegations contained herein.

252.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

FILED DATE: 4/16/2021 2:00 PM   2018L010475

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

253.     Sterigenics U.S.'s use and emission of EtO from the facilities substantially and unreasonably infringed upon and/or transgresses this public right. In particular, the activities of Sterigenics U.S. caused those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

254.     Sterigenics U.S.'s use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

255.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

### COUNT 8
### Negligence – Sotera Health, LLC

256.     Plaintiffs incorporate by reference all allegations contained herein.

257.     Sotera wholly owned, managed, controlled, supervised and otherwise participated directly in the sterilization operations at the Willowbrook facilities. With respect to

FILED DATE: 4/16/2021 2:00 PM    2018L010475

those operations, Sotera shared a complete unity of interest with Sterigenics U.S., with Sterigenics U.S. operating as an instrumentality of Sotera.

258.    At all relevant times, Sotera knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

259.    Sotera had a duty to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities.

260.    Sotera breached this duty by failing to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities with respect to one or more of the following:

    a.  by conducting operations in a densely populated residential area, exposing Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

    b.  by emitting massive and unnecessary amounts of EtO into the air from the facilities;

    c.  using of EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

    d.  placing of its own economic interests and the interest of Sterigenics U.S. above the health and well-being of those who lived or worked near the facilities;

    e.  failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

    f.  failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

    g.  failing to warn or advise Plaintiffs, their decedents, and others who

lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

h.  failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i.  failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air; and

j.  failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities.

261.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

**COUNT 9**
**Negligent Training – Sotera Health, LLC**

262.    Plaintiffs incorporate by reference all allegations contained herein.

263.    As a direct participant in the facilities' sterilization operations, including but not limited to developing written operating procedures for training and guiding the work of operators and training operations employees, Sotera had a duty to ensure that the facilities' employees were properly trained on conducting sterilization operations, the use, control, storage, and disposal of hazardous substances including EtO and its byproducts, and the operation and maintenance of equipment used in the sterilization process, to prevent a creation of danger or

harm to others.

264.     Sotera, knowing that that a failure to ensure the facilities' employees were properly trained would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

265.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

### COUNT 10
### Willful and Wanton Conduct – Sotera Health, LLC

266.     Plaintiffs incorporate by reference all allegations contained herein.

267.     At all relevant times, Sotera knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

268.     Sotera had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

269.     Sotera breached its duty and was guilty of willful and wanton conduct with respect to one or more of the following:

FILED DATE: 4/16/2021 2:00 PM   2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

a. conducting operations in a densely populated residential area, exposing Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

b. emitting massive and unnecessary volumes EtO into the air from the facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c. placing its own economic interests above the health, safety, and well-being of Plaintiffs, their decedents, and others who lived or worked near the facilities;

d. failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding Sotera's knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e. failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding Sotera's knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

f. emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

g. deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

270.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

## COUNT 11
### Public Nuisance – Sotera Health, LLC

271.     Plaintiffs incorporate by reference all allegations contained herein.

272.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

273.     The activities of Sotera as described above unreasonably infringed upon and/or transgressed this public right by causing those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

274.     Sotera's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

275.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

FILED DATE: 4/16/2021 2:00 PM    2018L010475

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

### COUNT 12
### Negligence – Griffith Foods International, Inc. (Griffith Labs)

276.    Plaintiffs incorporate by reference all allegations contained herein.

277.    From July 30, 1984 to July 31, 1986, Griffith Labs was the permittee and thus operator of the Willowbrook facilities.

278.    From July 30, 1984 to May 14, 1999, as set forth in the paragraphs above, Griffith Labs was a direct participant of operations at the Willowbrook facilities such that it both actively participated in, directed, and/or exercised control over operations, and it mandated an overall course of action and authorized the manner in which specific activities were conducted.

279.    Additionally, from July 30, 1984 to April 15, 1999, as set forth in the paragraphs above, the relationship between Griffith Labs and the Operators was such that was no true separate identity between them.

280.    The "touchstone" of the duty analysis in Illinois "is whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed on defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill.2d 422, 436 (2006). The existence of such a "relationship" is determined by consideration of four factors, including: (a) the reasonable foreseeability of the injury; (b) the likelihood of the

FILED DATE: 4/16/2021 2:00 PM     2018L010475

injury; (c) the magnitude of the burden of guarding against the injury; and (d) the consequences of placing that burden on the defendant. *Id.* at 436-37.

281.     At all relevant times, Griffith Labs knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it. Accordingly, at all relevant times, it was reasonably foreseeable to Griffith Labs that emitting EtO from the Willowbrook facilities would injure Plaintiffs. Numerous facts set forth demonstrate that such injury was reasonably foreseeable, including in Paragraphs 5, 7, 9-10, 33-35, 37-56, 68-70, 74-76, 82-88, 96-99, 111-129, 131-141, 144-148, and 159-166.

282.     At all relevant times, the likelihood of injury to Plaintiffs was exceedingly high as set forth above in Paragraphs 5, 7, 9-10, 34, 37-39, 42-56, 82-91, 111-129, 131-141, and 159-166.

283.     Griffith Labs not only knew that it was emitting a known carcinogen into the Willowbrook community and that it would be inhaled by neighboring residents, but Griffith Labs also knew that conservative modeling performed by IEPA showed that its emissions were "several magnitudes higher than desirable."

284.     The magnitude of the burden on Griffith Labs of guarding against such injury was minimal as set forth above in paragraphs 35, 56, 70, 82-95, 100-102, and 146-147, particularly for a self-espoused pioneer and expert in the field of EtO. Griffith Labs could have, but did not, control the emissions from the Willowbrook facility by using state of the art equipment or even the same equipment used at its other facilities during the same timeframe.

285.     The consequences of placing such a burden on Griffith Labs would be appropriate, such that the expert in the field—with superlative knowledge and expertise with EtO and the sterilization process, the opportunity to select and update sterilization sites, emissions controls,

FILED DATE: 4/16/2021 2:00 PM    2018L010475

operational actions and processes, and financial incentive and ability—would have the obligation to prevent foreseeable injury to residents who, on the other hand, have no such expertise or knowledge, no such opportunity, and no such corresponding financial ability.

286.    Accordingly, at all relevant times, Griffith Labs had a duty to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities.

287.    Griffith Labs breached this duty by failing to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities with respect to one or more of the following:

    a.  Locating, and then for the next 16 years operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing at all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses.

    b.  Operating the Willowbrook facility with virtually no emission control equipment designed to remove or eliminate EtO from emissions for its first four years of operation (1984-1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time;

    c.  Operating the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control designed to remove or eliminate EtO from emissions from the facility's back-vents, aeration rooms, and work aisles, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those alleged in subparagraph (b), above) during that time;

    d.  Designing in 1984, and then from 1984 to 1999, mandating the use of, a sterilization/emissions process that Griffith Labs knew violated the

FILED DATE: 4/16/2021 2:00 PM   2018L010475

standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

e. Purchasing, using, and mandating the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

f. Failing to use emission control equipment in Willowbrook and otherwise comply with the standard of care that Griffith Labs was in fact using in its other EtO facilities in the United States and other countries, which resulted in EtO emissions from the Willowbrook facilities that were sometimes hundreds of times higher, and more dangerous, than those at Griffith Labs' other facilities;

g. Failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

h. Using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

i. Conducting operations which exposed Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

j. Emitting massive and unnecessary amounts of EtO into the air from the facilities;

k. Failing to heed IEPA's warning that emissions into the Willowbrook community based on Griffith's operational design would be "several magnitudes higher than desirable";

l. Failing to heed IEPA's advisement that steps "can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level";

m. Failing to warn the Willowbrook community, including Plaintiffs, that the toxicity data reviewed by the IEPA and communicated to Griffith "provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure";

n. Failing to warn the Willowbrook community, including Plaintiffs, that "various animal studies have shown carcinogenic, mutagenic, leukogenic and teratogenic effects" of EtO exposure;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

o.  Failing to warn its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs: (A) knew that the emissions threatened its neighbors' health and that its neighbors had no idea that EtO was even being emitted into their community, and (B) provided warnings to residents living near some of Griffith Labs' *other* EtO sterilization facilities outside of Illinois;

p.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

q.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

r.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

s.  Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs was specifically required to conduct extensive ambient air testing in 1984-1986 as a special condition for its permit to operate the Willowbrook facility;

t.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air;

u.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities;

v.  Misleading the State's regulator, Illinois EPA, by, *inter alia*, failing to inform the agency as to what Griffith Labs knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA into granting Griffith Labs the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions from Willowbrook that were based on assumptions which Griffith Labs knew had no basis or were false;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

w.  Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities;

x.  Placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

y.  Failing to provide the Operators with capital to invest in reasonable emission control systems even though such capital was available;

z.  Failing to provide the Operators with capital to invest in reasonable equipment upgrades and maintenance even though such capital was available; and

aa. Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies with the purpose of understating those health dangers and ultimately creating a justification for emissions that endangered the health of those living near the Willowbrook (and other) sterilization facilities.

288.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 13
### Negligent Training –  Griffith Foods International, Inc. (Griffith Labs)

289.    Plaintiffs incorporate by reference all allegations contained herein.

290.    As a direct participant in the facilities' sterilization operations, including but not

94

FILED DATE: 4/16/2021 2:00 PM   2018L010475

limited to developing written operating procedures for training and guiding the work of operators and training operations employees, Griffith Labs had a duty to ensure that the facilities' employees were properly trained on the following to prevent a creation of danger or harm to others:

    a.   conducting sterilization operations;

    b.   the use, control, storage, and disposal of hazardous substances including EtO and its byproducts;

    c.   the operation and maintenance of equipment used in the sterilization process;

    d.   running aeration room and back-vent emissions through the emission control system;

    e.   keeping chamber doors, aeration doors, and exterior doors closed and sealed so as to prevent EtO from escaping directly into the atmosphere;

    f.   preventing and/or minimizing off-gassing of sterilized products in areas that were not ventilated to emission controls; and

    g.   auditing the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors.

291.    Griffith Labs, knowing that that a failure to ensure the facilities' employees were properly trained would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

292.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

### COUNT 14
### Negligent Supervision – Griffith Foods International, Inc. (Griffith Labs)

293.    Plaintiffs incorporate by reference all allegations contained herein.

294.    As a direct participant in the facilities' sterilization operations, including but not limited to preparing and implementing the facilities' risk management plans, developing written operating procedures for training and guiding the work of operators, training operations employees, investigating incidents, conducting safety audits, and evaluating the facilities' accident history, Griffith Labs had a duty to ensure the facilities' employees were properly supervised on conducting sterilization operations, the use, control, storage, and disposal of hazardous substances including EtO and its byproducts, and the operation and maintenance of equipment used in the sterilization process, to prevent a creation of danger or harm to others.

295.    Griffith Labs, knowing that that a failure to ensure the facilities' employees were properly supervised would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

296.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

### COUNT 15
### Willful and Wanton – Griffith Foods International, Inc. (Griffith Labs)

297.    Plaintiffs incorporate by reference all allegations contained herein.

298.    At all relevant times, Griffith Labs knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

299.    Griffith Labs had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

300.    Griffith Labs breached its duty and was guilty of willful and wanton conduct with respect to one or more of the following:

    a.  Locating, and for then for next 16 years, operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing that all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses;

    b.  Operating the Willowbrook facility with virtually no emission control equipment designed to remove or eliminate EtO from emissions for its first four years of operation (1984-1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time;

    c.  Operating the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control designed to remove or eliminate EtO from

97

FILED DATE: 4/16/2021 2:00 PM      2018L010475

emissions from the facility's back-vents and aeration rooms, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those alleged in subparagraph (b), above) during that time;

d. Designing and requiring the use of a sterilization/emissions process that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

e. Purchasing, using, and authorizing the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

f. Failing to use emission control equipment in Willowbrook and otherwise comply with the standard of care that Griffith Labs was in fact using in its other EtO facilities in the United States and other countries, which resulted in EtO emissions from the Willowbrook facilities that were sometimes hundreds of times higher, and more dangerous, than those at Griffith Labs' other facilities;

g. Failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

h. Using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

i. Conducting operations which exposed Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

j. Emitting massive and unnecessary amounts of EtO into the air from the facilities;

k. Failing to heed IEPA's warning that emissions into the Willowbrook community based on Griffith's operational design would be "several magnitudes higher than desirable";

l. Failing to heed IEPA's advisement that steps "can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level";

FILED DATE: 4/16/2021 2:00 PM    2018L010475

m.  Failing to warn the Willowbrook community, including Plaintiffs, that the toxicity data reviewed by the IEPA and communicated to Griffith "provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure";

n.  Failing to warn the Willowbrook community, including Plaintiffs, that "various animal studies have shown carcinogenic, mutagenic, leukogenic and teratogenic effects" of EtO exposure;

o.  Failing to warn its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs: (A) knew that the emissions threatened its neighbors' health and that its neighbors had no idea that EtO was even being emitted into their community, and (B) provided warnings to residents living near some of Griffith Labs' *other* EtO sterilization facilities outside of Illinois;

p.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

q.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

r.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

s.  Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs was specifically required to conduct extensive ambient air testing in 1984-1986 as a special condition for its permit to operate the Willowbrook facility;

t.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air;

u.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

v.  Misleading the State's regulator, Illinois EPA, by, *inter alia*, failing to inform the agency as to what Griffith Labs knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA into granting Griffith Labs the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions from Willowbrook that were based on assumptions which Griffith Labs knew had no basis or were false;

w.  Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities;

x.  Placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

y.  Failing to provide the Operators with capital to invest in reasonable emission control systems even though such capital was available;

z.  Failing to provide the Operators with capital to invest in reasonable equipment upgrades and maintenance even though such capital was available;

aa. Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies with the purpose of understating those health dangers and ultimately creating a justification for emissions that endangered the health of those living near the Willowbrook (and other) sterilization facilities;

bb. Emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

cc. deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

301.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

### COUNT 16
### Ultrahazardous Activity / Strict Liability – Griffith Foods International, Inc. (Griffith Labs)

302.    Plaintiffs incorporate by reference all allegations contained herein.

303.    The use and emission of EtO from the facilities constitutes an ultrahazardous activity.

304.    The use and emission of EtO created a high degree of risk to Plaintiffs, their decedents, and others who lived or worked near the facilities such that the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

305.    The use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

306.    While the activities conducted at the facilities are exceedingly dangerous, they offer little to no value to the surrounding community.

307.    Griffith Labs is strictly liable for any injuries proximately resulting therefrom.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

308.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 17
### Civil Battery – Griffith Foods International, Inc. (Griffith Labs)

309.     Plaintiffs incorporate by reference all allegations contained herein.

310.     At all relevant times, Griffith Labs knew that EtO emitted from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

311.     Notwithstanding this knowledge, Griffith Labs caused and/or set in motion events that caused EtO to come in contact with Plaintiffs and their decedents.

312.     Plaintiffs and their decedents' contact with EtO was offensive and harmful.

313.     Griffith Labs intentionally emitted EtO into the air despite its knowledge that it would contact people who lived or worked near the facilities.

314.     Plaintiffs and their decedents did not consent to contact with EtO emitted from the facilities.

315.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 18
## Public Nuisance – Griffith Foods International, Inc. (Griffith Labs)

316.    Plaintiffs incorporate by reference all allegations contained herein.

317.    The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

103

FILED DATE: 4/16/2021 2:00 PM    2018L010475

318.    The activities of Griffith Labs as described above unreasonably infringed upon and/or transgressed this public right by causing those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

319.    Griffith Labs' use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

320.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

**COUNT 19**
**In Concert Liability – Griffith Foods International, Inc. (Griffith Labs)**

321.    Plaintiffs incorporate by reference all allegations contained herein.

322.    Illinois law has adopted section 876 of the Restatement (Second) of Torts, entitled "Persons Acting In Concert," which holds liable persons who act "in concert" with another tortfeasor to cause harm. *E.g.*, *Woods v. Cole*, 181 Ill.2d 512 (1998).

323.    Specifically, for harm resulting to a third person for the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

324.    The activities of Griffith Labs as described above, including those occurring subsequent to its October 1984 asset transfer to Micro-Biotrol Company: (a) were done in concert with the operators of the Willowbrook facility or pursuant to a common design with the operators, namely, to operate an ethylene oxide sterilization facility in a residential community with insufficient pollution controls and without warning to the community; (b) gave substantial assistance or encouragement to the Willowbrook facility operators knowing that such operators were breaching duties to Plaintiffs; and (c) gave substantial assistance to the Willowbrook facility operators to accomplish such tortious result and, when separately considered, Griffith Labs' conduct constituted an independent breach of duty to Plaintiffs.

325.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

**COUNT 20**
**Negligence – Bob Novak**

326.     Plaintiffs incorporate by reference all allegations contained herein.

327.     Beginning in August 2003, Mr. Novak was the Operations Manager at the Willowbrook facilities.

328.     In that capacity, Mr. Novak was responsible for the operation of the facilities, coordinating and overseeing all activities in facility operations, which included testing and analysis to determine the nature and extent of EtO emissions.

329.     At all relevant times, Mr. Novak had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

330.     At all relevant times, Mr. Novak knew or should have known that the EtO emitted from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

331.     Mr. Novak breached his duty and failed to exercise ordinary care in one or more of the following ways:

a.   by permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of EtO to escape the chamber area in the facilities;

b.   by permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the facilities;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

    c.   by allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the facilities;

    d.   by allowing exterior doors to remain open for unreasonable lengths of time in the facilities;

    e.   by failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of EtO emissions therefrom in the facilities;

    f.   by failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the facilities;

    g.   by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

    h.   by permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the facilities;

    i.   by subjecting Plaintiffs, their decedents, and others who lived and worked near the facilities to an elevated cancer risk;

    j.   by failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer; and

    k.   by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer.

332.    As a direct and proximate result of one or more of the foregoing acts or omissions,

Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

conditions identified in their Short Form Complaints and, as a result, have been caused to incur

FILED DATE: 4/16/2021 2:00 PM    2018L010475

and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Bob Novak in an amount to be determined by a trier of fact.

## COUNT 21
## Willful and Wanton Conduct – Bob Novak

333.   Plaintiffs incorporate by reference all allegations contained herein.

334.   At all relevant times, Mr. Novak had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

335.   At all relevant times, Mr. Novak knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

336.   Mr. Novak breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

   a.   by approving test results and/or monitoring systems which provided misleading and inaccurate report on pollution relating to the facilities;

   b.   by permitting emissions of massive and unnecessary amounts of EtO into the air from the Facility notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   c.   by failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were being exposed

FILED DATE: 4/16/2021 2:00 PM    2018L010475

to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d. by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e. by deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure has on people who lived or worked near the facilities; and

f. by subjecting Plaintiffs, their decedents, and others who lived and worked near the facilities to an elevated cancer risk without warning them of the same.

337.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Bob Novak in an amount to be determined by a trier of fact.

**COUNT 22**
**Negligence – Roger Clark**

338.    Plaintiffs incorporate by reference all allegations contained herein.

339.     Mr. Clark was the Maintenance Supervisor at the Willowbrook facilities from the late 1980s until approximately 2015.

109

FILED DATE: 4/16/2021 2:00 PM    2018L010475

340.    In that capacity, Mr. Clark was responsible for calibrating the internal EtO monitors and overseeing the sterilization process at the facilities.

341.    At all relevant times, Mr. Clark had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

342.    At all relevant times, Mr. Clark knew or should have known that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

343.    Mr. Clark breached his duty and failed to exercise ordinary care in one or more of the following ways:

a.  by inaccurately calibrating and/or manipulating internal EtO monitors to allow for erroneous monitoring results and excessive levels of EtO in the facilities;

b.  by failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the facilities;

c.  by permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of EtO to escape the chamber area in the facilities;

d.  by permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the facilities;

e.  by allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the facilities;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

f.  by allowing exterior doors in the warehouse to remain open for unreasonable lengths of time in the facilities;

g.  by failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of EtO emissions therefrom in the facilities;

h.  by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i.  by permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the facilities;

j.  by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk;

k.  by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer; and

l.  by failing to a warn or advise Plaintiffs, decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer.

344.  As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Roger Clark in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

## COUNT 23
### Willful and Wanton Conduct – Roger Clark

345.    Plaintiffs incorporate by reference all allegations contained herein.

346.    At all relevant times, Mr. Clark had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

347.    At all relevant times, Mr. Clark knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

348.    Mr. Clark breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

   a.  by deliberately falsifying test results and/or inaccurately calibrating and/or manipulating the monitoring systems to provide a misleading and inaccurate report on pollution relating to the facilities;

   b.  by permitting emissions of EtO into the air from the facilities notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   c.  by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   d.  by failing to a warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

e.   by deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure had on people who lived or worked near the facilities; and

f.   by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk without warning them of the same.

349.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Roger Clark in an amount to be determined by a trier of fact.

## COUNT 24
## Negligence – GTCR

350.     Plaintiffs incorporate by reference all allegations contained herein.

351.     Along with Sterigenics, GTCR owned and operated the facilities since 2011.

352.     In that capacity, GTCR had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, the decedents, and all those living and working in the area surrounding the facilities.

353.     At all relevant times, GTCR knew or should have known that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

113

FILED DATE: 4/16/2021 2:00 PM   2018L010475

354.     GTCR breached its duty and failed to exercise ordinary care in one or more of the

following ways:

   a.  by emitting massive and unnecessary amounts of EtO into air from the
       facilities;

   b.  by using EtO as part of its sterilization process when safer alternatives
       could accomplish the same or similar business purpose without
       presenting the same level of risk to human health and well-being;

   c.  by placing its own economic interests above the health and well-being
       of Plaintiffs, their decedents, and others who lived or worked near the
       facilities;

   d.  by failing to warn or advise Plaintiffs, their decedents, and others who
       lived or worked near the facilities that they were being exposed to EtO;

   e.  by failing to warn or advise Plaintiffs, their decedents, and others who
       lived or worked near the facilities that they were inhaling EtO;

   f.  by failing to warn or advise Plaintiffs, their decedents, and others who
       lived or worked near the facilities that it was emitting a known
       carcinogen into the air from the facilities;

   g.  by failing to employ safe methods to adequately control, reduce,
       minimize, and/or mitigate EtO emissions from the facilities;

   h.  by failing to adequately study and test the effect of its EtO emissions
       from the facilities on the quality of air;

   i.  by failing to adequately study and test the effect of its EtO emissions
       from the facilities on the health and well-being of people who lived or
       worked near the facilities; and

   j.  by subjecting Plaintiffs, their decedents, and others who lived and
       worked near the facilities to an elevated cancer risk.

355.     As a direct and proximate result of one or more of the foregoing acts or omissions,

Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

FILED DATE: 4/16/2021 2:00 PM   2018L010475

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR, LLC in an amount to be determined by a trier of fact.

**COUNT 25**
**Willful and Wanton Conduct – GTCR**

356.    Plaintiffs incorporate by reference all allegations contained herein.

357.    At all relevant times, GTCR had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and all those living and working in the area surrounding the facilities.

358.    At all relevant times, GTCR knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

359.    GTCR breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

a.    by permitting emissions of massive and unnecessary amounts of EtO into the air from the facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

b.    by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO

115

FILED DATE: 4/16/2021 2:00 PM    2018L010475

notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c.  by failing to a warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d.  by permitting emissions of EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area;

e.  by deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on people who lived or worked near the facilities; and

f.  by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk without warning them of the same.

360.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR, LLC in an amount to be determined by a trier of fact.

### COUNT 26
### Public Nuisance - GTCR

361.    Plaintiffs incorporate by reference all allegations contained herein.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

362.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

363.     GTCR's use and emission of EtO from the facilities substantially and unreasonably infringed upon and/or transgresses this public right. In particular, the activities of GTCR caused those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

364.     GTCR's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

365.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR in an amount to be determined by a trier of fact.


Date:   April 16, 2021                          Respectfully submitted,

                                                /s/ *Antonio M. Romanucci*
                                                Antonio M. Romanucci


Antonio M. Romanucci, *Lead Counsel*
Bryce T. Hensley, *Liaison Counsel*
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
(312) 458-1000
aromanucci@rblaw.net
bhensley@rblaw.net

FILED DATE: 4/16/2021 2:00 PM  2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

Steven A. Hart
Brian H. Eldridge
John S. Marrese
**HART MCLAUGHLIN & ELDRIDGE**
22 W. Washington Street, Suite 1600
Chicago, Illinois 60602
(312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com

Patrick A. Salvi II
Lance Northcutt
Jennifer M. Cascio
**SALVI, SCHOSTOK & PRITCHARD P.C.**
161 North Clark Street, Suite 4700
Chicago, IL 60601
(312) 372-1227
psalvi2@salvilaw.com
lnorthcutt@salvilaw.com
jcascio@salvilaw.com

Todd Smith
Brian LaCien
**SMITH LACIEN LLP**
70 West Madison, Suite 5770
Chicago, Illinois
(312) 236-9381
tsmith@smithlacien.com
blacien@smithlacien.com

Scott A. Entin
Sarah Siskind
Deanna Pihos
**MINER, BARNHILL & GALLAND, P.C.**
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
(312) 751-1170
sentin@lawmbg.com
ssiskind@lawmbg.com
dpihos@lawmbg.com

Daniel M. Kotin
Shawn K. Kasserman
Loren Legorreta
**TOMASIK KOTIN KASSERMAN, LLC**
161 North Clark Street, Suite 3050
Chicago, Illinois 60601
(312) 605-8800
dan@ttklaw.com
skasserman@tkklaw.com
loren@tkkkaw.com

Shawn Collins
Edward J. Manzke
Margaret Galka
**THE COLLINS LAW FIRM, P.C.**
1770 Park St., Ste. 200
Naperville, IL 60563
(630) 537-1595
shawn@collinslaw.com
ejmanzke@collinslaw.com
mgalka@collinslaw.com