# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| STERIGENICS U.S., LLC, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 1:21-cv-04581 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) | Honorable Mary M. Rowland |
| Defendant/Third-Party Plaintiff, | ) ) | |
| v. | ) ) ) | |
| ZURICH AMERICAN INSURANCE COMPANY, AND DOES 1-20, | ) ) ) | |
| Third-Party Defendants. | ) | |

## [PROPOSED] THIRD-PARTY COMPLAINT

Third-Party Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), for its Third-Party Complaint against Third-Party Defendants, Zurich American Insurance Company ("Zurich") and DOES 1-20, states as follows:

### Introduction

1.     National Union brings this Third-Party lawsuit to obtain contribution and other relief from Zurich American Insurance Company ("Zurich") and DOES 1-20 relative to this Court's finding that National Union owes a duty to defend Sterigenics, U.S., LLC ("Sterigenics") against underlying litigation.

Sterigenics initiated this lawsuit seeking a declaration that National Union owed a duty to defend Sterigenics against hundreds of pending lawsuits alleging bodily injuries that are consolidated for purposes of discovery and are captioned *In re: Willowbrook Ethlyene Oxide*

*Litigation*, Circuit Court of Cook County, Illinois Consolidated Case No. 18-L-010475 (the "Underlying Litigation"). The Underlying Litigation seeks compensatory damages from Sterigenics arising out of ethylene oxide ("EtO") medical device sterilization facilities located in Willowbrook, Illinois. The Underlying Litigation maintains that Griffith Foods International, Inc. f/k/a Griffith Laboratories U.S.A., Inc. ("Griffith") and certain affiliate entities designed and operated the EtO facilities from inception in or around 1984 until May 1999, when successor entities operated the facilities. The Underlying Litigation alleges that emissions of EtO for decades caused underlying plaintiffs who reside in surrounding communities of the facilities to develop various diseases caused by ingesting EtO emissions.

National Union maintained that it did not owe coverage to Sterigenics under various terms and conditions of two Commercial General Liability insurance policies it issued to Griffith Laboratories, Inc. and Griffith Laboratories U.S.A., Inc.

In this lawsuit, Sterigenics and National Union cross-moved for judgment on the pleadings regarding National Union's duty to defend. On August 3, 2022, this Court entered a Memorandum Opinion and Order [ECF 40], which held that National Union owed a duty to defend Sterigenics ("the Ruling"). A true and accurate copy of the Ruling is attached hereto as Exhibit 1. In relevant part, the Ruling found that pollution exclusions in National Union's policies were "ambiguous as to whether emission of EtO under an IEPA permit qualifies as traditional environmental pollution." [ECF 30 at 16]. As the pollution exclusion's application was not free from doubt, National Union was not excused from its defense obligation. *Id.* Further, the Ruling also found that the allegations of the underlying litigation raised a possibility that Sterigenics constitutes an insured under the National Union Policies as a successor to a Griffith affiliate.

Upon information and belief Zurich and DOES 1-20 issued Commercial General Liability insurance policies effective September 30, 1985 through 2019 that provide insurance coverage to Sterigenics for the Underlying Litigation. Based on the Ruling, pollution exclusions in insurance policies issued by Zuirch and DOES 1-20 are inapplicable to preclude coverage. Thus, similar to National Union – under the terms of the Ruling – Zurich and DOES 1-20 owe a defense to Sterigenics relative to the Underlying Litigation. Pursuant to the Ruling, National Union is entitled to contribution and other relief from Zurich and DOES 1-20 for their equitable share of Sterigenics' defense of the Underlying Litigation.

## Parties

2.      National Union is a Pennsylvania corporation with its principal place of business located in New York, NY. At all relevant times, National Union was authorized to issue insurance policies in Illinois.

3.      Zurich American Insurance Company is New York Corporation with its principal place of business located in Schaumburg, Illinois.

4.      National Union is informed and believes, and thereon alleges, that each of the fictitious Defendants named as DOES 1-20 is an insurer that provides coverage to Sterigenics for the claims asserted in the Underlying Litigation. National Union is unaware and ignorant of the true names of the Defendants named as DOES 1-20, inclusive, and therefore National Union sues these Defendants by such fictitious names. National Union will amend this Third-Party Complaint to allege their true names and capacities when ascertained.

## Jurisdiction And Venue

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 2201 and 2202 insofar as National Union seeks a declaration of rights and duties under insurance policies

it and other insurers issued to Griffith under which Sterigenics asserts a right to insurance coverage. This Court also has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 as complete diversity exists between the original parties to this lawsuit, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    There is a present and actual controversy between the parties.

7.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 (a), (b), and (c) because Zurich's principal place of business is located in this judicial district and Zurich conducts sufficient business within this judicial district as to confer personal jurisdiction over it in this Court. Venue is further proper in this judicial district because underlying lawsuits allege that Sterigenics' business operations in this district caused injury and damage for which compensatory damages are sought. Venue is also proper in this judicial district because Sterigenics' requests for insurance coverage regarding the Underlying Litigation arises from alleged conduct that occurred in this judicial district, including the delivery of the National Union insurance policies to Griffith Laboratories, Inc. at an Alsip, Illinois address.

## The Underlying Litigation

8.    Hundreds of underlying lawsuits are currently pending and consolidated for pre-trial and discovery purposes in the Circuit Court of Cook County, Illinois, County Department, Law Division. A true and accurate copy of the Fourth Amended Master Complaint of the Underlying Litigation is attached hereto as Exhibit 2.

9.    The Underlying Litigation asserts that on or about April 12, 1984, Griffith through its unincorporated division Micro-Biotrol, Co., leased a facility located at 7775 Quincy Street in Willowbrook, Illinois.

10.    The Underlying Litigation alleges that Griffith sought to operate EtO medical device sterilization at the facility.

11. Upon information and belief, operations and EtO emissions at 7775 Quincy Street were in operation between September 30, 1985 to and including at least May 1999.

12. The Underlying Litigation alleges that Sterigenics under its current name and through predecessor entities including, Micro-Biotrol Company, Micro-Biotrol, Inc., Griffith Micro Science, Inc., IBA S&I, Inc., and Sterigenics EO, Inc., operated EtO sterilization facilities located at 7775 Quincy Street in Willowbrook, Illinois and 830 Midway Drive, Willowbrook, Illinois (collectively, "the Facilities").

13. The Underlying Litigation maintains that plaintiffs lived or worked near the Facilities and unknowingly breathed excessive amounts of EtO emitted from the Facilities on a routine and continuous basis for years.

14. The Underlying Litigation alleges that chronic inhalation exposure to EtO causes cancer, including lymphatic cancers, leukemia, and breast cancer.

15. The Underlying Litigation alleges plaintiffs and their descendants inhaled dangerous amounts of EtO and developed diseases and conditions resulting in medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, loss of normal life and death.

## The National Union Insurance Policies

16. National Union issued to Griffith Laboratories U.S.A., Inc. and Griffith Laboratories, Inc. Commercial General Liability Policy No. GLA9 457058RA, effective September 30, 1983 to September 30, 1984 and Policy No. GLA1940011RA, effective September 30, 1984 to September 30, 1985 (collectively, "the National Union Policies").

17. The Policies, in relevant part, provide:

**I.  COVERAGE A—BODILY INJURY LIABILITY**
**COVERAGE B—PROPERTY DAMAGE LIABILITY**

The company will pay on behalf of the insured all sums which the **insured** shall become legally obligated to pay as damages because of

    A.    **bodily injury** or
    B.    **property damage**

to which this insurance applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This insurance does not apply:

\*      \*      \*

(f)    to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

\*      \*      \*

**II.    PERSONS INSURED**

Each of the following is an insured under this insurance to the extent set forth below:

\*      \*      \*

(c)    if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

\*      \*      \*

**DEFINITIONS**

\*      \*      \*

**"bodily injury"** means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

*  *  *

**"insured"** means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

*  *  *

**"named insured"** means the person or organization named in Item 1. of the declarations of this policy;

*  *  *

**"occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

*  *  *

**"property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period;

*  *  *

### BROAD FORM COMPREHENSIVE GENERAL LIABILITY ENDORSEMENT

*  *  *

**II.  Personal Injury and Advertising Injury Liability Coverage**

(A)  The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of **personal injury** or **advertising injury** to which this insurance applies, sustained by any person or organization and arising out of the conduct of the **named insured's** business, within the policy territory….

*  *  *

(D)  Additional Definitions

*  *  *

"Personal injury," in relevant part, means injury arising out of one or more of the following offenses committed during the policy period of the following offenses committed during the policy period:

\*     \*     \*

2. wrongful entry or eviction or other invasion of the right of private occupancy;

\*     \*     \*

## X.    ADDITIONAL PERSONS INSURED

As respects **bodily injury**, **property damage** and **personal injury** and **advertising injury** coverages, under the provision "Persons Insured", the following are added as **insureds**:

\*     \*     \*

(B)    Employee—Any employee (other than executive officers) of the **named insured** while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

    (1)    to **bodily injury** or **personal injury** to another employee of the **named insured** arising out of or in the course of his employment;

    (2)    to **personal injury** or **advertising injury** to the **named insured** or, if the **named insured** is a partnership or joint venture, any partner or member thereof, or the spouse of any of the foregoing;

    (3)    to **property damage** to property owned, occupied or used by, rented to, in the care, custody or control of or over which physical control is being exercised for any purpose by another employee of the **named insured**, or by the **named insured** or, if the **named insured** is a partnership or joint venture, by any partner or member thereof or by the spouse of any of the foregoing.

\*     \*     \*

## XII.    AUTOMATIC COVERAGE—NEWLY ACQUIRED ORGANIZATIONS (90 DAYS)

The word **insured** shall include as **named insured** any organization which is acquired or formed by the **named insured** and over which the **named insured** maintains ownership or majority interest, other than a joint venture, provided this insurance does not apply to **bodily injury**, **property damage**, **personal injury** or **advertising injury** with respect to which such new organization under this policy is also an **insured** under any other similar liability or indemnity policy or would be an **insured** under any such policy but for exhaustion of its limits of liability. The insurance afforded hereby shall terminate 90 days from the date any such organization is acquired or formed by the **named insured**.

          *      *      *

Item 1 - Named Insured

Griffith Laboratories U.S.A., Inc.
Griffith Laboratories, Inc.

"Named Insured" means the organization, including any subsidiary thereof, named in item 1 of the declarations and also includes any other company which is acquired or formed by the named insured during the policy period and over which the named insured maintains ownership or financial control, provided this insurance does not apply to any such newly acquired or formed company which is an insured under any other liability or indemnity policy or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability. Such insurance as may be afforded and newly acquired or formed company shall terminate within sixty days of its acquisition of formation unless reported to the company within said sixty days.

          *      *      *

## Coverage Dispute and The Ruling

18.     On or about February 12, 2021, Sterigenics sought insurance coverage under the National Union Policies relative to the Underlying Litigation.

19.     National Union maintained that the National Union Policies preclude coverage for the Underlying Litigation.

20.     National Union also asserted that Sterigenics failed to meet its burden to establish it qualified as an insured under the National Union Policies.

21.     Sterigenics filed this lawsuit seeking, in part, a declaratory judgment that National Union owed Sterigenics a duty to defend the Underlying Litigation.

22.     The Court entered the Ruling on August 3, 2022 based on cross-motions for judgment on the pleadings.

23.     The Ruling finds that the allegations of the Underlying Litigation raise at least the possibility that Sterigenics constitutes a Named Insured to the National Union Policies as a successor to Griffith's affiliate.  Exhibit 1 at 12.

24.     The Ruling holds, in part, that pollution exclusions in the National Union Policies do not excuse National Union's duty to defend Sterigenics against the Underlying Litigation, because the pollution exclusions is ambiguous as to whether the emission of EtO under an IEPA permit qualifies as traditional environmental pollution that is excluded under the National Union Policies.  *Id.* at 16.

25.     The Ruling also holds that allegations of unintended leaks, spills or emissions in the Underlying Litigation are sufficient to trigger the "sudden and accidental" exception to the pollution exclusion.  *Id.* at 18.

26.     The Ruling provides that the allegations of private nuisance in the Underlying Litigation implicate "personal injury" coverage under the National Union Policies.  *Id.* at 23.

27.     The Ruling finds that National Union sought declaratory relief regarding its coverage position within a reasonable time of receiving actual notice of the Underlying Litigation and, as a result, is not estopped from asserting coverage defenses.  *Id.* at 28.

28.     The Ruling concludes that National Union owes a duty to defend Sterigenics based on the Fourth Amended Master Complaint of the Underlying Litigation.

### Zurich and DOE Insurance Policies

29.     On information and belief, Zurich issued Commercial General Liability insurance policies to policies to Griffith effective September 30, 1985 to and including at least May 1999.

30.    On information and belief, DOES 1-20 issued Commercial General Liability insurance policies that provide insurance coverage for the Underlying Lawsuit to Sterigenics effective September 30, 1985 through 2019.

31.    Based on the Ruling, pollution exclusions in insurance policies issued by Zuirch and DOES 1-20 are inapplicable to preclude coverage for the Underlying Litigation.

32.    Based on the Ruling, the allegations of the Underlying Litigation implicate "personal injury" coverage.

33.    On information and belief, Zurich and DOES 1-20 denied coverage to Sterigenics, including a duty to defend, relative to the Underlying Litigation.

34.    Pursuant to the Ruling, Zurich and DOES 1-20 owe a defense to Sterigenics relative to the Underlying Litigation.

## Count I – Declaratory Judgment

35.    National Union realleges Paragraphs 1 - 34 as if fully set forth herein.

36.    Based upon the Ruling, pollution exclusions in insurance policies issued by Zurich and DOES 1-20 are inapplicable to preclude coverage for Sterigenics regarding the Underlying Litigation.

37.    Based upon the Ruling, "bodily injury" and "personal injury" coverage is implicated under insurance policies issued by Zurich and DOES 1-20 for Sterigenics regarding the Underlying Litigation.

38.    The Ruling's determination that National Union owes a duty to defend Sterigenics applies equally to Zurich and DOES 1-20.

## Count II – Equitable Contribution

39.    National Union realleges Paragraphs 1 – 34 as if fully set forth herein.

40.     On information and belief, Sterigenics tendered the Underlying Litigation to Zurich and DOES 1-20 and sought a defense and indemnity

41.     On information and belief, Zuirch and DOES 1-20 denied coverage to Sterigenics, including a duty to defend, relative to the Underlying Litigation.

42.     Based on the Ruling, pollution exclusions in insurance policies issued by Zurich and DOES 1-20 are inapplicable to preclude coverage for Sterigenics regarding the Underlying Litigation.

43.     Based on the Ruling, "bodily injury" and "personal injury" coverage is implicated under insurance policies issued by Zurich and DOES 1-20 for Sterigenics regarding the Underlying Litigation.

44.     The Ruling's determination that National Union owes a duty to defend Sterigenics in the Underlying Litigation applies equally to the risk insured by Zurich and DOES 1-20.

45.     Any sums National Union is required to pay toward the defense and/or indemnity of Sterigenics in the Underlying Litigation pursuant to the Ruling should be shared by by Zurich and DOES 1-20 based on the time on the risk.

46.     Pursuant to the Ruling, insurance rights and obligations under policies issued by Zurich and DOES 1-20 constitute other valid and collectible insurance that is owed to Sterigenics.

47.     Sums paid under the National Union Policies for Sterigenics regarding the Underlying Litigation under the terms of the Ruling are not voluntarily paid by National Union.

48.     Sums paid under the National Union Policies for Sterigenics regarding the Underlying Litigation under the terms of the Ruling that are not also shared by those insurance policies issued by Zurich and DOES 1-20 shall exceed National Union's equitable share of responsibility to defend and/or indemnify Sterigenics and warrant contribution from DOES 1-20.

**Unjust Enrichment**

49.     National Union realleges Paragraphs 1 – 34 as if fully set forth herein.

50.     On information and belief, Sterigenics tendered the Underlying Litigation to Zurich and DOES 1-20 and sought a defense and indemnity.

51.     On information and belief, Zurich and DOES 1-20 denied coverage to Sterigenics, including a duty to defend, relative to the Underlying Litigation.

52.     Based upon the Ruling, pollution exclusions in insurance policies issued by Zuirch and DOES 1-20 are inapplicable to preclude coverage for Sterigenics regarding the Underlying Litigation.

53.     Based upon the Ruling, "bodily injury" and "personal injury" coverage is implicated under insurance policies issued by Zurich and DOES 1-20 for Sterigenics regarding the Underlying Litigation.

54.     The Ruling's determination that National Union owes a duty to defend Sterigenics in the Underlying Litigation applies equally to the risk insured by Zurich and DOES 1-20.

55.     Sums paid under the National Union Policies for Sterigenics regarding the Underlying Litigation under the terms of the Ruling are not voluntarily paid by National Union.

56.     By not contributing to defend and/or indemnify Sterigenics regarding the Underlying Litigation under the terms of the Ruling, Zurich and DOES 1-20 are unjustly benefitting from sums required to be paid on Sterigenis' behalf by National Union.

57.     Equity and justice entitle National Union to reimbursement from Zurich and DOES 1-20 for amounts they should have paid to defend and/or indemnify Sterigenics regarding the Underlying Litigation under the terms of the Ruling.

**WHEREFORE**, National Union respectfully requests that this Court enter judgment in its favor and:

a. Declare that the Ruling, including a duty to defend Sterigenics regarding the Underlying Litigation, applies to the insurance policies issued by Zurich and DOES 1-20;

b. Declare that Zurich and DOES 1-20 must share in Sterigenics' defense based on each insurer's time of the risk;

c. Award National Union damages equal to sums it is required to pay under the Ruling that are in excess of its proportional share that should be paid by Zurich and DOES 1-20 on behalf of their co-insured Sterigenics regarding the Underlying Litigation, plus interest; and,

d. Grant National Union such other and further relief as this Court deems just and appropriate, including costs.

## DEMAND FOR JURY TRIAL

National Union hereby demands a trial by jury of all triable issues in this case.

Dated: ---, 2022          Respectfully submitted,

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA

By: _____
Matthew J. Fink
Joseph P. Lang
Nicolaides Fink Thorpe Michaelides Sullivan LLP
10 South Wacker Drive, Suite 2100
Chicago, IL 60606
Telephone: (312) 585-1400
jlang@nicolaidesllp.com

4853-3852-6259

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Sterigenics, U.S., LLC, | |
| Plaintiff, | Case No. 21-cv-4581 |
| v. | |
| National Union Fire Insurance Company Of Pittsburgh, P.A., | |
| | Judge Mary M. Rowland |
| Defendant. | |
| Griffith Foods International, Inc., et al., | |
| Plaintiffs, | Case No. 21-cv-6403 |
| v. | |
| National Union Fire Insurance Company of Pittsburgh, P.A., | |
| | Judge Mary M. Rowland |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this insurance coverage dispute, Plaintiff Sterigenics U.S., LLC and Plaintiffs Griffith Foods International, Inc. and Griffith Foods Group, Inc. have brought separate but related lawsuits against their insurer, National Union Fire Insurance Company of Pittsburgh, P.A. Plaintiffs seek judgments declaring that National Union owes them duties to defend and indemnify them in an underlying

1

action pending in Illinois state court. Sterigenics and the Griffith Plaintiffs have moved for partial judgment on the pleadings, requesting a judgment that National Union owes them a duty to defend. The Griffith Plaintiffs have also moved for judgment on their claims for breach of the duty to defend and estoppel. National Union has cross-moved for judgment on the pleadings. For the reasons explained below, this Court grants Sterigenics' and the Griffith Plaintiffs' motions as they pertain to the duty to defend, denies the Griffith Plaintiffs' motion as to estoppel, and denies National Union's motions except as it pertains to estoppel.

## I.      Background

This Court accepts as true the following facts from the amended complaint in the Sterigenics case and the complaint in the Griffith case. *See Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016). Because Plaintiffs' complaints contain similar allegations and concern the same insurance policies, this Court will sometimes cite to one complaint for a proposition that applies to both Plaintiffs. Unless otherwise indicated, citations to docket numbers refer to filings in Sterigenics' case.

### A.      Underlying Litigation and the Policies

In Illinois state court, multiple plaintiffs have sued several defendants, including two of the Plaintiffs here—Sterigenics and Griffith Food International, Inc., formerly known as Griffith Laboratories U.S.A., Inc. (hereinafter Griffith Labs). [15] ¶¶ 13, 16. The underlying litigation, entitled *In re: Willowbrook Ethylene Oxide Litigation*, is currently pending in the Circuit Court of Cook County, Illinois. [15-1].

In the (operative) fourth amended complaint, the underlying plaintiffs allege that they suffered bodily and personal injuries as a result of exposure to discharges of ethylene oxide (EtO) from sterilization facilities Sterigenics currently owns in Willowbrook, Illinois. [15] ¶ 14. The fourth amended complaint serves as the master complaint for hundreds of actions which the state court consolidated for pretrial and discovery purposes; its allegations concern each named plaintiff. *Id.* ¶ 14 & n.2.

The underlying plaintiffs assert that, in 1984, Griffith Labs "purposely directed" that an EtO sterilization facility be located in the plaintiffs' residential community, knowing the facility would endanger the community's health and safety; the plaintiffs also assert that Griffith Labs operated the facility for the next fifteen years without adequately protecting the plaintiffs from the facility's carcinogenic emissions. [15-1] ¶ 7. Griffith Labs operated the Willowbrook facility "[d]uring certain times prior to May 14, 1999," according to the underlying complaint. *Id.* ¶ 24.[1] The underlying complaint also alleges that "Defendant Sterigenics U.S., under its current name and previously under other names, operated EtO sterilization facilities at 7775 Quincy Street in Willowbrook, Illinois . . . and 830 Midway Drive in Willowbrook, Illinois, continuously and at all relevant times." *Id.* ¶ 22. The underlying complaint asserts state-law claims against Sterigenics and Griffith Labs for negligence, negligent training, negligent supervision, willful and wanton conduct, strict liability, civil battery, and public nuisance. [15-1].

---

[1] Prior iterations of the underlying complaint—the second and third amended complaints—named Griffith Foods Group Inc., the other Plaintiff in the Griffith suit (hereinafter Griffith Foods). Griffith [1] ¶¶ 19, 23. Griffith Foods is formerly known as Griffith Laboratories, Inc. *Id.* ¶ 1.

### B.     Policies' Provisions

The parties' dispute centers around two commercial general liability policies that National Union insures. [15] ¶ 17. Policy number GLA-945-70-58RA was effective from September 30, 1983 to September 30, 1984; policy number GLA-194-00-11RA was effective from September 30, 1984 to September 30, 1985. *Id.*

The Policies' insuring agreement provides coverage for "bodily injury" or "property damage":

> The company will pay on behalf of the Insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
> B. property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

[25-1] at 6; [25-2] at 12. Exclusion (f) of the Policies—the Pollution Exclusion—states:

> Coverage A and B are subject to exclusion (f), which precludes coverage for:
>
> [] bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

[25-1] at 6; [25-2] at 12.

4

The Policies also provide coverage for "personal injury," as follows:

Personal Injury and Advertising Injury Liability Coverage

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent. . .

'Personal injury,' in relevant part, means injury arising out of one or more of the following offenses committed during the policy period of the following offenses committed during the policy period:

* * *
2.      wrongful entry or eviction or other invasion of the right of private occupancy;

[25-1] at 7; [25-2] at 6.

The Policies contain an endorsement stating that the term "Named Insured"

means:

> [T]he organization, including any subsidiary thereof, named in item 1 of the declarations and also includes any other company which is acquired or formed by the named insured during the policy period and over which the named insured maintains ownership or financial control, provided this insurance does not apply to any such newly acquired or formed company which is an insured under any other liability or indemnity policy or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability. Such insurance as may be afforded and *[sic]* newly acquired or formed company shall terminate within sixty days of its acquisition of *[sic]* formation unless reported to the company within said sixty days.

[25-1] at 16; [25-2] at 15.

Item 1 of the Policies' declarations pages identifies "Griffith Laboratories, Inc."

and "Griffith Laboratories U.S.A., Inc." (the Griffith Plaintiffs, under their former names) as the named insureds. *Id.* ¶ 20.

### C. National Union Denies Coverage

In February 2021, Sterigenics tendered the underlying litigation to National Union for defense and indemnity coverage. [15] ¶ 52. National Union denied coverage on the grounds that Sterigenics is not insured under the Policies and that the Pollution Exclusion precludes coverage. *Id.* ¶¶ 53, 55. National Union similarly denied coverage to the Griffith Plaintiffs after they provided notice to it of the third amended underlying complaint. Griffith [1] ¶¶ 31, 34.

After National Union denied coverage, Sterigenics and the Griffith Plaintiffs brought separate suits against National Union in this district; the Sterigenics case was initially assigned to this Court. Upon National Union's unopposed motion, this Court deemed the suits related and the Executive Committee reassigned the case to this Court. [30]. In its amended complaint, Sterigenics seeks a judgment declaring that National Union possesses a duty to defend (Count I) and a duty to indemnify (Count II), as well as damages resulting from National Union's alleged breach of the Policies (Count III). [15] ¶¶ 57–82. The Griffith Plaintiffs assert claims for breach of contract based on National Union's refusal to defend (Counts I and II); they also seek declaratory judgment ordering National Union to defend and indemnify and estopping National Union from asserting coverage defenses (Counts III and IV). Griffith [1] ¶¶ 49–78.

Sterigenics moves under Rule 12(c) for partial judgment on Counts I and III,

as to National Union's duty to defend, [24]; National Union cross-moves for entry of judgment on all counts against Sterigenics, [31]. In the Griffith case, the Griffith Plaintiffs move pursuant to Rule 12(c) for judgment on Counts I and II for breach of contract with respect to the duty to defend and on Counts III and IV for a declaration that National Union has a duty to defend and that National Union is estopped from raising coverage defenses. Griffith [15]. National Union cross-moves against the Griffith Plaintiffs for judgment on all counts. Griffith [23].

## II. Legal Standard

Rule 12(c) permits a party to move for judgment solely on the pleadings. Fed. R. Civ. P. 12(c). Pleadings include the complaint, the answer, and any written instruments attached as exhibits. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312–13 (7th Cir. 2020). This Court reviews Rule 12(c) motions under the same standards as a motion to dismiss under Rule 12(b)(6). *Mesa Lab's, Inc. v. Fed. Ins. Co.*, 994 F.3d 865, 867 (7th Cir. 2021); *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015). Accordingly, this Court takes all facts pleaded in the amended complaint as true and draws all reasonable inferences and facts in favor of the nonmoving party. *Mesa*, 994 F.3d at 867.

## III. Analysis

Before addressing the parties' legal arguments, this Court notes that all parties agree that Illinois law applies to the construction of the Policies. Under Illinois law, the interpretation of an insurance policy, like any other contract, is a question of law. *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir.

2021). This Court construes insurance policies as a whole, "giving effect to every provision if possible." *Melcorp, Inc. v. W. Am. Ins. Co.*, No. 21-2448, --- F.4th ----, 2022 WL 2068256, at *1 (7th Cir. June 8, 2022) (quoting *Paradigm Care & Enrichment Center, LLC v. W. Bend Mut. Ins. Co.*, 33 F.4th 417, 420 (7th Cir. 2022)). Policy terms "that are 'clear and unambiguous' must be given their 'plain and ordinary meaning.'" *Mashallah*, 20 F.4th at 319 (quoting *Sanders v. Ill. Union Ins. Co.*, 157 N.E.3d 463, 467 (Ill. 2019)).

### A.    The Duty to Defend

This Court first considers whether National Union owes Sterigenics and the Griffith Plaintiffs a duty to defend in the underlying lawsuit. Illinois law "recognizes that the insurer's duty to defend arises when the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions." *Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 447 (7th Cir. 2022) (internal quotation omitted). The duty to defend is generally broader than the duty to indemnify "because it arises in cases of arguable or potential coverage," while the duty to indemnify "arises only in circumstances of *actual* coverage." *Id.* (quoting *Keystone Consol. Indus., Inc. v. Emps. Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006)). To determine whether insurer's duty to defend has arisen, the Court compares the allegations of the underlying complaint to the policy language. *Thermoflex Waukegan, LLC v. Mitsui Sumitomo Ins. USA, Inc.*, No. 21 C 788, 2022 WL 954603, at *3 (N.D. Ill. Mar. 30, 2022) (citing *Metzger v. Country Mut. Ins. Co.*, 986 N.E.2d 756, 761 (Ill. App. Ct. 2013)). This is known as the "eight corners rule," meaning that the duty to

8

defend depends on a comparison between the four corners of the insurance policy and the four corners of the complaint for which defense is sought. *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 579–80 (7th Cir. 2021).

The duty to defend arises where the "allegations of the underlying complaint potentially assert a claim within the liability coverage of the policy." *Id.* at 580; *see also Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021) ("If the facts alleged in the complaint fall within, or potentially fall within, the policy coverage, the insurer must defend the insured."). This Court resolves any doubts about the duty to defend and liberally construes policy terms and the underlying complaint's allegations in the insured's favor. *Am Bankers*, 3 F.4th at 327; *Zurich Am. Ins. Co. v. Ocwen Fin. Corp.*, 990 F.3d 1073, 1078 (7th Cir. 2021).

## 1.   Named Insured

Initially, there is no dispute that the Griffith Plaintiffs qualify as "named insureds" under the Policies. National Union argues that Sterigenics fails to qualify as an insured under the Policies and therefore cannot avail itself of their benefits. This Court disagrees; Sterigenics is a "named insured" for the purposes of National Union's duty to defend.

Both Policies contain an endorsement providing that the term "Named Insured" means:

> [T]he organization, including any subsidiary thereof, named in item 1 of the declarations and also includes any other company which is acquired or formed by the named insured during the policy period and over which the named insured maintains ownership or financial control, provided this insurance does not apply to any such newly acquired or formed company which is an insured under any other

liability or indemnity policy or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability.

[15] ¶ 18. Item 1 of the Policies' declarations pages identifies Griffith Labs as one of the named insureds. *Id.* ¶ 20. Thus, under the Policies' plain language, any subsidiary of or any other company acquired or formed by Griffith Labs also qualifies as a named insured under the Policies.

The underlying fourth amended complaint's allegations trigger Sterigenics' status as a named insured because it attempts to hold Sterigenics liable for its own and its predecessor's acts. The complaint alleges that on "October 4, 1984, Griffith Labs formed a nominal corporate subsidiary, Micro Biotrol Company (MBC)," [15-1] ¶ 105. This allegation establishes that MBC is also a "named insured" under the Policies due to its status as a subsidiary of Griffith Labs. The underlying complaint next alleges that:

> 22. "Defendant Sterigenics U.S., under its current name and previously under other names, operated EtO sterilization facilities at 7775 Quincy Street in Willowbrook, Illinois . . . and 830 Midway Drive in Willowbrook, Illinois, continuously and at all relevant times.

> 23. Sterigenics U.S.'s predecessors who operated the Willowbrook facilities include: Micro-Biotrol Company, Micro-Biotrol, Inc., Griffith Micro Science, Inc., IBA S&I, Inc., and Sterigenics EO, Inc. Through a series of acquisitions, mergers, and name changes, Sterigenics U.S. has assumed the liabilities of these predecessor entities for their respective involvement in the operation of the Willowbrook facilities. (Sterigenics U.S. and its predecessors are referred to collectively herein as 'Sterigenics U.S.')

[15-1] ¶¶ 22, 23. Read in combination, these allegations establish that Sterigenics became the successor entity to MBC, a named insured, through a series of corporate

transactions, including by acquisition, merger, and name change. The allegation that Sterigenics is MBC's successor raises at least the "possibility" that Sterigenics is covered as a "named insured." *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 816 (7th Cir. 2010) (quoting *Health Care Industry Liability Ins. Program v. Momence Meadows,* 566 F.3d 689, 696 & n.9 (7th Cir.2009)); *see, e.g.*, *Am. Alternative Ins. Corp. v. Metro Paramedic Servs., Inc.*, 829 F.3d 509, 515 (7th Cir. 2016) (concluding that, under a reading of the underlying complaint, that a party qualified as a named insured).

This conclusion is supported by general principles of corporate law. Once "a merger is established, the successor corporation takes on the obligations and liabilities under the insurance policies." *Knoll Pharm. Co. v. Auto. Ins. Co.*, 167 F. Supp. 2d 1004, 1010 (N.D. Ill. 2001); *see also Kaleta v. Whittaker Corp.*, 583 N.E.2d 567, 570 (Ill. App. Ct. 1991) (noting that "the general rule is that a corporation that merges with another corporation takes on the latter corporation's obligations and liabilities"); *accord Cont'l Ins. Co. v. Daikin Applied Americas Inc.*, 998 F.3d 356, 361 (8th Cir. 2021) (noting that, under Minnesota law, "a surviving corporation may assert claims under insurance policies issued to an acquired company for pre-merger liabilities of the acquired company, even though the survivor was not named on the policy.") (quotation omitted). Similarly, "a corporation that simply changes its name retains the rights and liabilities it possessed prior to the identity switch." *Gen. Elec. Bus. Fin. Servs. Inc. v. Hedenberg*, No. 10 C 5094, 2011 WL 1337105, at *2 (N.D. Ill. Apr. 7, 2011).

National Union argues that whether Sterigenics qualifies as an insured cannot be determined by the underlying complaint allegations and that "numerous fact issues" preclude judgment on this issue. [32] at 10–16. To that end, National Union dedicates much of its briefing questioning whether Sterigenics, in fact, is a corporate successor of MBC, and whether it in fact inherited MBC's insurance protections. These arguments are misplaced because "the duty to defend is gauged by the allegations of the complaint," and "what the facts subsequently show is immaterial." *Am. Alternative Ins. Corp. v. Metro Paramedic Servs., Inc.*, 75 F. Supp. 3d 833, 841 (N.D. Ill. 2014) (quoting *In re Country Mut. Ins. Co.*, 889 N.E.2d 209, 210 (Ill. 2007)), *aff'd*, 829 F.3d 509 (7th Cir. 2016). Even if the underlying complaint's allegations "are groundless, false or fraudulent, the insurer is obligated to defend." *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 581 (7th Cir. 2021) (quoting 14 Couch on Insurance § 200:20). The Seventh Circuit has emphasized that "the bar to finding a duty to defend is low." *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 722 (7th Cir. 2015). The underlying complaint's allegations raise at least the possibility that Sterigenics constitutes a "named insured" under the Policies as MBC's successor.

### 2.    Bodily Injury

Next, there is no dispute that the operative fourth amended complaint in the underlying litigation alleges a covered "bodily injury" as defined under the Policies.

The Policies provide:

The company will pay on behalf of the Insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

[25-1] at 6; [25-2] at 12. The underlying complaint seeks damages from Griffith Labs and Sterigenics based on allegations that they caused the underlying plaintiffs to breathe excessive and dangerous amounts of EtO, causing them serious—and sometimes fatal—diseases or conditions. [15-1] ¶ 13. These allegations plainly trigger "bodily injury" coverage under the Policies—a point that National Union concedes. [32] at 6–7; Griffith [28] at 1.

### 3. Pollution Exclusion

Although National Union concedes that the underlying fourth amended complaint alleges "bodily injury" under the Policies, it argues that the Pollution exclusion excuses its obligation to defend Sterigenics and Griffith Labs from those allegations in the underlying litigation. An insured's claim can fall outside of a policy's coverage if it falls "*within* an exclusion." *Mesa Lab'ys, Inc. v. Fed. Ins. Co.*, 994 F.3d 865, 868 (7th Cir. 2021). But "a decision to excuse an insurer's duty to defend based on an exclusionary clause in the contract 'must be clear and free from doubt.'" *Zurich Am. Ins. Co. v. Ocwen Fin. Corp.*, 990 F.3d 1073, 1078 (7th Cir. 2021) (quoting *Evergreen Real Estate Servs., LLC v. Hanover Ins. Co.*, 142 N.E.3d 880, 887 (Ill. App. Ct. 2019)).

13

Exclusion (f) of the Policies—the Pollution Exclusion—states:

> Coverage A and B are subject to exclusion (f), which precludes coverage for:
>
> [] *bodily injury or property damage* arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*[.]

[25-1] at 6 (emphasis added); [25-2] at 12 (emphasis added).

In Illinois, courts restrict pollution exclusions to "only hazards traditionally associated with environmental pollution." *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 37 F.4th 440, 444 (7th Cir. 2022) (citing *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997)). National Union argues that the Pollution Exclusion bars coverage because the underlying fourth amended complaint asserts that the plaintiffs have sustained severe injuries stemming from traditional environmental pollution—namely, the emissions of EtO, a toxic and poisonous chemical that has been classified as a carcinogenic and a "priority pollutant." [15-1] ¶¶ 13, 44, 46, 128. This Court disagrees and concludes that the Pollution Exclusion is inapplicable for two reasons.

First, the Pollution Exclusion is ambiguous as to whether it applies to permitted emissions like the ones alleged in the underlying complaint. In *Erie Insurance Exchange v. Imperial Marble Corp.*, the Illinois Appellate Court construed a similar pollution exclusion to the one here barring coverage for bodily injury of property damage "arising out the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." 957 N.E.2d 1214,

1220 (Ill. App. Ct. 2011) (internal quotation marks omitted). The policy in *Imperial Marble* defined "pollutants" as any "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemical, and waste." *Id.* at 1220–21. The insured argued that the alleged emissions it made did not qualify as traditional environmental pollution because those emissions were made pursuant to a permit issued by the Illinois Environmental Protection Agency (IEPA). *Id.* at 1221. Reasoning that pollution exclusions have "potentially limitless application," the appellate court found the pollution exclusion "arguably ambiguous as to whether the emission of hazardous materials in levels permitted by an IEPA permit constitute traditional environmental pollution excluded under the policy." *Id.* at 1221 (internal quotation omitted). Thus, construing the ambiguity in favor of the insured, the court held that the pollution exclusion did not apply and that the insurer owed the insured a duty to defend. *Id.*; *see also Country Mut. Ins. Co. v. Bible Pork, Inc.,* 42 N.E.3d 958, 961, 970 (Ill. App. Ct. 2015) (finding a similar pollution exclusion ambiguous as to whether it applied to emissions from a hog factory which operated under state regulations and permits).

The same reasoning applies here. The underlying fourth amended complaint alleges that the IEPA issued Griffith Labs a two-year permit, beginning in July 1984 (during the first Policy period) and expiring on July 31, 1986 (after the expiration of the Policies' periods). [15-1] ¶¶ 57–58. According to the underlying complaint, the IEPA permit made Griffith Labs responsible for "sterilization processes for the six chambers for which it received a permit," "emissions of EtO

and other volatile organic materials from the facility," and "ensuring that its emissions and emission controls were compliant with local, state and federal law." *Id.* ¶ 60. The underlying complaint similarly attempts to hold Sterigenics liable for negligence due its management of the Willowbrook facilities, including for its emission of "massive and unnecessary amounts of" the permitted "EtO into the air from the Willowbrook facilities." *Id.* ¶ 220. As in *Imperial Marble*, this Court finds that the Pollution Exclusion is ambiguous as to whether emission of EtO under an IEPA permit qualifies as a traditional environmental pollution under the Policies. Because the Pollution Exclusion's application is not "clear and free from doubt," it cannot excuse National Union from its defense obligations. *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015) (quoting *Hurst–Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir. 1995)).

In addition, even if EtO emissions qualify as the type of traditional environmental pollution recognized under Illinois jurisprudence, the Pollution Exclusion itself contains an exception that reinstates coverage for Sterigenics. That is, the Pollution Exclusion "does not apply if such discharge, discharge dispersal, release or escape is sudden and accidental." [25-1] at 6; [25-2] at 12. In interpreting a similar "sudden" and "accidental" pollution exception to a pollution exclusion, the Illinois Supreme Court has held that the term "sudden" in pollution exclusions to be ambiguous and has construed the term "in favor of the insured to mean unexpected or unintended." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992). Additionally, courts construe the term "accident" in the context of

CGL policies as "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 688–89 (7th Cir. 2008) (quoting *Westfield Nat'l Ins. Co. v. Cont'l Cmty. Bank & Trust Co.,* 804 N.E.2d 601, 605 (Ill. App. Ct. 2003)); *see also Westfield Ins. Co. v. Zaremba Builders II LLC*, No. 19-CV-00794, 2022 WL 614938, at *5 (N.D. Ill. Mar. 2, 2022) (using the same definition). The underlying fourth amended complaint triggers the "sudden and accidental" exception to the Pollution Exclusion for Sterigenics because it alleges that Sterigenics' negligence resulted in "unintended leaks, spills, or emissions." [15-1] ¶¶ 225, 230. The "unintended" nature of the alleged leaks, spills, or emissions fit squarely within the definitions of "sudden" and "accidental," as interpreted by Illinois courts.

National Union counters that the underlying complaint, read as a whole, paints the picture that the "EtO emissions were a common, recurring, expected and intended aspect of the business," rather than sudden and accidental occurrences. [32] at 23. True, the underlying plaintiffs allege that the Willowbrook facilities' failure to control emissions resulted in "unnecessary emission of EtO into the surrounding community of at least 25,000 pounds each year of at least 400,000 pounds between 1984 and 1999," and that the facilities "operated 24 hours a day, emitting toxic, cancerous gas on a steady and continuous basis." [15-1] ¶¶ 86, 141. These allegations suggest, as National Union argues, that the emissions were routine and recurring, and not "sudden" nor "accidental." But "if several theories of

17

recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy." *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774 (7th Cir. 2016) (quoting *Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). Here, in addition to alleging that EtO emissions were continuous and routine, the underlying plaintiffs also allege that the emissions were unintended and unexpected. The latter theory is all that is needed to trigger the "sudden and accidental" exception.

National Union's citation to *Fruit of the Loom, Inc. v. Travelers Indemnity Co.* does not alter this Court's conclusion. *Contra* [38] at 6. In *Fruit of the Loom*, the Illinois appellate court considered the "sudden and accidental" exception in the context of an insured's discharge of liquid polychlorinated biphenyls (PCBs) in the mid-1950s to the late 1970s. 672 N.E.2d 278, 280 (Ill. App. Ct. 1996). There, the court held that the exception did not apply where the undisputed facts showed that, even though accidental spills occurred, those accidents occurred with regularity and were expected by the insured in the "ordinary course of business." *Id.* at 287–88. An employee testified, for example, that "PDB drippage occurred all the time; it was an ongoing problem to keep certain areas clean." *Id.* at 281. Unlike this case, the *Fruit of the Loom* court determined coverage on a full evidentiary record and determined that, although accidents occurred, they were not unexpected. Here, in contrast, this Court construes only the allegations of the underlying complaint in considering the duty to defend and it does so liberally in favor of coverage. *Am Bankers*, 3 F.4th at

327; *Zurich Am. Ins.*, 990 F.3d at 1078. Because the underlying complaint contains allegations that Sterigenics is liable for "unintended leaks, spills, or emissions," [15-1] ¶¶ 225, 230, it triggers the "sudden and accidental" exception to the Pollution Exclusion for Sterigenics.

### 4.   Personal Injury Coverage

Sterigenics and the Griffith Labs also contend that National Union must defend them under the "personal injury" coverage provision of the Policies, to which the Pollution Exclusion does not apply. [25] at 26; Griffith [25] at 14–16. National Union does not dispute that the Pollution Exclusion is inapplicable to "personal injury" coverage. *See generally* [32]; [38]. Instead, National Union disputes that the underlying complaint does not allege any covered "personal injury."

The personal injury coverage provision provides:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory. . . .

> "Personal injury," in relevant part, means injury arising out of one or more of the following offenses committed during the policy period of the following offenses committed during the policy period:

> \* \* \*
> 2.      wrongful entry or eviction or other invasion of the right of private occupancy;

[25-1] at 7; [25-2] at 6.

This Court agrees with Plaintiffs that the underlying fourth amended complaint alleges injuries that fall under the definition of "personal injury" under

the Policies. Under Illinois law, private nuisance claims trigger "personal injury" coverage because they entail a "wrongful entry or eviction or other invasion of the right of private occupancy." *Admiral Indem. Co. v. 899 Plymouth Ct. Condo. Ass'n D&kK Real Est. Serv. Corp.*, No. 16 C 5085, 2017 WL 345559, at *7 (N.D. Ill. Jan. 24, 2017) (quoting *Great Am. Ins. Co. of N.Y. v. Helwig*, 419 F. Supp. 2d 1017, 1025 (N.D. Ill. 2006)). A private nuisance "is a substantial invasion of another's interest in the use and enjoyment of his or her land." *Martinez v. City of Chicago*, 534 F. Supp. 3d 936, 953 (N.D. Ill. 2021) (quoting *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 204 (Ill. 1997)). Allegations "that the defendant's conduct threatens the plaintiff's land with environmental contamination . . . sufficiently state a nuisance claim." *City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 825 (N.D. Ill. 2014); *see also Lewis v. 300 W. LLC.*, No. 18-CV-50186, 2019 WL 4750313, at *11 (N.D. Ill. Sept. 30, 2019) (allegations that environmental contamination substantially interfered with the plaintiffs' reasonable use, development, and enjoyment of their property adequately stated a private nuisance claim).

The underlying complaint asserts that Sterigenics and Griffith Labs have threatened the underlying plaintiffs' land with environmental contamination. In Counts VII, the underlying plaintiffs assert that Sterigenics' "use and emission of EtO from the facilities . . . caused those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer." [15-1] ¶ 253. Similarly, Count XVIII alleges that the activities of "Griffith

Labs . . . caus[ed] those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer." *Id.* ¶ 318. These allegations that Sterigenics and Griffith Labs have threatened the underlying Plaintiffs' enjoyment and use of land with environmental contamination state a private nuisance claim and thus fall under the definition of "personal injury" under the Policies. *See, e.g., Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, N.E.2d 223, 231 (Ill. App. Ct. 1996) (concluding that facts alleging "the unauthorized seepage and migration of gasoline onto the property of an adjoining neighbor[] were sufficient to bring the underlying complaint within the personal injury coverage of the policies").

National Union argues that the underlying complaint does not trigger "personal injury" coverage because the underlying plaintiffs have labeled Counts VII and XVIII "public nuisance" and not "private nuisance." [32] at 24. Legal labels are not dispositive. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010) (noting that the court's inquiry on a duty to defend claim "is based on the allegations in the complaint, not the legal labels attached to them"). Further, when the "nuisance, in addition to interfering with the public right, also interferes with the use and enjoyment of the plaintiff's land, it is a private nuisance as well as a public one." *Willmschen v. Trinity Lakes Improvement Ass'n*, 840 N.E.2d 1275, 1282–83 (Ill. App. Ct. 2005) (quoting Restatement (Second) of Torts § 821C, Comment *e,* at 96 (1979)). As discussed, the underlying complaint contains

allegations that Sterigenics and Griffith Labs emitted carcinogenics onto the plaintiffs' private property. Thus, even though the underlying plaintiffs have labeled those counts as "public nuisance" claims, the facts they have alleged also "potentially give rise to" a private nuisance claim, and thus fall within the Policies' "personal injury" coverage. *Santa's Best Craft*, 611 F.3d at 346; *see Liberty Mut.*, 33 F.4th at 447 (instructing that the duty to defend arises when the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions).

National Union also argues that the Policies preclude coverage for "personal injury" arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured. [32] at 28; *see* [25-1] at 7 (excluding from coverage "personal injury or advertising injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured"); [25-2] at 6 (same). This argument is unpersuasive. The underlying complaint does not allege any statutory violation; it alleges common law causes of action. *See generally* [15-1]. To be sure, the underlying fourth amended complaint contains a reference to the Illinois Environmental Protection Act. *See* [15-1] ¶ 72 (alleging that "Griffith Labs was obligated to comply with the Illinois Environmental Protection Act and its supporting regulations, which prohibited 'the emission of any contaminant into the environment so as to cause or tend to cause air pollution in Illinois. . .'"). But the Act is not the basis for any of the plaintiffs' claims. National Union has not demonstrated that an exclusion to the "personal injury"

22

coverage provision applies. In sum, the underlying complaint's private nuisance allegations trigger the "personal injury" coverage provisions in the Policies, thus providing another independent basis for National Union's duty to defend. *See Title Indus. Assurance Co., R.R.G. v. First Am. Title Ins. Co.*, 853 F.3d 876, 884 (7th Cir. 2017) (observing that "where insurer has duty to defend against at least one count of underlying lawsuit, it must then defend against all counts").

### 5. National Union Owes a Duty to Defend

As explained above, the underlying fourth amended complaint alleges bodily injury and personal injury that triggers coverage under the Policies, and National Union has not met its burden in demonstrating that any exclusions apply. Accordingly, this Court concludes that National Union owes Sterigenics and Griffith Labs a duty to defend based on the underlying fourth amended complaint.

The Griffith Plaintiffs also point out that although Griffith Foods is not named as a defendant in the fourth amended underlying complaint, it was named as a defendant in a prior iteration of the underlying complaint—the second amended underlying complaint. Griffith [19] at 15–16. Griffith Foods argues that, at a minimum, National Union owes it defense costs for the time that Griffith Foods was on the hook in the underlying case. *Id.* But this argument is undeveloped (indeed, Griffith Foods devotes only two sentences to it), and neither side engages in any substantive analysis regarding National Union's defense obligations under prior versions of the underlying complaint; instead, the parties' briefs focus on National Union's defense obligations under the fourth amended complaint. "When a party has

more than ample opportunity to present an argument but raises it in a perfunctory manner, it should not expect more than perfunctory consideration from the district court." *Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013). Because the parties have not sufficiently raised these issues before this Court, this this Court denies without prejudice Griffith Foods' request for defense costs arising from prior versions of the underlying complaint.[2]

### B. Estoppel

The Griffith Plaintiffs also ask this Court to enter judgment declaring that National Union is estopped from asserting policy defenses to coverage. National Union, for its part, requests a determination that estoppel is inapplicable.

Under Illinois law, when "an insurer learns of a claim against its insured, the ball is in the insurer's court." *Title Indus.*, 853 F.3d at 891. When a complaint against an insured alleges facts within or potentially within the coverage of the insurance policy, and the insurer takes the position that the policy does not cover the underlying complaint, the insurer must: (1) defend the suit under a reservation of rights; or (2) seek a declaratory judgment of non-coverage. *Essex Ins. Co. v. Blue Moon Lofts Condo. Ass'n*, 927 F.3d 1007, 1012 (7th Cir. 2019). If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer breaches its duty to defend and is estopped from asserting policy defenses to

---

[2] This Court also notes that, although Griffith Foods relies on the second amended complaint in arguing that National Union owed it a defense, the insurer's duty to defend only arises upon "actual notice of the underlying suit." *Cincinnati Cos. v. W. Am. Ins. Co.*, 701 N.E.2d 499, 505 (Ill. 1998). Here, Griffith Foods alleges that National Union received actual notice when it received the *third* amended complaint, not the second amended complaint. Griffith [1] ¶ 31. Thus, to the extent National Union owes Griffith Foods any defense costs, those costs ostensibly would arise only after Griffith Foods provided notice to National Union of the *third* amended complaint.

24

coverage. *Santa's Best Craft*, 611 F.3d at 349; *Emps. Ins. of Wausau v. Ehlco Liquidating Tr.*, 708 N.E.2d 1122, 1135 (Ill. 1999); *see also Title Indus.*, 853 F.3d at 892 (observing that an "insurer that breaches its duty to defend and abandons its insured is estopped from later invoking policy defenses to indemnity"). To avoid estoppel, the insurer must take one of the above steps—defend under a reservation of rights or seek declaratory judgment—"within a reasonable time of a demand by the insured." *Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n*, 764 F.3d 726, 733 (7th Cir. 2014) (quoting *Korte Constr. Co. v. Am. States Ins.,* 750 N.E.2d 764, 770 (Ill. App. Ct. 2001)).

On January 29, 2021, the Griffith Plaintiffs provided National Union with notice of the underlying suit and provided copies of the (then-operative) third amended complaint. Griffith Compl. [1] ¶ 31.[3] On February 17, 2021, National Union acknowledged receipt of the notice and requested copies of the Policies, which the Griffith Plaintiffs provided the same day. *Id.* ¶ 32. National Union ultimately denied coverage on October 12, 2021. *Id.* ¶ 33. Shortly after, on November 30, 2021, the Griffith Plaintiffs filed this declaratory judgment action, and shortly after that, on January 31, 2022, National Union answered and asserted affirmative defenses. *See* Griffith [1]; [11]. In its answer and affirmative defenses, National Union explicitly denies coverage and "requests that this Court find and declare that Plaintiffs are not entitled to any relief." [11] at 11. Thus, about one year transpired between the

---

[3] The parties assume, without discussing, that the third amended complaint's allegations were sufficiently similar to the fourth amended complaint's allegations, such that if the latter triggered National Union's duty to defend, the former would have, too.

Griffith Plaintiffs' tender of the underlying litigation and National Union's request for a declaration of non-coverage. *See Sentinel Ins. Co. v. Walsh Constr. Co.*, 298 F. Supp. 3d 1165, 1176 (N.D. Ill. 2018) (noting that to avoid estoppel, "an insurer need not be the one to have filed the action in which it seeks a declaration of no coverage").

Illinois courts have generally applied one of three standards to measure an insurer's promptness in requesting declaratory judgment. *L.A. Connection v. Penn-Am. Ins. Co.*, 843 N.E.2d 427, 432 (Ill. App. Ct. 2006); *Nat'l Cas. Co. v. S. Shore Iron Works, Inc.*, 341 F. Supp. 3d 884, 893 (N.D. Ill. 2018). One approach deems a declaratory judgment action timely requested "as long as it was filed before the underlying lawsuit ends," and another approach focuses on whether the insurer requested declaratory judgment before trial or settlement was imminent. *Id.* The third approach asks simply whether "the insurer filed the declaratory action within a reasonable amount of time after receiving notification of the underlying action." *Allied World Specialty Ins. Co. v. John Sexton Sand & Gravel Corp.*, 2019 IL App (1st) 182468-U, ¶ 66. Here, it is undisputed that the underlying suit remains ongoing, and there is nothing in the present record suggesting that trial or settlement is imminent. Thus, National Union clearly discharged its duty to act with reasonable promptness under the first two approaches.

Under the third approach, which is the one now favored by Illinois courts, the Court asks whether National Union requested declaratory judgment within a "reasonable time" of being on notice of the underlying suit, regardless of the posture of the underlying suit. *State Auto. Mut. Ins. Co. v. Kingsport Dev., LLC*, 960, 846

N.E.2d 974, 987 (Ill. App. Ct. 2006); *see also Zurich Specialties London Ltd. v. Vill. of Bellwood*, No. 07 CV 2171, 2011 WL 248444, at *10 (N.D. Ill. Jan. 26, 2011) (noting that although the "Illinois Supreme Court has not yet decided the issue, this court agrees with those courts that have adopted the third approach"); *Sentinel*, 298 F. Supp. 3d at 1175 ("This Court agrees with these decisions . . . that the proper inquiry is whether Sentinel sought a declaratory judgment of no coverage within a reasonable time."). This Court finds that National Union did not unreasonably delay in requesting declaratory judgment. Illinois courts have not adopted a bright line rule as to what constitutes a "reasonable time." *Nat'l Cas. Co. v. S. Shore Iron Works, Inc.*, 341 F. Supp. 3d 884, 894 (N.D. Ill. 2018). In *South Shore Iron Works*, the district court found that a thirteen-month delay between an initial tender and filing a declaratory judgment action was reasonable because of the "protracted procedural history" of the underlying suit—including that it involved multiple amended complaints, one of which was filed just four months prior to the insurer's filing of a declaratory judgment action. 341 F. Supp. 3d at 894.

Similarly, there is protracted history here in the underlying case. And while "delays of *over a* year have been found unreasonable by courts employing the reasonable time test," *Zurich*, 2011 WL 248444, at *10 (emphasis added), the delay here between the time the Griffith Plaintiffs provided actual notice of the underlying suit and when National Union first requested a declaration of non-coverage was just about one year. Particularly given the complex nature of the underlying dispute (which involves hundreds of consolidated complaints) and the fact that the

underlying dispute is nowhere near completion nor settlement, this Court concludes that National Union sought declaratory relief within a reasonable time of receiving actual notice of the underlying suit. Therefore, this Court denies the Griffith Plaintiffs' motion as to estoppel, and grants National Union's motion as to estoppel.

## IV. Conclusion

For the reasons explained above, this Court concludes that National Union owes Sterigenics and Griffith Labs a duty to defend the underlying fourth amended complaint and that National Union is not estopped from asserting coverage defenses. As a result, this Court grants Sterigenics' partial motion for judgment on the pleadings and denies National Union's cross-motion for judgment; and grants in part the Griffith Plaintiffs' partial motion for judgment on the pleadings, and grants in part National Union's cross-motion for judgment. This Court sets a telephonic status hearing for August 25, 2022 at 10:00 a.m. Parties shall call 866-434-5269; access code 3751971. Counsel shall be prepared to report on what substantive issues remain in this case, given that this Court has adjudicated National Union's defense obligations (at least with respect to the underlying fourth amended complaint), and questions regarding National Union's duty to indemnify are unripe and subject to dismissal pending the outcome of the underlying litigation. *See Am. Bankers*, 3 F.4th at 331.

E N T E R:

Dated: August 3, 2022

_____

MARY M. ROWLAND
United States District Judge

# EXHIBIT 2

FILED
4/16/2021 2:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| IN RE: WILLOWBROOK ETHYLENE OXIDE LITIGATION | **Consolidated for Pretrial and Discovery Purposes Under:**<br><br>**No. 2018-L-010475**    2018L010475 |
| **This filing applies to: ALL ACTIONS CONSOLIDATED FOR PRETRIAL AND DISCOVERY PURPOSES** | **Judge Christopher E. Lawler** |

**PLAINTIFFS' FOURTH AMENDED MASTER COMPLAINT**

Plaintiffs, by and through their attorneys, for their Complaint at Law[1] against Defendants

STERIGENICS U.S., LLC, SOTERA HEALTH, LLC, BOB NOVAK, ROGER CLARK, GTCR, LLC,

and GRIFFITH FOODS INTERNATIONAL, INC.,[2] allege as follows:

---

[1] Plaintiffs submit this Fourth Amended Master Complaint in accordance with prior Court orders, including CMO-1. In so doing, Plaintiffs maintain their position that this consolidated matter is not a mass action under 28 U.S.C. § 1332. In no way should this complaint be taken to mean that any Plaintiff is proposing any joint trials and/or joint decision of one or more issues in one or more cases. These matters have been consolidated for discovery and pretrial only based on certain Defendants' motion and the Court's own orders. Plaintiffs further submit this Fourth Amended Master Complaint in accordance with the Court's August 17, 2020 Order on Defendants' Motions to Dismiss, which dismissed certain counts of Plaintiffs' First Amended Complaint without prejudice. Plaintiffs hereby preserve Counts X (Sotera-Negligent Supervision), XII (Sotera-Strict Liability), XIII (Sotera-Battery), XXI (GTCR-Strict Liability), and XXII (GTCR-Battery) from their First Amended Master Complaint previously dismissed on August 17, 2020 for appeal, disclaim any waiver, and explicitly reserve the right to amend those counts as provided by the Court's dismissal without prejudice.

[2] Plaintiffs previously named Griffith Foods, Inc., Griffith Foods Worldwide, Inc., and Griffith Foods Group, Inc. as defendants in their Third Amended Master Complaint. The first two entities moved to dismiss that complaint pursuant to 735 ILCS 5/2-619 and produced a Declaration from William Frost stating, in relevant part, that these two entities never possessed any ownership interest in the Willowbrook facilities or in any entity owning any interest in the Willowbrook facilities, and that neither entity had any involvement with EtO sterilization services. *See* Frost Decl. at ¶¶ 17-18. Mr. Frost also attested that Griffith Foods Group, Inc. was merely the parent to Griffith Foods International, Inc., formerly known as Griffith Laboratories, U.S.A., Inc. *Id.* at ¶¶ 3-4. Plaintiffs have no reason to believe that Griffith's and Mr. Frost's representations to this effect are untrue and Plaintiffs are reasonably relying upon these representations

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

## I.    Prefatory Statement on Griffith Foods

1.     In this Fourth Amended Complaint, Plaintiffs sue *only one Griffith entity*, referred to herein as "Griffith Labs." Today, Griffith Labs is known as "Griffith Foods International, Inc."; it was formerly known as "Griffith Laboratories U.S.A., Inc."

2.     Plaintiffs sue Griffith Labs *only for its own independent acts and omissions* between 1984 and 1999, detailed extensively in this complaint. Plaintiffs do not sue Griffith Labs for the conduct of any other entity.

3.     Sterigenics *has not assumed liability for the conduct of Griffith Labs.* (This is contrary to the Court's understanding at page 6 of its March 16, 2021 dismissal order). Indeed, in Stipulation No. 1, entered on June 12, 2020, Sterigenics assumed the liabilities of certain entities explicitly identified in the Stipulation, *but Griffith Labs is not one of them*.[3]

4.     In this complaint, Plaintiffs specifically allege that Griffith Labs' misconduct persisted throughout the entirety of the period from 1984 to May 14, 1999, when Griffith Labs sold its sterilization business. *See* Paragraphs 33 – 104. Plaintiffs further describe how Griffith Labs' misconduct satisfies the elements of Plaintiffs various causes of action. *See* Paragraphs 275 – 324.

5.     In summary, as alleged in this complaint, Griffith Labs' independent acts and omissions throughout the entirety of the period between 1984 and 1999, which caused or contributed to Plaintiffs' injuries, include:

---

in electing not to name Griffith Foods, Inc. Griffith Foods Worldwide, Inc. and Griffith Foods Group, Inc. in their Fourth Amended Master Complaint.

[3] Stipulation No. 1 only applies to the approximate 70 plaintiffs who had filed suit at the time the stipulation was entered on June 12, 2020; it does not apply to the hundreds of plaintiffs who filed suit after, all of whom expressly disclaimed that stipulation in their respective complaints.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a.  Locating, and then for the next 16 years operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing at all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses.

b.  Never warning its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs knew that the emissions threatened their health and that they had no ability to protect themselves because they had no idea that EtO was even being emitted into their community. Griffith Labs failed to warn the Willowbrook community even though it provided warnings to residents living near other Griffith Labs' EtO sterilization facilities in other states.

c.  Deciding and mandating that the Willowbrook facility operate without essentially any emission control equipment whatsoever for its first four years of operation (1984 – 1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time.

d.  Deciding to operate the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control over EtO emissions from, e.g., the facility's back-vents, aeration rooms, and work aisles, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those emissions alleged in subparagraph (c), above) during that time.

e.  Designing in 1984, and then from 1984 to 1999 mandating the use of, a sterilization/emissions process that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility.

f.  Throughout the period from 1984 to 1999, itself directly purchasing, using, and mandating the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

g. Failing to use emission control equipment in Willowbrook that it (Griffith Labs) was using in its other EtO facilities in the United States and other countries. This resulted in EtO emissions from the Willowbrook facilities that were sometimes as much as 100x higher, and more dangerous, than those at Griffith Labs' other facilities.

h. Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs knew those concentrations would be health threatening, and IEPA had specifically and directly required Griffith Labs to conduct extensive ambient air testing in 1984 to 1986 as a special condition for granting Griffith Labs' permit to operate the Willowbrook facility.

i. Misleading the State's regulator, IEPA, by, *inter alia*, failing to inform IEPA as to what it (Griffith Labs) knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA to grant it (Griffith Labs) the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions that were based on assumptions Griffith Labs knew had no basis or were false.

j. Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities.

k. Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies in order to understate those health dangers and create a justification for emissions it knew endangered the health of those living near the Willowbrook (and other) sterilization facilities.

6. The above misconduct of Griffith Labs persisted well past its October 1984 nominal transfer to Micro Biotrol Company of certain (though far from all) assets and liabilities and at least until May 14, 1999. Indeed, as alleged above and throughout this complaint, this

FILED DATE: 4/16/2021 2:00 PM    2018L010475

October 1984 transaction did nothing to diminish Griffith Labs' substantive participation in the Willowbrook facility's operations and emissions.

7.    In summary, Plaintiffs sue Griffith Labs because its actions and failures to act caused them to suffer the cancers and other serious illnesses that Griffith Labs specifically foresaw, when, in 1984, it purposely directed that an EtO sterilization facility be located in Plaintiffs' residential community that it (Griffith Labs) knew would endanger the community's health and safety, and then, for the next 15 years, directed that the facility be operated without the means necessary—indeed, for many years without any means at all—to protect the unsuspecting Plaintiffs against the facility's nearly one million pounds of carcinogenic emissions during that time. Griffith Labs may be held liable for this conduct, despite the fact that its subsidiaries were nominally operating the Willowbrook facility for portions of that 15 year period because, as the Illinois Supreme Court has determined, "[i]f a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290 (2007).

## II.    Introduction

8.    For decades, tens of thousands of people have lived in the quiet but densely populated suburbs of Cook and DuPage Counties—Willowbrook, Burr Ridge, Darien, and Hinsdale—believing that their neighborhoods were safe and their air free from dangerous toxins. Not so. Defendants' Willowbrook sterilization facilities were emitting massive and unnecessary amounts of ethylene oxide ("EtO")—an invisible, odorless carcinogen—into their air.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

9.       There is no safe level of EtO; its carcinogenic effects have been widely known since the 1940s and known to Defendants since at least 1984. Notwithstanding, Defendants chose to operate their business and emit EtO in a densely populated area full of children, houses, parks, schools, and businesses.

10.      Even further, although technologies to control EtO have been available—and widely used—since the 1980s, Defendants operated for years in Willowbrook without using the best practices and control technologies available to reduce their emissions; and as a direct and proximate result, the Willowbrook area has become one of the most toxic in the U.S. The people who have lived and worked in the area have inhaled EtO on a routine and continuous basis for years, unknowingly. Defendants never warned them about the danger it posed.

11.      In August 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released to the public a report titled "Evaluation of Potential Health Impacts for Ethylene Oxide Emissions."[4] That report, documenting the public health impacts of Defendants' emissions on the Willowbrook area, revealed the area's staggering and disproportionate risks of cancer.

12.      In February 2019, the Illinois Environmental Protection Agency ("IEPA") ordered Defendants' Willowbrook facilities to stop using EtO. In the months that followed, Sterigenics U.S. announced a plan to install equipment to reduce emissions of EtO to 85 lbs. per year — a *drastic* reduction from the thousands of pounds of EtO emitted in the years prior. Before

---

[4] https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf

implementing the plan, however, Sterigenics U.S. announced the permanent closure of its Willowbrook facilities effective September 30, 2019.

13. Plaintiffs lived and/or worked near Defendants' Willowbrook facilities. They unknowingly breathed the excessive and dangerous amounts of EtO emitted from the facilities on a routine and continuous basis for years. As a result, they have been diagnosed with serious — sometimes fatal — diseases or conditions, and/or have sustained severe personal injuries causing them to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and loss of normal life.

14. Plaintiffs bring these personal injury claims against Sterigenics U.S., LLC ("Sterigenics U.S."), Sotera Health, LLC ("Sotera"), Griffith Labs, two managers, and a private equity firm GTCR, LLC ("GTCR).

15. In addition, since 2016, Sterigenics U.S. and Sotera, and their corporate investors and parents (including GTCR), have pursued a plan to escape accountability to those who have been sickened or have lost their lives, and thereby to cynically render this Court proceeding a sham. That is, they have funneled nearly $1.3 billion in cash out of the Sterigenics U.S. / Sotera companies in just the last 34 months for distribution to wealthy venture-capitalist investors, such that the funds could never be used to compensate the victims who have come to this Court to seek justice. And they have made certain that even those assets not siphoned away would never be available to those victims, by pledging the assets to banks to guarantee repayment of billions in corporate borrowings, so that even if the companies failed, they would be used to pay the banks, not the plaintiffs who had proven their cases.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

16.     By these actions, Sterigenics U.S., Sotera, and GTCR *admit* culpability for the toxic exposure suffered by Plaintiffs, but intend never to be held accountable for it.

### III.    Parties and Venue

17.     This is an Illinois controversy. This Complaint is brought by or on behalf of individuals who are or were citizens of Illinois, for injuries that occurred in Illinois, as a result of ethylene oxide emissions in Illinois, that were caused by Illinois Defendants' negligence and other wrongful conduct, all of which took place in the State of Illinois. This court is a proper venue under 735 ILCS 5/2-101.

18.     Greater than two-thirds of Plaintiffs to this Complaint are Illinois citizens.

19.     All Plaintiffs to this Complaint were exposed to and inhaled EtO from Defendants' Willowbrook facilities on a routine and continuous basis.

20.     Plaintiffs did not have notice that the injuries and damages at issue were wrongfully caused or that they were caused by Defendants' emissions of EtO until, at the earliest, August 21, 2018, when the ATSDR report was issued.

21.     Defendant Sterigenics U.S., LLC, is a wholly-owned subsidiary of Sotera Health, LLC, and is a limited liability company organized under the laws of Delaware with its headquarters and principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois 60523.

22.     Defendant Sterigenics U.S., under its current name and previously under other names, operated EtO sterilization facilities at 7775 Quincy Street in Willowbrook, Illinois (the "Willowbrook facility") and 830 Midway Drive in Willowbrook, Illinois, continuously and at all

FILED DATE: 4/16/2021 2:00 PM   2018L010475

relevant times. (The two facilities are referred to collectively herein as "the Willowbrook facilities" or "the facilities.")

23. Sterigenics U.S.'s predecessors who operated the Willowbrook facilities include: Micro-Biotrol Company, Micro-Biotrol, Inc., Griffith Micro Science, Inc., IBA S&I, Inc., and Sterigenics EO, Inc. Through a series of acquisitions, mergers, and name changes, Sterigenics U.S. has assumed the liabilities of these predecessor entities for their respective involvement in the operation of the Willowbrook facilities. (Sterigenics U.S. and its predecessors are referred to collectively herein as "Sterigenics U.S.".)

24. Defendant Griffith Foods International, Inc., was previously known as Griffith Laboratories U.S.A, Inc. ("Griffith Labs"). During certain times prior to May 14, 1999, which are detailed below, Griffith Labs operated the Willowbrook facilities. At all times prior to May 14, 1999, Griffith Labs directed and controlled the sterilization operations at the Willowbrook facilities. Further, at all times prior to May 14, 1999, Griffith Labs directly participated in the operation of the Willowbrook facilities. Defendant Griffith Foods International, Inc. is responsible for all acts and omissions of Griffith Labs as alleged herein. At all relevant times, Griffith Labs, now Griffith Foods International, Inc., had its headquarters and principal place of business in Alsip, Illinois, which is in Cook County. To be clear, Plaintiffs allege that Griffith Labs committed independent injurious acts and omissions separate and apart from, though alongside of, Sterigenics' acts and omissions.

25. Defendant Sotera Health, LLC, under its current name and previously under other names (first as Sterigenics International, Inc. and then as Sterigenics International, LLC), and as the sole owner, member, and "manager" of Sterigenics U.S., operated, managed, and/or

9

FILED DATE: 4/16/2021 2:00 PM   2018L010475

maintained and otherwise participated directly in Sterigenics U.S.'s operation of the Willowbrook facilities. (Defendant Sotera Health, LLC and its predecessors are referred to collectively herein as "Sotera.")

26.     For example, Sotera took responsibility for, and participated directly in, the following functions in connection with the facilities' operations:

a.   Preparing and implementing risk management plans regarding health, safety, and other risks posed by the facilities' use and storage of EtO to human health and the environment;

b.   Conducting hazard reviews at the facilities;

c.   Developing written operating procedures for training and guiding the work of operators;

d.   Training operations employees;

e.   Evaluating whether the facilities' systems and equipment were in proper working condition;

f.   Implementing a program to monitor the physical condition of process equipment;

g.   Investigating incidents;

h.   Conducting safety audits;

i.   Determining potential impacts on the surrounding community from worst-case and alternative-case releases of EtO;

j.   Evaluating the facilities' accident history;

k.   Developing procedures for notifying local, state and federal emergency planning and response agencies about chemical spills;

l.   Developing an incident prevention program that includes the following:

i.    Process Safety Information;
ii.   Process Hazard Analysis;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

      iii.    Employee Training;
      iv.    Mechanical Integrity;
      v.    Pre-Startup Review;
      vi.    Compliance Audits;
      vii.    Employee Participation; and
      viii.    Hot Work Permit.

m.  Developing plans to address accidental release that includes the following:

      i.    Computer controls;
      ii.    Door interlock system;
      iii.    EtO leak detection monitors;
      iv.    Emission Control Systems to destroy residual EtO;
      v.    Pressure Relief Valves;
      vi.    Process Safety Information for employees;
      vii.    Written SOPs for training and instructions to employees; and
      viii.    New hire and annual refresher training.

n.  Applying for IEPA construction permits to allow structural modifications at the facilities, including modifications impacting the volume of EtO emitted;

o.  Holding the facilities' construction permit, as permittee, authorizing it to:

      i.    Modify EtO emissions controls including sterilization chamber exhaust vents;
      ii.    Operate the sterilization chamber exhaust vents without any EtO emissions controls; and
      iii.    Modify the operation of its sterilization equipment, such as aeration rooms, by allowing EtO emissions controls to be bypassed.

p.  Holding the facilities' construction permit, as permittee, requiring it to:

      i.    Operate EtO emission controls in a manner that complies with local, state and federal law;
      ii.    Conduct operational monitoring for the EtO emissions controls to ensure compliance with plans previously submitted to EPA;
      iii.    Enhance operational monitoring to address the effects of modification of EtO emissions controls;
      iv.    Keeping records for operational monitoring for the EtO emissions controls affecting certain aeration rooms; and
      v.    Notifying IEPA promptly of permit deviations including identifying the date, time, duration, description of the deviation, its

11

FILED DATE: 4/16/2021 2:00 PM    2018L010475

probable cause, corrective actions, if taken, and preventative measures, if taken.

q. Certifying the facilities' permit compliance (or non-compliance) to the IEPA;

r. Communicating with IEPA regarding permit violations and uncontrolled emissions events;

s. Communicating with IEPA about its emission control equipment, including its plans to exhaust EtO from its chamber back vents to the atmosphere;

t. Monitoring and reviewing of the facilities' emission data to analyze the duration and quantity of EtO emissions released, including any excess emissions;

u. Reporting to IEPA on the volume of the facilities' EtO emissions;

v. Monitoring the facilities' emissions control equipment;

w. Assessing the capacity of the EtO sterilization chambers at the Willowbrook facilities as compared to customer demand for its sterilization services;

x. Deciding to add EtO sterilization chambers at the facilities to meet customers' demand;

y. Inventorying hazardous chemicals stored at the facilities, including EtO; and

z. Communicating with state and local emergency response groups about such hazardous chemicals, including EtO.

27.      Sotera undertook these responsibilities and functions even though, as alleged elsewhere in this complaint, it failed to ensure implementation adequate to keep the community safe.

28.      With respect to the Willowbrook facilities, the activities of Sterigenics U.S. and Sotera have been intertwined. Sterigenics U.S. and Sotera have routinely and publicly held

FILED DATE: 4/16/2021 2:00 PM    2018L010475

themselves out as a single entity – "Sterigenics" – engaged in operating EtO sterilization facilities throughout the country, including the Willowbrook facilities; and others, including Moody's Investor Services, for example, has always treated the Sterigenics entities as a single entity and issued them a single "Corporate Family Rating." Indeed, Sterigenics U.S. and Sotera have shared the same Chairman and CEO, the same Vice President, the same General Counsel & Secretary, the same President and COO, and the same Vice President for Environmental, Health & Safety. And they have shared a complete unity of interest, with Sterigenics U.S. acting as an instrumentality of Sotera to accomplish Sotera's business mission.

29.     Defendant Bob Novak was the Operations Manager at the Willowbrook facilities since August 2003. He was responsible throughout this period for coordinating and overseeing the operation of the facilities, directing personnel at the facilities, implementing procedures, and ensuring overall safety at the facilities. Upon information and belief, Mr. Novak resides in Illinois.

30.     Defendant Roger Clark was the Maintenance Supervisor at the Willowbrook facilities from the late 1980s until approximately 2015. Mr. Clark was responsible throughout this period for calibrating the internal EtO monitors and overseeing the maintenance activities at the facilities which included, among other responsibilities, monitoring and replacing emissions systems equipment. Mr. Clark resides in Cook County, Illinois.

31.     In 2011, a private equity trust managed by GTCR acquired Sterigenics International, LLC (now Sotera), along with its subsidiaries (including Sterigenics U.S.) and parent companies, for $675 million.[5] From 2011 through the present, GTCR, with its principal

---

[5] https://www.gtcr.com/gtcr-announces-agreement-to-acquire-sterigenics-international-inc/

FILED DATE: 4/16/2021 2:00 PM   2018L010475

place of business at 300 N. LaSalle Street, Suite 5600, Chicago, Illinois, has owned, operated, managed, and/or maintained Sterigenics U.S. and Sotera.

32.     Defendants Sterigenics U.S., Griffith Labs, Sotera, and GTCR do regular and substantial business in Cook County, Illinois.

**IV.   Griffith Labs is responsible for EtO emissions from the Willowbrook facility up until at least May 14, 1999, when it sold its sterilization business**

    **A.   Griffith Labs decided to locate an EtO Sterilization facility in Willowbrook notwithstanding its knowledge that exposure to EtO is harmful to human health and can cause cancer**

33.     Griffith Labs claims to have pioneered the development and use of EtO as a sterilant in the 1930s. In the 1940s, Griffith Labs received patents for the EtO sterilization of hospital and medical supplies. Beginning in the 1950s, Griffith Labs began offering contract EtO sterilization to third-party customers. Griffith Labs continued its contract sterilization business for decades, and in or around 1984, it opened and operated an EtO sterilization facility in the Village of Willowbrook — a suburban community located roughly 20 miles southwest of Chicago with a population of approximately 8,500.

34.     Before 1984, Griffith Labs knew or should have known that it was too dangerous to locate an EtO sterilization facility in or near a residential community, and indeed that any sterilization facility anywhere should be equipped with emission control equipment adequate to ensure that no one outside the facility was exposed to EtO.

35.     Griffith Labs' decision to locate its EtO sterilization facility in Willowbrook was driven by logistical and financial self-interest, such as Griffith Labs' belief that Willowbrook would be an optimal location because it is centrally located in the Midwest near highways and

railroads and because it was able to secure favorable lease terms. Griffith Labs' decision was also driven by a desire to expand its ethylene oxide sterilization services to the commercial sterilization of medical supplies. In making its decision, Griffith Labs ignored its knowledge that placing an EtO sterilization facility in or near a residential community would cause significant risk to human health. Griffith Labs could have secured a facility far enough away from a residential population to drastically reduce and/or minimize the danger to residents, but consciously chose not to.

36.    On or about April 12, 1984, Griffith Labs, through its unincorporated division, Micro-Biotrol, Co[6]., leased a 44,939 square foot facility at 7775 Quincy Street in Willowbrook for the stated purpose of: "Sterilization process of various products." The lease terms were originally for five years, with multiple options to renew for another five years thereafter. In this way, Griffith Labs ensured that a dangerous EtO sterilization facility would operate next to a residential neighborhood in Willowbrook for many years to come.

**B. Griffith Labs' dealings with IEPA in securing a permit to operate an EtO sterilization facility in Willowbrook**

37.    On or about May 31, 1984, in anticipation of constructing and operating the sterilization facility in Willowbrook, Griffith Labs created the plot below:

---

[6] Sterigenics U.S. has also not assumed the liabilities for Micro-Biotrol, Co. Because Micro-Biotrol Co., was an unincorporated division of Griffith Labs, Griffith Labs is directly responsible for its conduct.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475



FILED DATE: 4/16/2021 2:00 PM   2018L010475

38.     In making this plot, Griffith Labs marked off the distances from its EtO facility in Willowbrook to various schools, and therefore knew its facility would be located within ½ mile of Gower Elementary; one mile of Hinsdale South High School; two miles of Gower West Elementary; ¼ mile of the nearest residence to the west; ½ mile of the nearest residence to the south; and otherwise in the immediate proximity of many homes, parks, schools, and small businesses.

39.     Griffith Labs further knew that EtO emissions from its Willowbrook facility could and would migrate to each of the locations on the plot, including those listed on the plot, in concentrations that would endanger human health.

40.     Notwithstanding this knowledge, Griffith Labs elected to move forward with its plans to open an EtO sterilization facility in Willowbrook and, on or about June 1, 1984, applied for a construction and operating permit from IEPA.

41.     Griffith Labs' permit application to IEPA included the above plot and also included a representation to IEPA that its maximum emissions of EtO would be 40 tons (80,000 lbs.) per year.

42.     On or about  July 6, 1984, Griffith Labs received the following letter from IEPA concerning the environmental impact of its proposed EtO emissions (highlighting added):

***

FILED DATE: 4/16/2021 2:00 PM    2018L010475

 Illinois Environmental Protection Agency   2200 Churchill Road, Springfield, IL 62706

217/782-2113

I.D. No.: 043110AAC
Application No.: 84060002

July 6, 1984


Griffith Laboratories
12200 South Central Avenue
Alsip, Illinois 60658

Attention: John Kjellstrand

This is in response to a telephone call from Mr. Dickinson to Mr. Cobb on
July 3, 1984, concerning the environmental impact of ethylene oxide
emissions from the six proposed sterilizers included in the above
mentioned construction permit application.

According to the information provided by your company in the application,
the maximum emissions of ethylene oxide were 40 tons per year during
1983.   The data you provided included a building which may cause a
downwash effect, therefore, the ISCST model was used in the analysis.
ISCST utilized one year of meteorology (1975 Midway), the urban
dispersion mode and the building downwash option. Model results were
obtained at 180 receptors located on five rings surrounding the source.
Each ring contained 36 receptors spaced at 10° intervals. The rings
were spaced at radial distances of 100, 400, 810, 1205, and 1609 meters
from the source. According to the modeling run, the maximum annual
ground level concentrations of ethylene oxide will vary from 3.120
micrograms per cubic meter at 100 meters to 0.09883 micrograms per cubic
meter at one mile outside the plant boundary line. A copy of the modeled
annual concentrations is attached.

The ethylene oxide (ETO) toxicity data was derived from different
literature references. One such document is a USEPA draft publication --
"Health Assessment Document - Ethylene Oxide - EPA 600-8-84-009A." A
copy of this document can be obtained by calling USEPA at phone number
513/684-7562.

The toxicity data provides evidence of human cancers of the pancreas,
bladder, brain, central nervous system and stomach associated with ETO
exposure. Various animal studies have shown carcinogenic, mutagenic,
leukogenic and teratogenic effects. These studies indicate that the
acceptable ground level concentrations of ETO is 0.007 micrograms per
cubic meter. While the Agency does not have any established standards
for ETO at this time, nor are we suggesting that the acceptable
concentrations referenced above are necessarily the numbers that we are
committed to using, in our opinion the emissions from the Micro Biotrol
facility appear to be several magnitudes higher than desirable.

18

FILED DATE: 4/16/2021 2:00 PM    2018L010475

 Illinois Environmental Protection Agency  ·  2200 Churchill Road, Springfield, IL 62706

Page 2

We request a meeting as soon as possible to be able to better explain our evaluation and concerns. In our opinion, there are several methods by which emissions of ETO at this facility can be reduced. At our meeting, we wish to also discuss steps that can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level.

We are looking forward to hearing from you in the near future. In the meantime, should you have any questions, please feel free to call Jim Cobb, Harish Desai or me at 217/782-2113.

Very truly yours,

Bharat Mathur, P.E.
Manager, Permit Section
Division of Air Pollution Control

BM:JDC:sd/1392d/24-25

cc: Warren Dickinson, Griffith Laboratories
    Dennis Lawler
    Permit File
    Region 1

43.     This July 6, 1984 letter from IEPA specifically addressed the *"environmental impact"* of ethylene oxide emissions from the sterilization chambers Griffith Labs sought to operate in Willowbrook. As Griffith Labs' Project Engineer for the Willowbrook facility later testified, the "environmental impact" from the facility included the neighboring residents' exposure to EtO and their resulting risk of contracting cancer.

44.     By way of this July 6, 1984 letter, Griffith Labs was expressly advised by the state regulatory authority that its EtO sterilization operation posed significant adverse health risks to humans in that: (i) EtO exposure is associated with human cancers; and (ii) EtO has carcinogenic, mutagenic, leukogenic, and teratogenic effects. Griffith Labs thus had knowledge that its EtO

19

FILED DATE: 4/16/2021 2:00 PM    2018L010475

emissions would cause harm to humans in neighboring communities long before it exposed any Plaintiff or Plaintiff's decedent to EtO emissions.

45.     As Griffith Labs' Project Engineer later testified, IEPA was warning Griffith Labs by this letter that at least two of the schools and two residential areas on the plot (*see* Paragraph 37) were within the area where IEPA had determined that EtO concentrations from the Willowbrook facility would be "several magnitudes higher than desirable".

46.     Indeed, Griffith Labs was already aware of the toxic and deadly effects of EtO when it received the July 6, 1984 letter from IEPA.  Even before that date, and before any Plaintiff or Plaintiff's decedent was exposed to EtO emissions, Griffith Labs knew that:

    a.  there was "no safe level" of EtO, *i.e.*, there was no concentration of EtO that could be safely breathed without risk of serious damage to health;

    b.  "ethylene oxide has also been found to pose a serious health risk";

    c.  the very attribute which made EtO so lethally effective as a sterilant— *e.g.*, its ability to inactivate DNA—also made EtO very dangerous for human beings exposed to it;

    d.  the state of Illinois recognized EtO as one of the 19 most dangerous chemicals (a "priority" pollutant);

    e.  EtO was suspected to cause cancer in humans, and threaten reproductive harm;

    f.  "the highly toxic nature of ethylene oxide and its classification as a suspect carcinogen";

    g.  any exposure to EtO that threatened to cause even one additional cancer in a population of 1,000,000 was unacceptable;

    h.  those exposed to EtO emitted from a sterilization facility were significantly more likely to contract cancer and other serious illnesses;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

      i.   EtO was a "mutagen", *i.e.*, that it damaged human DNA in a way that promoted the development of cancer;

      j.   "[t]here has been widespread recognition of the mutagenic potential of ethylene oxide";

      k.   once emitted from a sterilization facility, EtO would be breathed by those living, working, and attending school near the facility; and

      l.   "human receptors outside of the building may unknowingly come into contact with ethylene oxide before it has been sufficiently dispersed in the ambient atmosphere."

47.     As a result, and well before it began operations in Willowbrook, Griffith Labs was acutely aware of the catastrophic risk to human health that inhalation exposure to EtO would create.

48.     In addition to warning Griffith Labs about the health risks of EtO, the IEPA letter expressly told Griffith Labs that IEPA's air modeling raised substantial concerns that the surrounding Willowbrook community would be adversely impacted by Griffith Labs' EtO emissions. In particular, it informed Griffith Labs that: (i) emissions from the Willowbrook facility appear to be ***"several magnitudes higher than desirable"***; and (ii) steps should be taken to "minimize emissions in order to reduce the ambient impacts to an acceptable level."

49.     Moreover, Griffith Labs knew or should have known when it received IPEA's letter that IEPA's modeling results vastly understated the risk to Griffith Labs' neighbors that the Willowbrook emissions would pose. According to the letter, IEPA had based its EtO modeling in part on Griffith Labs' representation that its maximum emissions would be 40 tons (80,000 lbs.) per year. Upon information and belief, Griffith Labs knew that its emissions going forward would be significantly more than 80,000 pounds per year. In fact, in 1985, the Willowbrook facility

21

FILED DATE: 4/16/2021 2:00 PM    2018L010475

emitted more than 125,000 pounds of EtO. In each of 1986 and 1987, it emitted more than 160,000 pounds of EtO.

50.     Further, Griffith Labs' representation to IEPA that it had emitted 40 tons of EtO during the year of 1983 was itself understated. In an internal memorandum dated May 3, 1984, Griffith Labs discloses that it had actually emitted approximately 50 tons in 1983. Griffith Labs never corrected its misrepresentation to IEPA.

pollutant constitutes a major stationary emission source. Since our total emissions are approxiamtely 50 tons per year (calendar 1983) and our anti-cipated growth is to 65 tons per year in 5 years, the part 203 does not

51.     The same internal memo also predicted that Griffith Labs would grow to emit 65 tons per year. Griffith Labs did not disclose this fact to IEPA either.

52.     As a result, Griffith Labs knew or should have known that IEPA's opinion that its emissions would be "several magnitudes higher than desirable" was based on modeling that only accounted for about half of what Griffith Labs actually intended to emit. Griffith Labs never corrected IEPA's modeling assumptions at any point prior to receiving its permit.

53.     Separately, upon information and belief, Griffith Labs misinformed IEPA about the height of the stack it would use at Willowbrook to release EtO emissions. The height of the stack is important because, in general, the higher the stack, the greater the EtO concentrations will be diminished before they descend to the zone in which they are breathed by, e.g., residents, workers, and schoolchildren. In connection with its 1984 permit application, Griffith Labs told IEPA that the stack exhaust point would be 40-50 feet above grade. However, upon information and belief, the actual exhaust point was only 28 feet above grade.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

54.     As a result, Griffith Labs knew or should have known that IEPA's opinion that its emissions would be "several magnitudes higher than desirable" was based upon modeling that used a falsely inflated stack height. Griffith Labs never corrected IEPA's modeling assumptions at any point prior to receiving its permit.

55.     Even further, Griffith Labs took essentially no action in connection with IEPA's stated concerns about its "minimiz[ing] emissions in order to reduce the ambient impacts to an acceptable level." Instead, once Griffith Labs received its permit, it operated without any emission controls designed to remove or eliminate EtO from emissions and thereby caused massive unfiltered emissions of EtO into the Willowbrook community 24 hours a day, 7 days a week, 365 days a year. Griffith Labs did so notwithstanding its knowledge that: (a) toxicity data showed that EtO exposure was associated with human cancers and other harms; (b) the facility was located within the immediate proximity of homes, parks, schools, and small businesses; and (c) IEPA's (understated) modeling predicted emissions "several magnitudes higher than desirable."

56.     Indeed, by no later than 1982, Griffith Labs knew that emission control technology was available that could remove up to 99% of EtO from the Willowbrook facility's exhaust before it was allowed to enter Willowbrook's air. Despite knowing of the availability of this technology before operating in Willowbrook, Griffith Labs specifically declined to use it for essentially the first four years of Willowbrook operations.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

**C. Griffith Labs' received an operating permit for the Willowbrook facility that was subject to special conditions with which Griffith Labs failed to comply**

57.     On July 30, 1984, IEPA issued Griffith Labs a Joint Construction and Operating Permit to construct and operate sterilization chambers 1, 3, 4, 5, 9, and 10 at the Willowbrook facility.



Illinois Environmental Protection Agency   ·   2200 Churchill Road, Springfield, IL 62706

217/782-2113

JOINT CONSTRUCTION AND OPERATING PERMIT

PERMITTEE

Griffith Laboratories, U.S.A., Inc.
12200 S. Central Avenue
Alsip, Illinois  60658

Attention:   John Kjellstrand

Application No.: 84060002          I.D. No.: 043110AAC
Applicant's Designation: STERILIZER   Date Received: June 1, 1984
Subject: Gas Sterilization System
Date Issued: July 30, 1984          Operating Permit Expiration
                                    Date: July 31, 1986
Location: 7775 Quincy St., Willowbrook, Illinois

58.     The permit was issued to "Griffith Laboratories, U.S.A., Inc." (i.e., Griffith Labs) for its operation of the Willowbrook facility. The permit had a two-year term, expiring on July 31, 1986. Griffith Labs never attempted to amend or correct this permit in any way, including to substitute any other entity as the permit holder.

59.     The 1984 permit, as well as all permits relating to the Willowbrook facility issued thereafter, expressly warned Griffith Labs the permit did *not* release it from liability for harm to its neighbors. They stated:

    a.  the permit "does not release the permittee from any liability for any loss due to damage to person or property caused by, resulting from, or arising out

24

FILED DATE: 4/16/2021 2:00 PM   2018L010475

of, the design, installation, maintenance, or operation of" the Willowbrook facility.

b. the permit "in no manner implies or suggests that the [IEPA] . . . assumes any liability, directly or indirectly, for any loss due to damage, installation, maintenance or operation" of the Willowbrook facility.

c. the Willowbrook facility could not be operated in such a manner as to "cause a violation of the Environmental Protection Act or Regulations promulgated thereunder," all of which forbid air pollution in the State of Illinois.

60. As the permittee for the Willowbrook facility, Griffith Labs was responsible for the following operations:

a. sterilization processes for the six chambers for which it received a permit;

b. emissions of EtO and other volatile organic materials from the facility;

c. the acquisition, installation, and operation of pollution controls at the facility;

d. testing and monitoring for levels of EtO both in the facility and the environment;

e. monitoring, testing, maintenance, and repair of all equipment involved in the sterilization processes at the facility;

f. maintaining emission records and reporting to IEPA and as otherwise required by law;

g. ensuring that its emissions and emission controls were compliant with local, state, and federal law;

h. monitoring and reviewing the facility's emission data to analyze the duration and quantity of EtO emissions released, including any excess emissions;

i. assessing the capacity of the EtO sterilization chambers at the Willowbrook facility as compared to customer demand for its sterilization services;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

     j.   inventorying hazardous chemicals stored at the facilities, including EtO; and

     k.   communicating with state and local emergency response groups about such hazardous chemicals, including EtO.

61.    Griffith Labs undertook these responsibilities and functions even though, as alleged elsewhere in this complaint, it failed in its duty to ensure that its implementation of these responsibilities and functions was adequate to keep the community safe.

62.    In addition, as part of the 1984 operating permit issued to Griffith Labs by IEPA, several special conditions were imposed on Griffith Labs to address IEPA's concerns about the environmental impact of Griffith Labs' EtO emissions, including that:

     a.   Griffith Labs was required to conduct ambient air monitoring for a one-year period and submit a final report by December 1, 1985; and

     b.   Griffith Labs was required to "investigate the availability of emission reduction measures for ethylene oxide."

63.    Griffith Labs failed to comply with either special condition and, upon information and belief, misled IEPA as to both.

64.    Griffith Labs' obligation to monitor EtO concentrations in the ambient air outside the Willowbrook facility required that monitoring be conducted at locations in between the facility and the local residents, workers, and schoolchildren. The plain intent of this requirement was so that Griffith Labs and IEPA would know the concentrations of EtO that were being emitted from the facility and carried by air currents into the surrounding neighborhoods. Ultimately, the monitoring would determine the extent of the threat to the health of Griffith Labs' neighbors posed by the facility's EtO emissions.

26

FILED DATE: 4/16/2021 2:00 PM    2018L010475

65. Despite its obligation to conduct such monitoring, and its knowledge that the purpose of the monitoring was to provide critical information about the seriousness of threats posed to its neighbors' health by its EtO emissions, Griffith Labs never monitored the ambient air nor ever made any effort to determine the ambient air EtO concentrations, such as by modeling them.

66. Instead, Griffith Labs told IEPA that the monitoring equipment it purchased was not dependable and was malfunctioning. But instead of trouble-shooting the equipment with the supplier or getting new equipment (which was readily available), Griffith Labs simply ignored the requirement that it conduct ambient air monitoring, thereby also ignoring the serious threat to human health posed to those who lived and worked near its Willowbrook facility.

67. Due to Griffith Labs' initial failure to comply with the ambient air monitoring requirement and submit a final report by December 1, 1985, IEPA "extended" Griffith Labs' deadline to do so until July 31, 1986. Griffith Labs, however, did not perform ambient air monitoring or submit a final report by that date, either. Throughout Griffith Labs' 15-year control of facility operations, it *never* performed the ambient air monitoring it had been told was necessary to perform back in 1984.

68. Upon information and belief, Griffith Labs made a decision not to conduct ambient air monitoring because (i) it did not care about the harm its EtO emissions would cause those who lived and worked in the Willowbrook community; and (ii) it knew that actual monitoring would reveal to regulators that its EtO emissions were too dangerously high to warrant continued operation of the facility—either at all, or without installing significant and expensive emission control equipment.

69.     Griffith Labs' decision in this regard – a classic example of "profits over people" – exhibited reckless indifference and conscious disregard for the health and safety of its neighbors in the Willowbrook community.

70.     Griffith Labs also failed to comply with and/or misled IEPA about the requirement that it "investigate the availability of emission reduction measures for ethylene oxide." Griffith Labs was told in March 1983 – over one year before it submitted its permit application for the Willowbrook facility – that a Deoxx emission reduction system was certified as "Best Available Control Technology" and that the system was available for about $118,000. Even though Griffith Labs was well aware of the availability of this emission reduction technology for ethylene oxide when it applied for and received its permit, it stalled compliance with the requirement to purchase and implement it by falsely telling IEPA that it would have to "investigate [its] availability."

**D.  Griffith Labs' own independent acts and omissions contributed to cause Plaintiffs' injuries**

71.     Illinois law recognizes that multiple parties may contribute to cause a given injury. 735 ILCS 5/2-1117; *Sperl v. Henry*, 2018 IL 123132, ¶¶ 24-25 (2018).

72.     At all times between 1984 and May 14, 1999, Griffith Labs was obligated to comply with the Illinois Environmental Protection Act and its supporting regulations, which prohibited "the emission of any contaminant into the environment so as to cause or tend to cause air pollution in Illinois;" defined as "emissions sufficient "to be injurious to human life [or] health."

73.     Griffith Labs' conduct, as detailed in the paragraphs immediately below, breached its duty in this regard and was a substantial contributing factor in causing injury to every Plaintiff

or Plaintiff's decedent who lived and/or worked in the immediate vicinity of the Willowbrook facility up until May 14, 1999, when Griffith Labs sold the company.

*Griffith Labs greatly enhanced the danger to its neighbors by expanding its EtO operations in Willowbrook*

74.    As discussed above, in 1984, Griffith Labs located an EtO sterilization facility in a residential community, knowing that area residents, workers, and schoolchildren would be exposed to the facility's EtO emissions, and as a result would be significantly more likely to contract cancer and other serious illnesses.

75.    In 1999, Griffith Labs authorized and funded the establishment, construction, and operation of an additional EtO sterilization facility in Willowbrook (Willowbrook II), despite knowing that the first Willowbrook facility had never been operated safely, and that Willowbrook II could not be operated safely. The impact of Willowbrook II was to further inundate the Willowbrook area and its residents with thousands of pounds of unnecessary and dangerous EtO emissions, in addition to the EtO emitted from the first Willowbrook facility.

76.    Griffith Labs also authorized and funded the use of several "off-site" facilities in the Willowbrook area, including facilities at: (i) 407 Heathrow Court in Burr Ridge; (ii) 417 Heathrow Court in Burr Ridge; (iii) 261 Shore Drive in Burr Ridge; (iv) 7409 Quincy Street in Burr Ridge; and (v) 16 W 151 Shore Court in Burr Ridge. Upon information and belief, these facilities were used to store or treat sterilized products that were still off-gassing EtO. Upon further information and belief, these facilities had no emission controls such that all residual EtO from the off-gassing products at those facilities was emitted directly into the atmosphere.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

*Griffith Labs failed to monitor and model ambient air concentrations*

77.     Griffith Labs never monitored or modelled to determine the concentrations of EtO from the Willowbrook facility that those in the Willowbrook area would be breathing, even though Griffith Labs was obligated to do so by its permit, as described in Paragraphs 62 – 67, above.

78.     Griffith Labs knew that these monitoring results were very important to provide to IEPA so that it could do its job and determine whether the company was operating safely or unnecessarily dangerously.

79.     In fact, it had conducted and/or authorized ambient air modeling and monitoring at other of its EtO facilities.

80.     Griffith Labs consciously chose ***not*** to do the same in Willowbrook.

*Griffith Labs failed to timely or reasonably implement emission controls*

81.     At all times between July 1984 and May 14, 1999, Griffith Labs owned and controlled the sterilization and emission control equipment that was utilized at the Willowbrook facility. By participating in and authorizing the Willowbrook facility's decisions about the use of that equipment, Griffith Labs had the responsibility to ensure the adequacy of such equipment to protect its neighbors in the Willowbrook community. This is demonstrated, *inter alia,* by the following:

> a.     All expenditures for sterilization and emission control equipment used in the operation of the Willowbrook facility had to be authorized before purchase by Griffith Labs. Without such authorization, the equipment could not have been purchased or used at the Willowbrook facility. Simply, the facility could not have operated without Griffith Labs' specific authorization.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

b. Griffith Labs purchased and authorized for use at the Willowbrook facility sterilization and emission control equipment without which the facility could not function. Griffith Labs accomplished this via "Griffith Laboratories U.S.A. Purchase Order[s]" which it directed to specific Griffith Labs' vendors. An example of the purchase orders used by Griffith Labs is depicted immediately below, with emphasis added to show that the entity ordering and paying for the equipment was Griffith Labs:



c. Under its own "Griffith Laboratories U.S.A. Purchase Order[s]," Griffith Labs ordered equipment from its vendors, and directed the vendors to invoice Griffith Labs for payment thereon. Griffith Labs, in turn, paid the vendors for the equipment. For example:

    i. In 1986, Griffith Labs direct its vendor, Phillips Electric, Inc., to supply and install one complete computer control system for the 12-pallet EtO sterilization chamber No. 2 at the Willowbrook facility.

    ii. In 1986, Griffith Labs directed its vendor, Midwest Mechanical, Inc., to install one complete ventilation system for EtO sterilization chamber No. 2 at the Willowbrook facility.

    iii. In 1986, Griffith Labs directed its vendor Midwest Mechanical, Inc., to install all mechanical equipment and pipe that equipment according to a specific drawing for EtO sterilization chamber No. 2 at the Willowbrook facility.

    iv. In 1990, Griffith Labs direct its vendor, Midwest Mechanical, Inc., to install one complete nitrogen system for

FILED DATE: 4/16/2021 2:00 PM    2018L010475

sterilization chamber No. 2 with piping and mechanical work at the Willowbrook facility.

v.   In 1991, Griffith Labs directed its vendor Midwest Mechanical, Inc., to supply labor and material and install purging systems for gassing stations 1, 2, 3, 5, 6, 7, 8, 9, and 10 at the Willowbrook facility.

d.   At all times between 1984 and 1999, Griffith Labs owned all sterilization and emission control equipment utilized at the Willowbrook facility.

e.   On multiple occasions during the 1980s and 1990s, and after October 1984, Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking permits to construct or operate the Willowbrook facility, represented to IEPA that Griffith Labs was the "Plant Owner." For example, a 1988 application for a permit to construct and operate the EtO sterilizer system in Willowbrook identifies Griffith Labs as the Willowbrook "Plant Owner."

f.   On multiple occasions during the 1980s and 1990s, and after October 1984, Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking permits to construct or operate the sterilization system at the Willowbrook facility, represented to IEPA that the "Owner" of the sterilization system was Griffith Labs. The same 1988 application to IEPA referenced above identifies Griffith Labs as the owner of the EtO sterilizer system which needed the IEPA permission for construction and operation.

g.   It was the Board of Directors of Griffith Labs which, on multiple occasions in the 1980s and 1990s, and after October 1984, supplied IEPA with the corporate resolution authorizing the operation of the Willowbrook sterilization system. Such authorization was legally required before IEPA could award a permit for the operation of a sterilization system at the Willowbrook facility. Indeed, the application specifically provides that:

THIS APPLICATION MUST BE SIGNED IN ACCORDANCE WITH PCB REGS., CHAPTER 2, PART 1, RULE 103(a)(4) OR 103(b)(5) WHICH STATES: "ALL APPLICATIONS AND SUPPLEMENTS THERETO SHALL BE SIGNED BY THE OWNER AND OPERATOR OF THE EMISSION SOURCE OR AIR POLLUTION CONTROL EQUIPMENT, OR THEIR AUTHORIZED AGENT, AND SHALL BE ACCOMPANIED BY EVIDENCE OF AUTHORITY TO SIGN THE APPLICATION."

IF THE OWNER OR OPERATOR IS A CORPORATION, SUCH CORPORATION MUST HAVE ON FILE WITH THE AGENCY A CERTIFIED COPY OF A RESOLUTION OF THE CORPORATION'S BOARD OF DIRECTORS AUTHORIZING THE PERSONS SIGNING THIS APPLICATION TO CAUSE OR ALLOW THE CONSTRUCTION OR OPERATION OF THE EQUIPMENT TO BE COVERED BY THE PERMIT.

Thus, pursuant to the legal requirements set forth in the permit application, any corporation that owned or operated "the emission source or air pollution control equipment," had to file a certified copy of a board resolution authorizing the construction or operation of the equipment. The *only* board of directors to supply such a resolution, or authorize the use of

FILED DATE: 4/16/2021 2:00 PM    2018L010475

the sterilization equipment at the Willowbrook facility, was Griffith Labs'
(see below).



CERTIFIED COPY OF RESOLUTION

I, Gregory L. Schmidt, Secretary of Griffith Laboratories, US
Inc., a Delaware Corporation, having custody of the corporate
records thereof, do hereby certify that the Board of Directors
adopted the following resolution during a Meeting of the Board of
Directors, on May 23, 1984, which is in accordance with the law
and the by-laws of said corporation.

RESOLVED, by the Board of Directors of the Company
that it authorize Ralph A. Sair, its Senior Vice
President or Donald E. Alguire or John Kjellstrand,
respectively, President and Vice President of the
Company's division, Micro-Biotrol Company, to cause
or allow the construction or operation of the equipment
to be covered by the Illinois Environmental Protection
Agency permit to construct and operate such equipment
at the Micro-Biotrol facilities at 7775 Quincy Street,
Willowbrook, Illinois 60521.

In witness whereof, I have hereunto subscribed my name
as Secretary and have caused the corporate seal of said corporation
to be hereunto affixed, this 31st day of May, 1984.

Secretary

Applications submitted to IEPA for Willowbrook facility permits in the
1980s and 1990s — and after October 1984 — included the above Griffith
Lab's board resolution. No operator — not Micro-Biotrol or Griffith Micro
Science — supplied such a board resolution.

h.  On multiple occasions during the 1980s and 1990s, and after October 1984,
    Griffith Labs-affiliated entities and/or Griffith Labs itself, while seeking
    permits to construct or operate the Willowbrook facility, represented to
    IEPA that the design of the facility's sterilization system was that of Griffith
    Labs'. Indeed, in the 1988 application to the IEPA for example, Griffith
    Labs' Process Flow Diagram, illustrating the EtO sterilization system
    process in order to obtain the permit, was submitted.

i.  Griffith Labs paid all permit and other regulatory fees relating to
    Willowbrook operations thereby, on each occasion, authorizing and

33

FILED DATE: 4/16/2021 2:00 PM    2018L010475

funding the Willowbrook facility's continued operation and emission of dangerous amounts of EtO into the Willowbrook community.

j.    Griffith Labs mandated an operating strategy of seeking a competitive advantage by purchasing and directing the use of sterilization equipment designed to protect its workers and customers from exposure to EtO at the expense of exposing neighboring residents to even more EtO. Specifically, EtO concentrations inside the Willowbrook facility that were too dangerous for workers and customers to breathe were intentionally vented into the Willowbrook community, where they were breathed by area residents, workers, and schoolchildren.

82.    When the Willowbrook facility first began operating, Griffith Labs decided not to use any emission controls whatsoever even though it knew such controls were available and necessary. Thus, despite its knowledge that EtO emissions from its Willowbrook facility would make it significantly more likely that area residents, workers, and schoolchildren would contract cancer and other serious illnesses, Griffith Labs designed the Willowbrook facility without the emission controls that Griffith Labs knew were necessary to prevent such catastrophic outcomes.

83.    After about three years of operating without any controls, Griffith connected one of nine chambers to emission controls in July 1987. But, for the next nine months, until April 1988, Griffith Labs continued to operate eight of its sterilization chambers without any emission controls. As a result, for approximately the first four years of operation, close to 100% of all EtO used at the Willowbrook facility was emitted into the atmosphere.

84.    Griffith Labs made this decision despite its knowledge that it would result in the unnecessary emission of hundreds of thousands of pounds of EtO during over these four years, and gravely endanger its neighbors' health.

85.    Further, at all times between 1984 and May 14, 1999, Griffith Labs made a decision not to control EtO emissions from the Willowbrook facility's back-vents, aeration rooms, and

34

FILED DATE: 4/16/2021 2:00 PM    2018L010475

work aisles—three principal areas within the facility where EtO would collect after the products were sterilized.

86.    As Griffith Labs knew or should have known, this failure to control emissions from, e.g., back-vents, aeration rooms, and work aisles resulted in the unnecessary emission of EtO into the surrounding community of at least 25,000 pounds each year, or a total of at least 400,000 pounds between 1984 and 1999.

87.    Griffith Labs knew that these emissions, too, would gravely endanger its neighbors' health, but allowed them to occur anyway.

88.    As a result of Griffith Labs' decisions, at no time between 1984 and 1999 was the emission control equipment at Griffith Labs' Willowbrook facility adequate to protect the health of its neighbors.

### *Griffith Labs' failure to warn those in the Willowbrook community that they were being exposed to a deadly carcinogen*

89.    As detailed above, Griffith Labs knew before it opened the Willowbrook facility that (a) toxicity data showed that EtO exposure was associated with human cancers and other harms; (b) the facility was located within the immediate proximity of homes, parks, schools, and small business; and (c) IEPA's (understated) modeling showed emissions were "several magnitudes higher than desirable."

90.    Nevertheless, Griffith Labs made the conscious and purposeful decision not to warn those living and working in the Willowbrook community that they would be exposed to and caused to inhale a carcinogen on a routine and continuous basis.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

91.     As a result of Griffith Labs' failure in this regard, those who lived and worked in the Willowbrook community were not able to adequately protect themselves or avoid the emissions and were forced to unknowingly inhale a potent human carcinogen for years on end.

*Griffith Labs failed to adhere to its own standard of care*

92.     Between 1984 and 1999, Griffith Labs made decisions at other EtO sterilization facilities in both the Unites States and other countries to use emissions control equipment far more effective at protecting the facilities' neighbors than the equipment it authorized for use at its Willowbrook facility.

93.     As examples, in 1996 and 1997, Griffith Labs' EtO facilities in Willowbrook and Santa Teresa, NM, used roughly the same amount of EtO, but the emissions in Willowbrook were about 90-100x higher:

| 1996 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
|---|---|---|---|---|---|
| Willowbrook | Controlled | Atmosphere | Atmosphere | 423,721 lbs. | **21,567 lbs.** |
| Santa Teresa | Controlled | Controlled | Controlled | 401,875 lbs. | **239 lbs.** |
| 1997 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
| Willowbrook | Controlled | Atmosphere | Atmosphere | 516,187 lbs. | **25,985 lbs.** |
| Santa Teresa | Controlled | Controlled | Controlled | 442,726 lbs. | **260 lbs.** |

94.     In 1998, Griffith Labs' EtO facility in Willowbrook used a little more than twice as much EtO as its facilities in Charlotte, NC, Glen Falls, NY, and Ontario, CA, but emitted 50 to 80 times more EtO into the atmosphere.

| 1998 | Chambers | Aeration Rooms | Back Vents | EtO Used | Eto Emitted |
|---|---|---|---|---|---|
| Willowbrook | Controlled | Atmosphere | Atmosphere | 595,203 lbs. | **30,829 lbs.** |
| Charlotte | Controlled | Controlled | Controlled | 234,572 lbs. | **562 lbs.** |
| Glen Falls | Controlled | Controlled | Controlled | 262,318 lbs. | **380 lbs.** |
| Charlotte | Controlled | Controlled | Controlled | 277,249 lbs. | **401 lbs.** |

95.     These actions by Griffith Labs prove that, between 1984 and 1999, Griffith Labs was not only aware of technology that would dramatically reduce the EtO to which the neighbors

of its sterilization facilities would be exposed, but was already using that technology at its own facilities. There was no legitimate justification for its failure to use the same technology at Willowbrook.

*Griffith Labs failed to properly consider science and medicine in making operational decisions*

96.     Throughout the entirety of the 1980s and 1990s, Griffith Labs continued to learn that respected public health agencies and organizations had concluded that EtO was extremely dangerous to human health.  For example:

a.  Between 1981 and 1994, the National Institute for Occupational Safety and Health ("NIOSH"); the US Department of Health and Human Services ("HHS"); US EPA; State of California; and World Health Organization ("WHO") concluded that EtO was, respectively, a potential occupational human carcinogen, with no safe level; "reasonably anticipated to be a human carcinogen"; "probably carcinogenic to humans"; "a carcinogen"; and "carcinogenic to humans".

b.  In 1986, Griffith Labs learned that the state of California had modelled EtO emissions from Griffith Labs' facility in Southern California, and concluded that those emissions would cause a significant increase in EtO-related cancers for residents in the LA Basin.

97.     Despite this information about the human health dangers associated with EtO, Griffith Labs took no significant precautions to protect its Willowbrook neighbors. To the contrary, throughout the 1980s and 1990s, Griffith Labs worked—independently and through EtO industry organizations, lobbyists, lawyers, and public relations agents—to improperly dispute and distort independent studies showing the dangers of EtO, and to cause EtO to appear to be less dangerous than it really was. These efforts resulted in the allowance of greater emissions from the Willowbrook facility, further endangering the area's residents, workers, and schoolchildren. Among other tactics, Griffith Labs and the EtO industry:

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a.  successfully opposed implementation of back vent emission controls that would reduce EtO emissions;

b.  opposed limits on the EtO concentrations to which workers in sterilization facilities could be exposed; such workplace concentrations impact the health of the workers, of course, but also serve as the source of "fugitive" EtO emissions, which escape the facility, and expose the facility's neighbors; and

c.  funded scientifically baseless "studies," aimed at influencing independent public health studies on the health dangers of EtO with the ultimate purpose being to make EtO appear less dangerous to human health than Griffith Labs knew it to be.

*Griffith Labs misled IEPA*

98.  Between 1984 and May 14, 1999, Griffith Labs misrepresented to IEPA, or omitted

from disclosing to IEPA, the following significant information:

a.  what Griffith Labs knew to be the dangers to human health caused by EtO emissions from sterilization facilities;

b.  that Griffith Labs had emitted more EtO in 1983 than it told IEPA;

c.  that Griffith Labs intended on emitting more EtO from the Willowbrook facility than IEPA modeled for;

d.  that Griffith Labs' stack height where EtO would be released into the community was lower that what it told EPA;

e.  that emissions control equipment to reduce EtO emissions were available to Griffith Labs when the Willowbrook facility was opened and for years thereafter before such equipment was installed;

f.  that Griffith Labs was using emissions control equipment at its other EtO facilities that was far more protective of neighboring communities than the equipment its board of directors authorized for use at Willowbrook;

g.  that the reporting of emissions from the Willowbrook facility was based on false assumptions about the effectiveness of Griffith Labs' emissions control equipment;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

h.   that fugitive EtO emissions from the Willowbrook facility were far greater than reported;

i.   that Griffith Labs was working with the EtO industry to improperly influence science and make EtO appear less dangerous to human health than it actually is, with the purpose of influencing regulators to permit unsafe levels of EtO emissions.

99.    By misleading IEPA on these issues, Griffith Labs was able to evade further regulatory scrutiny of the Willowbrook facility and its operations such that far more EtO was emitted into the Willowbrook community.

*Griffith Labs failed to properly train the operators of the Willowbrook Facility*

100.    Between 1984 and May 14, 1999, Griffith Labs mandated that all EtO operations at the Willowbrook facility be conducted in strict compliance with its procedures and activity engaged with Willowbrook facility employees to ensure that those procedures were being followed.

101.    As a result, up until the point where it sold the company on May 14, 1999, it was incumbent upon Griffith Labs to train on-site employees at the Willowbrook facility how to properly operate the facility so as to minimize EtO emissions to the Willowbrook community.

102.    Griffith Labs failed to train those employees on how to operate the Willowbrook facility in a manner that would protect Willowbrook area residents, workers, and schoolchildren from the extraordinary health dangers posed by exposure to EtO emissions. Among other things, Griffith :abs:

a.   failed to train employees to run aeration room emissions through the emission control system;

b.   failed to train employees to run back-vent emissions through the emission control system;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

      c.    failed to train employees to keep chamber doors, aeration doors, and exterior doors closed and sealed so as to prevent EtO from escaping directly into the atmosphere; and

      d.    failed to train employees to prevent and/or minimize off-gassing of sterilized products in areas that were not ventilated to emission controls.

*Griffith Labs failed to responsibly audit the Willowbrook Facility*

103.    Between 1984 and May 14, 1999, Griffith Labs was responsible for conducting safety audits of the Willowbrook facility, and did in fact conduct such audits.

104.    Griffith Labs, however, failed to conduct those safety audits in a manner that ensured that Willowbrook area residents, workers, and schoolchildren would be protected from the extraordinary health dangers posed by exposure to EtO emissions.

**E.    Micro-Biotrol Company's involvement at the Willowbrook facility does not negate Griffith Labs' liability.**

105.    On October 4, 1984, Griffith Labs formed a nominal corporate subsidiary, Micro Biotrol Company ("MBC"). On that date, Griffith Labs also purported to transfer certain, but not all, assets to MBC.

106.    However, these events of October 4, 1984 do not negate Griffith Labs' liability for its own conduct as set forth above. Instead, Griffith Labs may be held liable as a joint tortfeasor under Illinois law.

107.    The formation of MBC did not lead or cause Griffith Labs to reduce its involvement in the operations of the Willowbrook facility, or in the decision-making that caused and authorized the EtO emissions that in turn caused and contributed to Plaintiffs' cancers and other

FILED DATE: 4/16/2021 2:00 PM    2018L010475

illnesses. *Indeed, the great majority of the Griffith Labs' conduct described in Paragraphs 33 –*
*104, occurred <u>after</u> October 4, 1984.*

108. Further, Griffith Labs' purported asset transfer agreement with MBC did **<u>not</u>**
transfer either (i) Griffith Labs' status or obligations relative to any permit issued by IEPA; or (ii)
any liability for injury to Willowbrook area residents caused by emissions from the Willowbrook
facility.

109. While MBC and its successors nominally operated the Willowbrook facility
(hereinafter "Operators"), Griffith Labs' participation in facility operations exceeded the accepted
norms of parental oversight, and Griffith Labs mandated and directed an overall course of action
for the facility's operators which surpassed the control exercised as a normal incident of
ownership. Facts relevant to this conclusion include, *inter alia:*

   a. Griffith Labs' independent obligations and tortious conduct set forth
      above.

   b. At all times through May 14, 1999, Griffith Labs was the 100% owner of the
      facility's operators.

   c. While the facility's operators were nominally corporations themselves,
      upon information and belief, the boards of directors of these operators
      never met to consider matters related to the Willowbrook facility. Instead,
      all such board-level decisions were made by the Griffith Labs' board of
      directors.

   d. There was no separate identity between Griffith Labs and the facility's
      operators. There was no arms-length relationship between them, including
      the fact that there was no documentation of the contracts and agreements
      between them, and no separate bank accounts. Griffith Labs and the
      facility's operators commingled funds in bank accounts that Griffith Labs
      controlled.

   e. Griffith Labs required the facility's operators to conduct Willowbrook
      sterilization operations in strict compliance with Griffith Labs' procedures,

FILED DATE: 4/16/2021 2:00 PM   2018L010475

which, as stated above, were grossly deficient in protecting Willowbrook area residents from exposure to health endangering EtO concentrations, violated emissions standards established by the State of Illinois and Village of Willowbrook, and indeed caused and contributed to cause Plaintiffs' cancers and other illnesses.

f.  Griffith Labs provided the facility's operators its intellectual property, trade-secrets, and sterilization know-how to operate the Willowbrook facility.

g.  Griffith Labs directly participated in operational decisions that impact environmental health and safety.

h.  Griffith Labs controlled all operating funds; the facility's operators had no funds of their own, and could not have existed independently of Griffith Labs. The facility's operators had no access to funds without first requesting them, or borrowing them, from Griffith Labs.

i.  Griffith Labs paid for, or had to approve payment of, any expenditure related to the Willowbrook facility.

j.  Griffith Labs provided the facility's operators with financial and administrative services for essentially every aspect of Willowbrook operations, including information systems, finance and accounting, treasury, legal, insurance and risk management, taxation, human resources and employee benefits, strategic planning, management services, and systems and procedures.

110.  Griffith Labs even dealt with regulators on behalf of the operators when it was determined sterilization facilities were not in compliance with statute or regulation. For example, in 1993, Griffith Labs' Chairman, Dean Griffith, *personally* corresponded with the FDA regarding Griffith Labs' New Mexico EtO sterilization facility's failure to meet FDA regulations. Mr. Griffith personally directed operator employees on how to respond to the regulatory issues and informed the FDA that he was personally involved, personally directing the operator's plan of action to remedy violations, and requiring that operator personnel report to him directly regarding progress.

42

FILED DATE: 4/16/2021 2:00 PM    2018L010475

### V. Ethylene Oxide as a Known Carcinogen

111.    At the center of this case is that from approximately July 1984 to February 2019, Defendants emitted EtO, a known carcinogen, into the Willowbrook community. Before the Willowbrook facility ever began operation, Griffith Labs knew that its EtO emissions would be harmful to the communities surrounding its facility whose residents and workers would breathe the ambient air.

112.    The DNA-damaging properties of EtO have been studied since the 1940s. For more than 40 years, EtO has been consistently recognized as dangerous, toxic, and carcinogenic.

113.    In a 1977 report, the National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in human populations. The report recommended that EtO be considered as mutagenic and potentially carcinogenic to humans and therefore that alternative sterilization processes be used whenever available. Occupational exposure studies like this one and others were and are relied upon by medical, scientific, and industry experts to determine the risk of harm of inhalation exposure to non-workers, like Plaintiffs and their decedents. Similarly, studies involving animals were and are relied upon by medical, scientific, and industry experts to determine the risk of harm of inhalation exposure to humans, like Plaintiffs and their decedents. Griffith Labs was or should have been aware of such studies which gave them the knowledge long before opening the Willowbrook facility that its EtO emissions would foreseeably harm persons in the neighboring communities.

114.    In 1981, NIOSH released a new bulletin focusing on new evidence of the carcinogenic, mutagenic, and reproductive hazards associated with EtO, reiterated that EtO was

43

a potential occupational carcinogen, and reported that no safe levels of EtO exposure had been demonstrated.

115.     In 1985, the U.S. Department of Health and Human Services ("U.S. HHS") Fourth Annual Report on Carcinogens classified EtO as "reasonably anticipated to be a human carcinogen."

116.     Also beginning in 1985, the U.S. Environmental Protection Agency ("U.S. EPA") categorized EtO as "probably carcinogenic to humans."

117.     In 1987, the State of California (home to at least two Sterigenics EtO sterilization facilities) officially designated EtO a carcinogen.

118.     In the early 1990s, NIOSH published a high quality, long-term research study on EtO's carcinogenic impacts on humans. It tracked the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and the 1980s at sterilizer facilities much like the Willowbrook facilities. (According to Sterigenics Senior Vice President of Global Environmental, Health, and Safety, Kathleen Hoffman, the studied facilities included more than one operated by Sterigenics.[7])

119.     The study found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. It has since been heavily cited and relied on by major regulatory organizations including the World Health Organization ("WHO") and the U.S. EPA.

---

[7]https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf

FILED DATE: 4/16/2021 2:00 PM     2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

120.    In 1994, the WHO International Agency for Research on Cancer ("IARC") found that "Ethylene Oxide is carcinogenic to humans," designating EtO as a Group 1 human carcinogen (the agency's highest risk classification for cancer).

121.    In 2000, the U.S. HHS Ninth Annual Report on Carcinogens classified EtO as "known to be a human carcinogen."

122.    In 2002, a U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") fact sheet on EtO stated that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[8]

123.    In 2016, the EPA's Integrated Risk Information System ("IRIS") reclassified EtO as "carcinogenic to humans," and increased its estimate of EtO's cancer potency by 30 times.[9] The U.S. EPA concluded that EtO is carcinogenic to humans by the *inhalation route of exposure* with a stated confidence level of "HIGH."

124.    Acute exposure to EtO can result in nausea, vomiting, neurological disorders, bronchitis, pulmonary edema, and emphysema.

125.    Chronic exposure to EtO can irritate the eyes, skin, nose, throat, lungs, and can cause harm to the brain and nervous system leading to headaches, nausea, memory loss, and numbness.

126.    Chronic inhalation exposure to EtO can also cause reproductive and developmental impairments. Evidence recognized by the U.S. EPA indicates that inhalation

---

[8] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf
[9] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf

exposure to EtO can cause an increased rate of miscarriages in females. Evidence also indicates that EtO inhalation exposure can cause decreased sperm concentration and testicular degeneration in males.

127. Additionally, inhalation exposure to EtO can cause mutations and chromosomal damage that can lead to birth defects and cancer. Even when exposure to EtO diminishes or ceases, the frequency of sister chromatid exchanges (mutations/chromosomal alterations) have been found to remain elevated.

128. Chronic inhalation exposure to EtO also causes cancer. Evidence recognized by the U.S. EPA indicates that inhalation exposure to EtO causes various cancers including but not limited to lymphatic cancers, leukemia, and breast cancer. There is also evidence that EtO causes tumors in the body and reproductive issues in both men and women, as well as birth defects.

129. At all relevant times during their respective operations and/or direct participation with the Willowbrook facilities, Defendants knew or should have known that EtO is toxic and dangerous to human health and well-being. In addition, Defendants knew or should have known that EtO is classified as a carcinogen and has been determined to cause the various illnesses and ailments described above.

130. At all relevant times during their respective tenures at Sterigenics, Defendants Bob Novak and Roger Clark knew or should have known that EtO is toxic and dangerous to human health and well-being. In addition, Mr. Novak and Mr. Clark knew or should have known that EtO is classified as a carcinogen and has been determined to cause the various illnesses and ailments described above.

46

FILED DATE: 4/16/2021 2:00 PM    2018L010475

131.     As described above, as early as in July 1984, Griffith was told by the IEPA that "the toxicity data provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure. Various animal studies have shown carcinogenic, mutagenic, leukogenic, and teratogenic effects." In the same letter, the IEPA opined that there were "several methods" to reduce EtO emissions and requested a meeting to "discuss steps that can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level." That same information was known or should have been known by all Operators of the Willowbrook Facilities and all Defendants.

132.     Accordingly, based on Griffith Labs' industry expertise as the pioneer of EtO sterilization, and all Defendants' knowledge of medical and scientific studies and reports dating back to the 1940s relating to the effects of EtO inhalation exposure (all of which scientific, medical, and industry professionals relied and rely upon to determine the risk of harm to persons like Plaintiffs and their decedents from inhalation exposure to EtO), and direct communications and warnings from IEPA, it was reasonably foreseeable to Defendants that their EtO emissions would far exceed levels safe for those in neighboring communities. Therefore, it was at all times reasonably foreseeable to Defendants that their Willowbrook operations would pose an unreasonable risk of harm to Plaintiffs and their decedents.

133.     Notwithstanding Defendants' respective knowledge concerning the dangers of the sterilization operations in Willowbrook and the adverse health impacts of chronic inhalation exposure to EtO, Defendants chose to operate the facilities in a densely populated residential area and emitted hundreds of thousands of pounds of EtO into the environment without so much as

warning those who lived and worked in the Willowbrook area that they were being exposed to and inhaling EtO on a routine and continuous basis.

## VI.   Defendants' Operations and Conduct in Willowbrook

134.   At all relevant times, the Willowbrook sterilization facilities were operated in a densely populated metropolitan area with 19,271 people living within one mile. Dense residential areas are located within approximately 0.3 miles to the immediate west, 0.6 miles to the southeast, 0.9 miles to the southwest, 0.7 miles to the north, 0.8 miles to the northeast, and 1.0 miles to the east.

135.   At all relevant times, the Willowbrook facilities were close to numerous schools, daycare facilities, parks, government buildings, and businesses, including, at some point during operations, the following:

 a.   **Schools:** Gower Middle School (0.42 miles); Conev's Cradle Infant Care, Inc. (0.70 miles); St. Mark Christian Montessori (0.70 miles); Hinsdale South High School (0.76 miles); Gower West Elementary School (0.79 miles); Kingswood Academy (0.87 miles); KinderCare (1.0 mile); Our Lady of Peace School (1.22 miles); Concord Elementary (1.62 miles); Ready Set Grow (1.76 miles); Burr Ridge Middle School (1.86 miles).

 b.   **Parks and Government Buildings:** Willowbrook Police Department and Mayor's Office (0.07 miles); Willowbrook Community Park (0.45 miles); Indian Prairie Library (0.97 miles); Harvester Park (1.0 mile); Whittaker Park (1.03 miles); Burr Ridge Police Department (1.19 miles).

 c.   **Businesses:** Dance Duo Studio (0.1 miles); Dell Rhea's Chicken Basket (0.16 miles); Denny's (0.18 miles); Target (0.19 miles); La Quinta Inn (0.29 miles); Red Roof PLUS+ (0.3 miles); Diamond Edge Training (0.3 miles); BIG Gymnastics (0.68 miles); Darien Sportsplex (1.0 mile).

FILED DATE: 4/16/2021 2:00 PM   2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

136.    In addition, Willowbrook Town Center, which has nearly 200,000 square feet of retail stores, restaurants, and other businesses, is located 1.1 miles from the Willowbrook facilities.

137.    Figure 1, below, depicts the area surrounding the Willowbrook facilities, in addition to a third facility that Defendants used for aerating products, and a lab Defendants used to test its sterilization process.

**Figure 1**



138.    Upon information and belief, the aeration facility Defendants used, which was located at 7409 Quincy Street in Willowbrook and referred to as "Willowbrook III," did not have any pollution controls and, therefore, all EtO emissions from the facility went directly into the atmosphere. Further, upon information and belief, Defendants did not include their emissions from Willowbrook III in their reporting to the government.

49

139.     Upon information and belief, the lab Defendants used, which was located at 16 W. 151 Shore Court in Burr Ridge, was used to test sterilization runs and, accordingly, involved the use of EtO. Upon information and belief, the lab did not have any pollution controls and, therefore, all EtO emissions from the lab went directly into the atmosphere. Further, upon information and belief, Defendants did not include its emissions from the lab in their reporting to the government.

140.     From 1984 through their permanent closure in 2019, the Willowbrook facilities released EtO into the air in the Willowbrook area. The facilities stored EtO and sprayed it into gas chambers to sterilize medical equipment and pharmaceuticals. The Willowbrook facility on Quincy Street (built in 1984) holds fifteen gas chambers. The facility on Midway Drive holds four chambers (some built during the facility's original construction in 1999, some later in 2012).

141.     The facilities operated 24 hours per day, emitting toxic, cancerous gas on a steady and continuous basis. As a result, EtO has been a constant element in the air inhaled by those who lived and worked near the facilities.

142.     The half-life of EtO in the atmosphere has been reported at up to 211 days.[10] Neither rain nor absorption into aqueous aerosols is capable of removing EtO from the atmosphere.

143.     Table 1 depicts the facilities' *self-reported* EtO emissions from point sources and *self-reported* amounts of EtO treated on site:

_____

[10] https://publications.iarc.fr/115

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

Table 1

| Year | Pounds of EtO Emissions | Pounds of EtO Treated On-site |
|------|------|------|
| 1984 | Unreported | Unreported |
| 1985 | Unreported | Unreported |
| 1986 | Unreported | Unreported |
| 1987 | Unreported | Unreported |
| 1988 | 169,996 | Unreported |
| 1989 | 97,518 | Unreported |
| 1990 | Unreported | Unreported |
| 1991 | Unreported | Unreported |
| 1992 | Unreported | Unreported |
| 1993 | Unreported | Unreported |
| 1994 | 18,407 | 420,069 |
| 1995 | 18,423 | 420,441 |
| 1996 | 22,000 | 400,000 |
| 1997 | 27,000 | 480,000 |
| 1998 | 31,000 | 560,000 |
| 1999 | 2,700 | 598,000 |
| 2000 | 7,627 | 565,086 |
| 2001 | 8,113 | 521,257 |
| 2002 | 6,686 | 535,109 |
| 2003 | 6,909 | 550,984 |
| 2004 | 5,313 | 540,797 |
| 2005 | 2,910 | 572,547 |
| 2006 | 4,280 | 573,961 |
| 2007 | 3,965 | 532,245 |
| 2008 | 3,858 | 517,941 |
| 2009 | 3,690 | 493,418 |
| 2010 | 6,595 | 512,570 |
| 2011 | 7,160 | 557,437 |
| 2012 | 7,091 | 553,083 |
| 2013 | 6,121 | 470,159 |
| 2014 | 5,241 | 404,681 |
| 2015 | 4,899 | 381,213 |
| 2016 | 4,205 | 388,288 |

144.     There is little emissions data publicly available from before 1995. However, the ATSDR report notes that the available data suggests that "substantially higher ambient releases

FILED DATE: 4/16/2021 2:00 PM    2018L010475

prior to 1995 were likely." Indeed, emissions from 1988 and 1989 – approximately 170,000 pounds and 100,000 pounds respectively—are far more than the highest amount recorded in the contiguous 1995 – 2016 data set (31,000 pounds in 1998) and over 20 times more than emissions levels in 2016 (4,205 pounds). It is therefore reasonable to infer that the pre-1995 emissions of EtO were, at best, similar to those from 1998 and, at worst, closer to the colossal emissions in 1988 and 1989.

145.    In addition to the reported point source emissions (EtO emitted through stacks), the facilities released significant volumes of fugitive (nonpoint source) emissions into the air.

146.    Effective technologies to reduce EtO emissions to levels low enough to make the emissions a "non-significant contributor" to cancer risk have been available, cost-effective, and widely known since the 1980s; and on information and belief, Defendants have known it.

147.    Despite the availability of these technologies, on information and belief, there have been periods during which the Willowbrook facilities had no pollution controls in place, had inadequate controls in place, and/or had pollution controls in place that failed to work due to the acts and omissions of the defendants.

148.    On information and belief, there have also been periods during which the Willowbrook facilities, despite having some pollution controls in place, vented EtO directly into the air. Upon information and belief, since at least 2006 and up until July 27, 2018, the facilities allowed uncontrolled emissions of EtO from backvent valves in the sterilization chambers.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

## VII.    A Pattern of Reckless Conduct

149.    Sotera predecessor Sterigenics International, Inc. ("Sterigenics International") has been the subject of regulatory and administrative enforcement action relative to its EtO emissions in Europe. Beginning in 1992, Sterigenics International (now Sotera) operated a sterilization facility in Zoetermeer, a city in the western Netherlands. The Zoetermeer facility was located in an area with residential housing and numerous small business. In 2009, it was determined that Sterigenics International had been knowingly releasing amounts of EtO that exceeded the local Maximum Permissible Risk concentration into the air for years, was penalized, yet continued with its excessive emissions until it ultimately relocated its facility in 2010. According to the Public Prosecutor, Sterigenics International knew the emissions were unauthorized, but failed to act or even warn local residents about them or the associated dangers.

150.    Sterigenics has also been faulted for neglecting safety in the United States. For example, after a major explosion in August 2004 at a sterilizing plant in Ontario, California, injuring four employees and forcing the evacuation of the plant and neighboring facilities, the U.S. Chemical Safety and Hazard Investigation Board (hereinafter "CSB") found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. And it faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.

151.    Current and former Sterigenics employees elsewhere have raised safety concerns. For example, on the company's Glassdoor page, one former employee noted on June 25, 2013 that

"[t]here is a minimum attention to quality & safety which will backfire eventually."[11] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[12] Similarly, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "The maintenance team cuts a lot of corners."[13]

152.    Former employees at the Willowbrook facilities have raised the same concerns, reporting, among other things, that Sterigenics and its predecessors:

   a.   routinely permitted chamber doors, aeration doors, and exterior doors to be left open, thereby allowing EtO to escape directly into the environment;

   b.   manipulated the EtO detection systems in the facilities to allow for an increased tolerance of EtO;

   c.   told employees to ignore warning lights in the facilities indicating high levels of EtO, and fired employees who complained about the warning lights;

   d.   directed employees to dump or wash toxic chemicals, including EtO and ethylene glycol, into the sewer system;

   e.   told an employee to take a leaking drum of EtO outside the facilities;

   f.   used off-site warehouse facilities without any pollution control or ventilation systems to store sterilized products that were still off-gassing EtO while, at the same time, leaving the exterior doors of those facilities open, causing the off-gassing EtO to go directly into the environment.

153.    Key operational managers at the Willowbrook facilities actively participated in dangerous and harmful activities, which resulted in extraordinary uncontrolled emissions of EtO into the environment.

---

[11] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm.

[12] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm.

[13] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

154. Defendant Novak routinely ignored warning systems in the Willowbrook facilities indicating the presence of unsafe levels of EtO. When Mr. Novak received employee complaints regarding such warning systems, he ignored them and instructed employees to ignore them as well. Mr. Novak permitted and/or directed chamber doors, aeration doors, and exterior doors in the Willowbrook facilities to remain open allowing uncontrolled EtO emissions into the environment. Mr. Novak also approved of inaccurate EtO monitoring and testing results, effectively hiding the actual EtO emissions within the facilities and into the environment and ensuring that the facilities would continue to operate in dangerous fashion.

155. In addition, Defendant Roger Clark recalibrated EtO monitoring systems at the Willowbrook facilities to permit increased tolerance of EtO. As a result, Mr. Clark caused and/or permitted consistently elevated levels of EtO in the facilities. Mr. Clark did this knowing that doors within the facilities as well as exterior doors were routinely left open and thereby caused or permitted uncontrolled EtO emissions into the environment.

156. Mr. Clark and Mr. Novak also routinely participated in and/or directed the operation of all chamber sterilization units in the facilities at the same time, which they knew or reasonably should have known would overload emissions control systems. As a result, both Mr. Clark and Mr. Novak caused excessive uncontrolled EtO emissions into the environment.

157. Mr. Clark and Mr. Novak also bore responsibility for monitoring, maintenance, and replacement of emissions systems equipment. They routinely failed to replace emissions system equipment, including filters, such that they caused excessive levels of EtO emissions into the environment.

55

158.    Taken together, these facts demonstrate a pattern of Defendants consistently failing to implement company-wide safety measures across all their facilities despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Defendants failed for decades to install available emission control technology to limit emissions of EtO from their Willowbrook facilities.

**VIII. EtO's Human Impact**

159.    EtO is a highly potent human carcinogen relative even to other carcinogens. For example, chronically inhaled EtO is 385 times more potent a carcinogen in comparison with benzene (pound for pound), and 231 times more potent in comparison with formaldehyde.[14] In terms of excess cancer risk effect, 6,000 pounds per year of EtO air emissions are roughly as harmful to humans as 2,300,000 pounds of benzene or 1,380,000 pounds of formaldehyde.

160.    The Willowbrook area has an extremely high cancer risk relative to other parts of the country. U.S. EPA's 2014 update to the National Air Toxics Assessment documented cancer risks in 76,727 census tracts across the country. Of these, 106 had cancer risk scores above U.S. EPA's acceptable limits. The area surrounding the Willowbrook facilities was among those tracts. Most of the remaining 106 tracts were located in "Cancer Alley" (the notoriously polluted, highly industrial area along the Mississippi River between Baton Rouge and New Orleans).

161.    Figure 2 lists the top 19 tracts, which also include the Willowbrook area tract— Tract No. 17043845902.

---

[14] https://www.epa.gov/sites/production/files/2014-05/documents/table1.pdf

FILED DATE: 4/16/2021 2:00 PM    2018L010475

**Figure 2**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | State | EPA Region | County | FIPS | Tract | Population | Total Cancer Risk (per million) |
| 2 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070800 | 2,537 | 1,505.1167 |
| 3 | LA | EPA Region 6 | St. Charles | 22089 | 22089060100 | 1,937 | 808.7227 |
| 4 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070900 | 3,115 | 616.6193 |
| 5 | PA | EPA Region 3 | Lehigh | 42077 | 42077005902 | 1,571 | 596.4609 |
| 6 | CO | EPA Region 8 | Jefferson | 08059 | 08059010902 | 2,310 | 525.5596 |
| 7 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070700 | 4,348 | 511.3240 |
| 8 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095071000 | 2,840 | 490.2785 |
| 9 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095000000 | 45,924 | 413.3152 |
| 10 | WV | EPA Region 3 | Kanawha | 54039 | 54039013400 | 2,222 | 366.6597 |
| 11 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095071100 | 3,398 | 363.1912 |
| 12 | TX | EPA Region 6 | Harris | 48201 | 48201343100 | 4,629 | 348.2016 |
| 13 | PA | EPA Region 3 | Lehigh | 42077 | 42077000101 | 3,661 | 346.5181 |
| 14 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070500 | 6,229 | 329.2657 |
| 15 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070100 | 2,685 | 303.0079 |
| 16 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070300 | 6,258 | 296.3112 |
| 17 | TX | EPA Region 6 | Harris | 48201 | 48201343200 | 4,944 | 296.1831 |
| 18 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070400 | 4,381 | 286.5417 |
| 19 | LA | EPA Region 6 | St. Charles | 22089 | 22089062700 | 4,753 | 284.5145 |
| 20 | IL | EPA Region 5 | DuPage | 17043 | 17043845902 | 3,411 | 281.8075 |

Twelve of these top 19 tracts are located in Cancer Alley. Another five, like the Willowbrook area tract, have sterilization facilities that emitted massive amounts of EtO. The Assessment shows that sterilization facilities were responsible for the extraordinarily high cancer risks reported for three of the top 19: DuPage County, Illinois, Jefferson County, Colorado, and Lehigh County, Pennsylvania.

162.     For the Willowbrook area tract, the U.S. EPA assessment found a cancer risk of 281.8075 in 1 million—nearly three times higher than U.S. EPA's acceptable upper limit and the highest in Illinois. The Willowbrook area tract is in the top 99.98% tracts in terms of cancer risk in the country.

163.     The U.S. EPA assessment attributed 88.98% of the elevated cancer risk to EtO emissions. Thus, the Willowbrook facilities—the sole emitter of EtO anywhere in the

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM   2018L010475

Willowbrook area tract—were almost entirely responsible for the Willowbrook area tract having the 19th highest cancer risk in the country.

164.     Later data revealed an even higher risk. The August 2018 ATSDR report, based on air measurements collected from 29 discrete locations around the Willowbrook facilities, concluded that the facilities' emissions were exposing Willowbrook-area residents and workers to elevated airborne EtO concentrations, and that these concentrations created a cancer risk of 6,400 in 1 million (or 64 in 10 thousand)—64 times the U.S. EPA acceptable limit of just 1 in 10 thousand.[15] The report also concluded that these elevated risks created a public health hazard and called for Sterigenics to reduce emissions immediately.

165.     According to U.S. EPA, each year of exposure to EtO creates even higher cancer risk for children than it does for adults because EtO can damage DNA and children have more years ahead of them to develop other cancer risk factors that lead to the formation of malignant cells.[16] Children are also at greater risk than adults because children receive larger doses per body weight compared to adults, so they have greater lung surface area and increased lung volume per body weight and they inhale in more air per body weight.

166.     According to U.S. Census data, 3,494 children ages five and under lived within three miles of the facilities in 2010, including 250 children who lived within one mile of the facilities.

---

[15] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions
[16] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-ethylene-oxide

167.    Neither the volume of the facilities' EtO emissions nor their impact on Willowbrook-area residents and workers was made known to the general public until the release of the ATSDR report on August 21, 2018.

168.    In February 2019, IEPA issued a seal order against Sterigenics U.S. "to prevent the commencement of any new sterilization cycles using EtO until measures are in place to prevent emissions of EtO . . . which present a public health hazard to residents and off-site workers . . . in the Willowbrook community."

### IX.    Sterigenics Under GTCR's Control and Leadership

169.    GTCR knew of the inherently dangerous nature of the EtO sterilization business: that this danger was driving medical companies to outsource sterilization to firms like Sterigenics is what made Sterigenics attractive for investment.

170.    Indeed, GTCR knew, from its pre-acquisition due diligence of the Sterigenics purchase, about of the risks and dangers posed by EtO.

171.    GTCR also knew that medical companies were beginning to outsource sterilization to firms like Sterigenics in order to avoid the risks of injury and potential for liability EtO posed; and this trend is what made Sterigenics an attractive target for investment to GTCR.

172.    All of this — the inherent risk, the danger, and the outsourcing trend — was publicly available as early as 1998 (well before GTCR's 2011 acquisition of Sterigenics), when Sterigenics U.S. and Sotera's predecessors, Griffith and Sterigenics International disclosed it in prospectuses they filed with the United States Securities and Exchange Commission in anticipation of issuing publicly traded securities.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

173.    The Griffith prospectus warned that "[e]thylene oxide is a toxic and hazardous chemical which is flammable and explosive. It has been identified as a cancer and reproductive hazard" and that "[t]he cancer and reproductive hazards associated with exposure to ethylene oxide subject the Company to the risk of liability claims being made against it by workers and others who are exposed to ethylene oxide."[17]

174.    Both prospectuses expressly identified the dangers, potential liabilities and new government regulations concerning EtO as catalysts for a sterilization outsourcing trend that was increasing demand for services from medical sterilization contractors like Sterigenics.

175.    The Sterigenics International prospectus stated that "[b]eginning in the 1970's, several governmental limitations were placed on gas fumigation due to the discovery that EtO was a mutagenic substance with possible carcinogenic properties…" and that "increased costs" and "exposure" concerns led many device manufacturers to outsource their sterilization processes.[18]

176.    The Griffith prospectus stated that "the significant capital required to construct and maintain an in-house sterilization facility and the need to comply with dynamic environmental and health and safety regulations" has contributed to "increased volume of outsourced sterilization to contract processors."[19]

177.    On information and belief, GTCR learned both as part of its pre-acquisition due diligence investigation of Sterigenics' business and in the course of providing management services after the acquisition, about Sterigenics' use of EtO in its sterilization process, Sterigenics'

---

[17] https://www.sec.gov/Archives/edgar/data/1066622/0000950124-98-006256.txt
[18] https://www.sec.gov/Archives/edgar/data/1009988/0000891618-98-000926.txt
[19] *Id.*

FILED DATE: 4/16/2021 2:00 PM    2018L010475

permitting history, the levels of its emissions of EtO, alternative sterilization processes, methodologies to capture EtO emissions and the cancer risks Sterigenics' EtO emissions posed to the neighboring community. GTCR also learned that the use of emissions control equipment required to reduce emissions of EtO was expensive and required substantial amounts of capital to operate.

178.    GTCR purchased Sterigenics to capitalize on the risk-avoidant trend of companies outsourcing sterilization to outfits like Sterigenics. GTCR's website admits this: "Based on extensive diligence, GTCR believed that Sterigenics was well positioned to capitalize on the consistent industry growth fueled by increasing med tech procedure volumes and continued outsourced sterilization trends." In other words, GTCR chose to capitalize on the potential for growth fueled by danger—the danger of EtO and client-companies' fear of liability.

179.    GTCR in turn used Sterigenics to execute a GTCR-focused investment strategy favoring growth and acquisition at the expense of safety.

180.    GTCR did this utilizing a hand-picked executive team it had worked with many times in the past. This was GTCR's core business strategy, which it has actually trademarked as "The Leaders Strategy."[20]

181.    GTCR's pitch books for the GTCR Funds it would use for the Sterigenics investment make the Leaders Strategy clear: "As in previous GTCR funds, [the Fund's] investment strategy is to team with strong executive teams to build companies in fragmented industries. These 'management startups' – where GTCR will first team up with a management

---

[20] https://www.gtcr.com/the-leaders-strategy/

FILED DATE: 4/16/2021 2:00 PM    2018L010475

group and then purchase a platform on which to build the company – are expected to make up approximately 60% of the deals in [the Fund]."

182.    Consistent with the Leaders Strategy, GTCR viewed its involvement with Sterigenics as a partnership with the new Sterigenics CEO and executive team to grow the Sterigenics business and profits.

183.    Thus, as part of the Sterigenics transaction, GTCR hand-picked Michael Mulhern, whom GTCR had worked with in the past, to serve as Sterigenics CEO.[21] "Together, GTCR and Mr. Mulhern identified several initiatives to improve Sterigenics' operational and growth initiatives, enhance its market leadership and drive incremental earnings growth."[22]

184.    In pursuit of the strategy, GTCR directed Sterigenics' free cash flow to be used to pay interest on high yield bonds, acquire other companies, and only be used for capital investments that drove incremental earnings growth – *not* investments in safety and/or the maintenance or installation of emissions control equipment. GTCR knew or should have reasonably foreseen that the high yield bonds used in the leveraged buyout acquisitions left Sterigenics with extremely high interest expenses that would deplete its free cash flow and prevent its investing in emissions capture and control systems. Indeed, GTCR directed Sterigenics to borrow up, increasing the debt that required high interest payments.

185.    In other words, GTCR acquired Sterigenics in order to actively expand the Sterigenics' geographic footprint through acquisitions that depleted its free cash flow and

---

[21] https://www.prnewswire.com/news-releases/amri-names-michael-mulhern-as-chief-executive-officer-300577662.html

[22] https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/

FILED DATE: 4/16/2021 2:00 PM    2018L010475

required it to pledge its assets as collateral for high yield debt financed leveraged buy-outs, including the acquisition of two sterilization facility add-ons and "the transformative acquisition" of Nordion, a key supplier to Sterigenics.[23]

186. In a March 8, 2011 report following the GTCR buy-out, Moody's expressed concerns about Sterigenics' free cash flow, capital expenditures, high interest expenses and EtO liability. It assigned Sterigenics debt and probability of default as "B2" or "highly speculative," explaining that "Sterigenics has very high fixed operating costs and capital expenditures, which limits free cash flow and can lead to significant volatility in profit margins based on variation in revenue," and specifically noting that "[t]he ratings also reflect the potential for event risk associated with the highly sensitive nature of the company's raw materials, including radioactive isotopes and toxic gases." "Because of some of the inherent risks in the business," Moody's wrote, "Moody's believes available liquidity, such as cash balances and revolver access, is of particular importance to Sterigenics."[24]

187. Despite Sterigenics' struggles with free cash flow and its expensive capital structure, however, GTCR was determined to use Sterigenics as a platform to earn high returns through acquisitions of companies in the commercial sterilization industry. By using Sterigenics' free cash flow and assets to finance a leveraged buy-out of Nordion, the world's largest supplier of Cobalt 60, making Sterigenics the only vertically integrated commercial sterilization company

---

[23]https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/
[24]https://www.moodys.com/research/Moodys-assigns-B2-CFR-to-STHI-Holdings-Sterigenics-outlook-stable--PR_215182

in the world, in combination with its cost cutting and incremental earnings growth strategy, GTCR was able to begin selling its interest in Sterigenics at a higher price.

188.     Sterigenics CEO, Michael Mulhern, crows about the Nordion acquisition on the GTCR website, explaining: "It came to our knowledge that a company was about to come to market to be sold. If that company got into the wrong hands, it would put at risk our source of supply. GTCR just kicked it into high gear and said we must own this asset, and today we're the only vertically integrated sterilization company in the world and in large part because GTCR made the decision and committed the resources [i.e., *Sterigenics*' resources] to get it done."

189.     Thus, the Nordion acquisition further depleted Sterigenics free cash flow and forced Sterigenics to cut costs. After the acquisition, Sterigenics was forced to pay the interest on the high interest junk bond debt that GTCR had secured with Sterigenics' and Nordion's assets. On July 17, 2015 Moody's wrote "[t]he total transaction is valued at $826 million and will be funded using a combination of new debt facilities and Nordion and Sterigenics' cash on hand"[25] and that most of the "cash on hand" was Sterigenics'. Moody's observed, "Nordion's business profile is weak" and "that around two-thirds of the combined company's gross profit will be generated by the legacy Sterigenics sterilization business."[26]

190.     The degree of control GTCR exercised over Sterigenics – in service of GTCR's own interests and disregard of Sterigenics interests and potential liability – surpassed the control exercised as a normal incident of ownership.

---

[25]https://www.moodys.com/research/Moodys-assigns-B2-to-STHIs-new-bank-debt-confirms-B2--PR_304313
[26]https://www.moodys.com/research/Moodys-assigns-B2-to-STHIs-new-bank-debt-confirms-B2--PR_304313

FILED DATE: 4/16/2021 2:00 PM     2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

191.    GTCR's relationship with Sterigenics executive team is evidence of this. At least four of GTCR's ten managing directors served as Sterigenics directors, acting (upon information and belief) for the protection of GTCR's interest.[27] Mulhern, GTCR's designated Sterigenics CEO, had previously been hired by GTCR as CEO of at least four GTCR-controlled portfolio companies.[28] The others had worked with GTCR as well.

192.    Indeed, during an Illinois Venture Capital Association (IVCA) award ceremony on May 7, 2015, GTCR Managing Director Sean Cunningham made these connections clear when he thanked the new Sterigenics executives team for their work in the past. He thanked "long time management collaborator, Phil McNabb, who has been in several GTCR deals" for his role at Sterigenics. He thanked Kevin Theriot, stating "I don't know what your title is at Sterigenics but you played just about every role in now three GTCR portfolio companies. He is our [GTCR's] client problem solver."[29] He waxed on about GTCR's long employment relationship with Mulhern: "Michael and GTCR have a very long history together. We actually initially recruited Michael in 2002 to run AmSan [American Sanitary]." "We partnered with Michael [again] in 2008 and asked him to become the CEO of Fairmont Food Group, which he did with Phil and Kevin nearly tripling the EBITDA from 2008 to 2011." "The very same week we sold Fairmont Food … we acquired Sterigenics with Michael, Phil and Kevin and the team." And he thanked the team

---

[27]https://www.gtcr.com/team-member/sean-l-cunningham/;
https://www.gtcr.com/gtcr-promotes-aaron-d-cohen-and-sean-l-cunningham-to-principal/;
https://www.gtcr.com/team-member/benjamin-j-daverman/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=66077&privcapId=20801;
https://www.gtcr.com/team-member/david-a-donnini/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=1155789&privcapId=20801
https://www.gtcr.com/team-member/constantine-s-mihas/
[28]https://www.prnewswire.com/news-releases/amri-names-michael-mulhern-as-chief-executive-officer-300577662.html
[29] https://drive.google.com/file/d/0B1vewN8DYsfDei1nM2diWnJ1X28/view?pref=2&pli=1

FILED DATE: 4/16/2021 2:00 PM   2018L010475

for growing Sterigenics EBITDA (profitability ratio) from $90 million to $250 million, allowing GTCR to recapitalize Sterigenics and recoup its investment.

193.    Mulhern, at the same award ceremony, in turn acknowledged his long-term working relationship with GTCR: "I've had the great pleasure to work with [GTCR], as Sean pointed out, for thirteen years;" "Sterigenics is the third company that I have run for GTCR;" "I've described [GTCR] as very forward leaning in terms of doing acquisitions to grow the company and move it forward."

194.    GTCR operated, managed, and controlled Sterigenics U.S. through its hand-picked team of Mulhern, McNabb and Theriot, whose interests and loyalty were to GTCR, which had provided them with executive employment for almost two decades, not Sterigenics. Based on their past experiences with GTCR, Mulhern, McNabb, and Theriot could expect that if they were able to drastically cut costs and invest in incremental earnings growth to increase Sterigenics' EBITDA in the short run, GTCR would be able to sell the company at a higher price, and they would have new employment opportunities to lead new GTCR projects.

195.    Sterigenics U.S.' own employees raised concerns about the safety of its operations under GTCR's management, budgetary, and operational control. On Sterigenics U.S.' Glassdoor page one employee on June 25, 2013 wrote, after GTCR made Mulhern CEO, that: "Since new management was installed by the investment company that owns them, doubling customer prices and massive cost cutting are paramount. There is minimum attention to quality & safety which

FILED DATE: 4/16/2021 2:00 PM    2018L010475

will backfire eventually. Only profitability counts to boost the company's value. Btw, new CEO was installed some time ago."[30]

196.     Another employee expressed his concerns with Sterigenics U.S.' lack of independence under GTCR's control, writing on February 21, 2012, that: "No education is given. No chance to expand kno[w]ledge. Owned by capital investment f[u]nd meaning that Sterigenics can [m]ake no independent decisions."[31]

197.     Another wrote on February 24, 2015 that: "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners. Managers aren't involved in what goes on during off shifts. A lot of our training is just a paperwork exercise. We learn very quickly how to cover our butts." That employee further addressed his concerns about safety under GTCR's management and recommended "[l]ock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system." On October 9, 2015 another employee wrote "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."

198.     GTCR knew that the only feasible way to acquire other companies in the commercial sterilization industry, like Nordion, without investing additional capital, would be to implement budget cuts or invest in projects that would drive incremental earnings growth to increase Sterigenics' free cash flow and EBITDA. GTCR also knew or should have reasonably foreseen that the budget cuts and investment in projects that only drove incremental earnings

---

[30] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm
[31] https://www.glassdoor.com/Reviews/Sterigenics-Reviews-E107174_P3.htm

would stop Sterigenics from spending on safety, maintenance and training and prevent Sterigenics' use, addition and/or maintenance of EtO emission control equipment, and cause continued injury to Plaintiffs and others exposed to the facilities' toxic emissions of EtO.

**X.    Systematic Distribution of Money to Shareholders to Avoid Accountability to Creditors**

199.    As discussed above, GTCR knew about the dangers of EtO and the liability risks before and after acquiring Sterigenics. One of the ways GTCR sought to limit its own investment risk and recoup its investment was by using dividend recapitalizations to pay itself dividends.

200.    GTCR knew that if it continually pulled cash out of Sterigenics with dividend recapitalizations and pledged any increase in the value of Sterigenics' assets for bonds used to fund acquisitions of other companies in the commercial sterilization industry, it could limit any liability stemming from Sterigenics' EtO emissions.

201.    Investopedia states: "A dividend recapitalization (also known as a dividend recap) happens when a company incurs a new debt in order to pay a special dividend to private investors or shareholders. This usually involves a company owned by a private investment firm, which can authorize a dividend recapitalization as an alternative to the company declaring regular dividends, based on earnings." "The dividend recap has seen explosive growth, primarily as an avenue for private equity firms to recoup some or all of the money they used to purchase their stake in a business. The practice is generally not looked upon favorably by creditors or common shareholders as it reduces the credit quality of the company, while benefiting only a select few." "The dividend reduces risk for PE firms by providing early and immediate returns to shareholders but increases debt on the portfolio company's balance sheet."

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

202.     Shortly after it acquired Sterigenics in March of 2011, GTCR issued $95 million in additional debt as part of a dividend recapitalization, pulling $95 million out of Sterigenics.

203.     After the buy-out, GTCR continually sought to increase Sterigenics' EBITDA by investing capital in projects that would drive incremental earnings growth and acquiring other companies using high yield debt. Between 2011 and 2016, acquisitions included Food Technology Service, Inc[32]; Gammarad[33]; Companhia Brasileira de Esterilização[34]; Nordion; Gibraltar Laboratories; Nelson Laboratories; and REVISS Services[35].

204.     In December 2016, when the US EPA altered EtO's cancer weight of evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans" and changed its adult based inhalation unit risk to 0.0001 μg/m³ from 0.003 μg/m³ (a thirty fold increase), GTCR recognized that its investment in Sterigenics had become substantially more risky and drastically increased its efforts to recover its money.

205.     Sterigenics U.S., Sotera and GTCR each played indispensable roles in a carefully-orchestrated funneling of nearly $1.3 billion to shareholders over 27 months beginning in 2016, with the intention of ensuring that these funds will not be available to compensate Plaintiffs when they secure judgments against them in this Court. By these transfers, Sterigenics U.S. and Sotera effectively admit, but hope to avoid accountability for, their culpability in exposing Willowbrook

---

[32] https://www.businesswire.com/news/home/20131206005135/en/Food-Technology-Service-Acquired-Sterigenics-International-LLC

[33] https://www.businesswire.com/news/home/20141031005705/en/Sterigenics-International-Continues-Growth-Acquisition-Leading-Italian

[34] https://sterigenics.com/sterigenics-acquires-companhia-brasileira-de-esterilizacao-cbe/

[35] https://www.ots.at/presseaussendung/OTE_20160816_OTE0004/sterigenics-international-and-its-subsidiary-nordion-enter-into-agreement-to-acquire-reviss-services

FILED DATE: 4/16/2021 2:00 PM    2018L010475

area residents (including Plaintiffs) to the extraordinarily dangerous EtO, which seriously damaged the health of many, and even claimed the lives of some.

206.    Specifically, during those 27 months, Sterigenics U.S. and Sotera executives were learning:

    a.  in 2016, that the US EPA would reclassify ethylene oxide as a "known" (from "probable") human carcinogen, and that the chemical was 30 times more likely to cause cancer than US EPA had previously recognized;

    b.  in 2018, that this information would soon be reported to the public, including and especially Willowbrook area residents;

    c.  in 2018, that cancer-stricken plaintiffs had begun to file lawsuits, some of them wrongful death lawsuits; and

    d.  in 2019, that the first of these plaintiffs had successfully obtained the remand to this Court of their lawsuits which had been baselessly removed by defendants to federal court.

207.    Yet, throughout these months, Sterigenics U.S. and Sotera executives were working with their corporate parents to make sure that virtually all available cash and other assets would be funneled away from these unsecured-creditor-Plaintiffs — and instead to their venture-capitalist investors and their banks in the form of massive distributions, pledged assets, and hundreds of millions in interest payments on borrowings undertaken to fund these payments. For example:

    a.  In October 2016, Sterigenics-Nordion Topco, LLC ("Topco"), a parent of defendants Sterigenics U.S. and Sotera, borrowed $350 million, for the purpose of funding a $340 million cash distribution to GTCR and other shareholders. Sterigenics U.S. and Sotera were necessary to this borrowing, upon information and belief, as they each guaranteed its repayment by granting the lender group a security interest in their tangible and intangible assets, thus making these assets unavailable to Plaintiffs, as Sterigenics U.S.' and Sotera's unsecured creditors.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

b.  In October 2017, Sotera Health Holdings, LLC ("Health Holdings"), also a parent of Sterigenics U.S. and Sotera, with Topco, together increased their borrowings by $175 million and added to these increased borrowings some $28 million in free cash to fund a $203 million distribution to their shareholders, including GTCR. As with the October 16 transactions, upon information and belief, the repayment of these borrowings was guaranteed by Sterigenics U.S. and Sotera, thus granting the lender group a security interest in their tangible and intangible assets, making the pledged assets unavailable to pay the judgments Plaintiffs will secure.

c.  In August 2018, Sotera itself made a $95 million cash distribution to investors, including GTCR, thus making this cash unavailable to Plaintiffs.

d.  In July 2019, Health Holdings borrowed an additional $320 million, which was used in its entirety to fund a $320 million cash distribution to Sterigenics' investors (including GTCR). Upon information and belief, once again, Sterigenics U.S. and Sotera each facilitated this distribution by guaranteeing repayment of Health Holdings' borrowing, thus granting the lender group a security interest in their tangible and intangible assets, thus making these assets unavailable to Plaintiffs as Sterigenics U.S. and Sotera's unsecured creditors.

e.  Just last month, in December 2019, Health Holdings completed a refinancing of, *inter alia*, previous borrowings, obtaining nearly $3.28 billion in new debt financing. This borrowing was used, in part, to fund a $309 cash million distribution to investors in December of 2019. As with previous borrowings by their parents, Sterigenics U.S. and Sotera guaranteed the repayment of this new borrowing, thus granting to the lender group security interests in their tangible and intangible assets.

208.    Sterigenics U.S., Sotera and GTCR's central role in this orchestrated and intentional effort has effectively placed the companies' cash and other assets out of Plaintiffs' reach, prevented Sterigenics from investing in emission control equipment, and dangerously de-stabilized the Sterigenics companies, thereby jeopardizing the companies' viability and the likelihood that Plaintiffs will receive just compensation for their injuries. As Moody's has observed, after the 2019 transactions noted above, these companies have "a high degree of

FILED DATE: 4/16/2021 2:00 PM    2018L010475

environmental risk[,]" and will have "limited ability to absorb unforeseen setbacks or cash demands on the business…"

209.    Neither Sterigenics U.S. nor Sotera received reasonably equivalent value for any of the guarantees they gave to enable dividends to be paid to GTCR to facilitate the dividend recapitalizations, notwithstanding that the guarantees increased their debt load and/or placed additional assets out of the reach of Plaintiffs as their unsecured creditors. The dividend recapitalizations and secured debt financing benefited only GTCR.

210.    On June 21, 2019, Illinois enacted Public Act 101-0022. Public Act 101-0022 prohibits EtO sterilization facilities from operating in Illinois unless: (a) the facility captures 100 percent of all fugitive EtO emissions within the facility; and (b) the facility reduces EtO emissions to the atmosphere from each exhaust point by at least 99.9 percent or to 0.2 parts per million.

211.    On June 24, 2019, Sterigenics applied to the IEPA for a construction permit to install or update its emissions control systems to ensure that it satisfies Public Act 101-0022's EtO emission requirements.

212.    In September of 2019, Sterigenics entered into an agreed final consent order prohibiting the operation of its Willowbrook EtO sterilization facilities before installing and testing new emissions capture and control equipment to reduce its EtO emissions in compliance with Public Act 101-0022 and reduce its EtO emissions below 85 pounds a year.

213.    Other companies in the commercial sterilization industry have limited their EtO emissions with capital investments. In 2019, Medline, a competing EtO commercial sterilization company, invested several million dollars in equipment to comply with Illinois Public Act 101-

FILED DATE: 4/16/2021 2:00 PM    2018L010475

0022, and on January 7, 2020, Medline released a press report stating that it was in compliance with the regulation.

214.    Sterigenics U.S. and Sotera declined to take measures to improve their emissions control systems due to the debt and dividend payments orchestrated by GTCR and on October 2019, when faced with the cost of capital improvement to reduce emissions, decided not to reopen the Willowbrook facilities.[36]

## COUNT 1
### Negligence – Sterigenics U.S., LLC

215.    Plaintiffs incorporate by reference all allegations contained herein.

216.    Sterigenics U.S. owned and operated the facilities during a material portion of time since 1984.

217.    Sterigenics U.S. managed, controlled, and supervised sterilization operations at the facilities during a material portion of time since 1984.

218.    Sterigenics U.S. had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the Willowbrook facilities.

219.    At all relevant times, Sterigenics U.S. knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

220.    Sterigenics U.S. breached its duty and failed to exercise ordinary care in one or more of the following ways:

---

[36] https://www2.illinois.gov/epa/topics/community-relations/sites/ethylene-oxide/Documents/04OCT19.cvrltr.pdf

FILED DATE: 4/16/2021 2:00 PM   2018L010475

a.   by choosing to operate within a densely populated residential area and thereby expose Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

b.   by emitting massive and unnecessary amounts of EtO into the air from the Willowbrook facilities;

c.   by using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

d.   by placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

e.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

f.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

g.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

h.   by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i.   by failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air; and

j.   by failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities.

221.   As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

74

FILED DATE: 4/16/2021 2:00 PM  2018L010475

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 2
### Negligent Training – Sterigenics U.S., LLC

222.    Plaintiffs incorporate by reference all allegations contained herein.

223.    Sterigenics U.S. had a duty to properly train its employees to control and dispose of hazardous substances including EtO and its byproducts, including but not limited to ethylene glycol.

224.    At all relevant times, Sterigenics U.S. knew that failing to properly train its employees to control, monitor, and dispose of hazardous materials would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it.

225.    Sterigenics U.S. breached its duty to properly train its employees in one or more of the following ways:

    a.  by failing to train its employees about the carcinogenic effects of EtO;

    b.  by failing to train its employees about the proper procedures to control and store EtO and its byproducts such that it would prevent unintended leaks, spills, or emissions;

    c.  by failing to train its employees about the proper procedures to monitor EtO emissions;

    d.  by failing to train its employees about the proper procedures for recording EtO emissions;

    e.  by failing to train its employees about the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

    f.    by failing to train its employees about the proper procedures for repairing and/or replacing defective EtO emissions equipment;

    g.    by failing to train its employees about the proper procedures for reporting uncontrolled emissions; and

    h.    by failing to properly train its employees about the proper procedures for disposing of EtO and its byproducts.

226.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 3
### Negligent Supervision – Sterigenics U.S., LLC

227.    Plaintiffs incorporates by reference all allegations contained herein.

228.    Sterigenics U.S. had a duty to properly supervise its employees to prevent a creation of danger or harm to others.

229.    At all relevant times, Sterigenics U.S. knew that failing to properly supervise its employees in their control, monitoring, and disposal of hazardous materials including EtO and its byproducts would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

230.    Sterigenics U.S., LLC breached its duty to supervise its employees in one or more of the following ways:

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a.  by failing to recognize when the proper procedures to control and store EtO and its byproducts were violated, resulting in unintended leaks, spills, or emissions;

b.  by failing to reprimand and/or discipline employees when the proper procedures to control and store EtO and its byproducts were violated, resulting in unintended leaks, spills, or emissions;

c.  by retaining employees who repeatedly violated the proper procedures to control and store EtO and its byproducts, resulting in unintended leaks, spills, or emissions;

d.  by failing to recognize when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities were violated, resulting in unintended leaks, spills, or emissions;

e.  by failing to reprimand and/or discipline employees when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities were violated, resulting in unintended leaks, spills, or emissions;

f.  by retaining employees who repeatedly violated the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities, resulting in unintended leaks, spills, or emissions;

g.  by failing to recognize when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

h.  by failing to reprimand and/or discipline employees when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

i.  by retaining employees who repeatedly violated the proper procedures for repairing and/or replacing defective EtO emissions equipment;

j.  by failing to recognize when the proper procedures for reporting uncontrolled emissions were violated;

k.  by failing to reprimand and/or discipline employees when the proper procedures for reporting uncontrolled emissions were violated;

l.  by retaining employees who repeatedly violated the proper procedures for reporting uncontrolled emissions;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

m.  by failing to recognize when the proper procedures for disposing of EtO or its byproducts were violated;

n.  by failing to reprimand and/or discipline employees when the proper procedures for disposing of EtO or its byproducts were violated;

o.  by retaining employees who repeatedly violated the proper procedures for disposing of EtO or its products;

p.  by failing to recognize when the proper procedures to monitor EtO emissions were violated;

q.  by failing to reprimand and/or discipline employees when the proper procedures to monitor EtO emissions were violated;

r.  by retaining employees who repeatedly violated the proper procedures to monitor EtO emissions;

s.  by failing to recognize when the proper procedures for recording EtO emissions were violated;

t.  by failing to reprimand and/or discipline employees when the proper procedures for recording EtO emissions were violated; and

u.  by retaining employees who repeatedly violated the proper procedures for recording EtO emissions.

231.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

**COUNT 4**
**Willful and Wanton Conduct – Sterigenics U.S., LLC**

232.    Plaintiffs incorporate by reference all allegations contained herein.

233.    Sterigenics U.S. had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

234.    At all relevant times, Sterigenics U.S. knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

235.    Sterigenics U.S. breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

    a.    by choosing to operate within a densely populated residential area and thereby expose Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

    b.    by emitting massive and unnecessary volumes EtO into the air from the Willowbrook facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

    c.    by placing its own economic interests above the health, safety, and well-being of Plaintiffs, their decedents, and others who lived or worked near the facilities;

    d.    by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

    e.    by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO

FILED DATE: 4/16/2021 2:00 PM    2018L010475

notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

f.  by emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

g.  by deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

236.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 5
### Ultrahazardous Activity / Strict Liability – Sterigenics U.S., LLC

237.    Plaintiffs incorporate by reference all allegations contained herein.

238.    Sterigenics U.S. use and emission of EtO from the facilities constitutes an ultra-hazardous activity.

239.    Sterigenics U.S.'s use and emission of EtO created a high degree of risk to Plaintiffs, their decedents, and others who lived or worked near the facilities such that the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

240.     Sterigenics U.S.'s use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

241.     While the activities conducted by Sterigenics U.S. are exceedingly dangerous, it offers little to no value to the surrounding community.

242.     Because the activities of Sterigenics U.S. are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

243.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 6
## Civil Battery – Sterigenics U.S., LLC

244.     Plaintiffs incorporate by reference all allegations contained herein.

245.     At all relevant times, Sterigenics U.S. knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

246.     Notwithstanding this knowledge, Sterigenics U.S. caused and/or set in motion events that caused EtO to come in contact with Plaintiffs and their decedents.

247.     Plaintiffs and their decedents' contact with EtO was offensive and harmful.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

248.     Sterigenics U.S. intended to emit EtO into the air despite its knowledge that it would contact people who lived or worked near the facilities.

249.     Plaintiffs and their decedents did not consent to contact with EtO emitted from the facilities.

250.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 7
### Public Nuisance – Sterigenics U.S., LLC

251.     Plaintiffs incorporate by reference all allegations contained herein.

252.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

FILED DATE: 4/16/2021 2:00 PM   2018L010475

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

253.    Sterigenics U.S.'s use and emission of EtO from the facilities substantially and unreasonably infringed upon and/or transgresses this public right. In particular, the activities of Sterigenics U.S. caused those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

254.    Sterigenics U.S.'s use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

255.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sterigenics U.S., LLC in an amount to be determined by a trier of fact.

## COUNT 8
## Negligence – Sotera Health, LLC

256.    Plaintiffs incorporate by reference all allegations contained herein.

257.    Sotera wholly owned, managed, controlled, supervised and otherwise participated directly in the sterilization operations at the Willowbrook facilities. With respect to

FILED DATE: 4/16/2021 2:00 PM    2018L010475

those operations, Sotera shared a complete unity of interest with Sterigenics U.S., with Sterigenics U.S. operating as an instrumentality of Sotera.

258.     At all relevant times, Sotera knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

259.     Sotera had a duty to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities.

260.     Sotera breached this duty by failing to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities with respect to one or more of the following:

    a.  by conducting operations in a densely populated residential area, exposing Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

    b.  by emitting massive and unnecessary amounts of EtO into the air from the facilities;

    c.  using of EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

    d.  placing of its own economic interests and the interest of Sterigenics U.S. above the health and well-being of those who lived or worked near the facilities;

    e.  failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

    f.  failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

    g.  failing to warn or advise Plaintiffs, their decedents, and others who

lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

h.  failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i.  failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air; and

j.  failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities.

261.  As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

## COUNT 9
### Negligent Training – Sotera Health, LLC

262.  Plaintiffs incorporate by reference all allegations contained herein.

263.  As a direct participant in the facilities' sterilization operations, including but not limited to developing written operating procedures for training and guiding the work of operators and training operations employees, Sotera had a duty to ensure that the facilities' employees were properly trained on conducting sterilization operations, the use, control, storage, and disposal of hazardous substances including EtO and its byproducts, and the operation and maintenance of equipment used in the sterilization process, to prevent a creation of danger or

harm to others.

264.     Sotera, knowing that that a failure to ensure the facilities' employees were properly trained would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

265.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

## COUNT 10
### Willful and Wanton Conduct – Sotera Health, LLC

266.     Plaintiffs incorporate by reference all allegations contained herein.

267.     At all relevant times, Sotera knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

268.     Sotera had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

269.     Sotera breached its duty and was guilty of willful and wanton conduct with respect to one or more of the following:

FILED DATE: 4/16/2021 2:00 PM   2018L010475

86

FILED DATE: 4/16/2021 2:00 PM    2018L010475

a.  conducting operations in a densely populated residential area, exposing Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

b.  emitting massive and unnecessary volumes EtO into the air from the facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c.  placing its own economic interests above the health, safety, and well-being of Plaintiffs, their decedents, and others who lived or worked near the facilities;

d.  failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding Sotera's knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e.  failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding Sotera's knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

f.  emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

g.  deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

270.  As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

## COUNT 11
## Public Nuisance – Sotera Health, LLC

271.     Plaintiffs incorporate by reference all allegations contained herein.

272.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

273.     The activities of Sotera as described above unreasonably infringed upon and/or transgressed this public right by causing those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

274.     Sotera's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

275.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Sotera Health, LLC in an amount to be determined by a trier of fact.

## COUNT 12
### Negligence – Griffith Foods International, Inc. (Griffith Labs)

276.    Plaintiffs incorporate by reference all allegations contained herein.

277.    From July 30, 1984 to July 31, 1986, Griffith Labs was the permittee and thus operator of the Willowbrook facilities.

278.    From July 30, 1984 to May 14, 1999, as set forth in the paragraphs above, Griffith Labs was a direct participant of operations at the Willowbrook facilities such that it both actively participated in, directed, and/or exercised control over operations, and it mandated an overall course of action and authorized the manner in which specific activities were conducted.

279.    Additionally, from July 30, 1984 to April 15, 1999, as set forth in the paragraphs above, the relationship between Griffith Labs and the Operators was such that was no true separate identity between them.

280.    The "touchstone" of the duty analysis in Illinois "is whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed on defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill.2d 422, 436 (2006). The existence of such a "relationship" is determined by consideration of four factors, including: (a) the reasonable foreseeability of the injury; (b) the likelihood of the

FILED DATE: 4/16/2021 2:00 PM    2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

injury; (c) the magnitude of the burden of guarding against the injury; and (d) the consequences of placing that burden on the defendant. *Id.* at 436-37.

281.    At all relevant times, Griffith Labs knew that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it. Accordingly, at all relevant times, it was reasonably foreseeable to Griffith Labs that emitting EtO from the Willowbrook facilities would injure Plaintiffs. Numerous facts set forth demonstrate that such injury was reasonably foreseeable, including in Paragraphs 5, 7, 9-10, 33-35, 37-56, 68-70, 74-76, 82-88, 96-99, 111-129, 131-141, 144-148, and 159-166.

282.    At all relevant times, the likelihood of injury to Plaintiffs was exceedingly high as set forth above in Paragraphs 5, 7, 9-10, 34, 37-39, 42-56, 82-91, 111-129, 131-141, and 159-166.

283.    Griffith Labs not only knew that it was emitting a known carcinogen into the Willowbrook community and that it would be inhaled by neighboring residents, but Griffith Labs also knew that conservative modeling performed by IEPA showed that its emissions were "several magnitudes higher than desirable."

284.    The magnitude of the burden on Griffith Labs of guarding against such injury was minimal as set forth above in paragraphs 35, 56, 70, 82-95, 100-102, and 146-147, particularly for a self-espoused pioneer and expert in the field of EtO. Griffith Labs could have, but did not, control the emissions from the Willowbrook facility by using state of the art equipment or even the same equipment used at its other facilities during the same timeframe.

285.    The consequences of placing such a burden on Griffith Labs would be appropriate, such that the expert in the field—with superlative knowledge and expertise with EtO and the sterilization process, the opportunity to select and update sterilization sites, emissions controls,

FILED DATE: 4/16/2021 2:00 PM    2018L010475

operational actions and processes, and financial incentive and ability—would have the obligation to prevent foreseeable injury to residents who, on the other hand, have no such expertise or knowledge, no such opportunity, and no such corresponding financial ability.

286.    Accordingly, at all relevant times, Griffith Labs had a duty to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities.

287.    Griffith Labs breached this duty by failing to ensure that the facilities were operated with ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others living and working near the facilities with respect to one or more of the following:

   a.  Locating, and then for the next 16 years operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing at all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses.

   b.  Operating the Willowbrook facility with virtually no emission control equipment designed to remove or eliminate EtO from emissions for its first four years of operation (1984-1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time;

   c.  Operating the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control designed to remove or eliminate EtO from emissions from the facility's back-vents, aeration rooms, and work aisles, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those alleged in subparagraph (b), above) during that time;

   d.  Designing in 1984, and then from 1984 to 1999, mandating the use of, a sterilization/emissions process that Griffith Labs knew violated the

standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

e. Purchasing, using, and mandating the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

f. Failing to use emission control equipment in Willowbrook and otherwise comply with the standard of care that Griffith Labs was in fact using in its other EtO facilities in the United States and other countries, which resulted in EtO emissions from the Willowbrook facilities that were sometimes hundreds of times higher, and more dangerous, than those at Griffith Labs' other facilities;

g. Failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

h. Using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

i. Conducting operations which exposed Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

j. Emitting massive and unnecessary amounts of EtO into the air from the facilities;

k. Failing to heed IEPA's warning that emissions into the Willowbrook community based on Griffith's operational design would be "several magnitudes higher than desirable";

l. Failing to heed IEPA's advisement that steps "can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level";

m. Failing to warn the Willowbrook community, including Plaintiffs, that the toxicity data reviewed by the IEPA and communicated to Griffith "provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure";

n. Failing to warn the Willowbrook community, including Plaintiffs, that "various animal studies have shown carcinogenic, mutagenic, leukogenic and teratogenic effects" of EtO exposure;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

o.  Failing to warn its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs: (A) knew that the emissions threatened its neighbors' health and that its neighbors had no idea that EtO was even being emitted into their community, and (B) provided warnings to residents living near some of Griffith Labs' *other* EtO sterilization facilities outside of Illinois;

p.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

q.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

r.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

s.  Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs was specifically required to conduct extensive ambient air testing in 1984-1986 as a special condition for its permit to operate the Willowbrook facility;

t.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air;

u.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities;

v.  Misleading the State's regulator, Illinois EPA, by, *inter alia*, failing to inform the agency as to what Griffith Labs knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA into granting Griffith Labs the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions from Willowbrook that were based on assumptions which Griffith Labs knew had no basis or were false;

w.  Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities;

x.  Placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

y.  Failing to provide the Operators with capital to invest in reasonable emission control systems even though such capital was available;

z.  Failing to provide the Operators with capital to invest in reasonable equipment upgrades and maintenance even though such capital was available; and

aa. Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies with the purpose of understating those health dangers and ultimately creating a justification for emissions that endangered the health of those living near the Willowbrook (and other) sterilization facilities.

288.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 13
### Negligent Training – Griffith Foods International, Inc. (Griffith Labs)

289.     Plaintiffs incorporate by reference all allegations contained herein.

290.     As a direct participant in the facilities' sterilization operations, including but not

94

FILED DATE: 4/16/2021 2:00 PM    2018L010475

limited to developing written operating procedures for training and guiding the work of operators and training operations employees, Griffith Labs had a duty to ensure that the facilities' employees were properly trained on the following to prevent a creation of danger or harm to others:

    a.   conducting sterilization operations;

    b.   the use, control, storage, and disposal of hazardous substances including EtO and its byproducts;

    c.   the operation and maintenance of equipment used in the sterilization process;

    d.   running aeration room and back-vent emissions through the emission control system;

    e.   keeping chamber doors, aeration doors, and exterior doors closed and sealed so as to prevent EtO from escaping directly into the atmosphere;

    f.   preventing and/or minimizing off-gassing of sterilized products in areas that were not ventilated to emission controls; and

    g.   auditing the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors.

291.    Griffith Labs, knowing that that a failure to ensure the facilities' employees were properly trained would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

292.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 14
### Negligent Supervision – Griffith Foods International, Inc. (Griffith Labs)

293.     Plaintiffs incorporate by reference all allegations contained herein.

294.     As a direct participant in the facilities' sterilization operations, including but not limited to preparing and implementing the facilities' risk management plans, developing written operating procedures for training and guiding the work of operators, training operations employees, investigating incidents, conducting safety audits, and evaluating the facilities' accident history, Griffith Labs had a duty to ensure the facilities' employees were properly supervised on conducting sterilization operations, the use, control, storage, and disposal of hazardous substances including EtO and its byproducts, and the operation and maintenance of equipment used in the sterilization process, to prevent a creation of danger or harm to others.

295.     Griffith Labs, knowing that that a failure to ensure the facilities' employees were properly supervised would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons exposed to it, breached this duty.

296.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

## COUNT 15
### Willful and Wanton – Griffith Foods International, Inc. (Griffith Labs)

297. Plaintiffs incorporate by reference all allegations contained herein.

298. At all relevant times, Griffith Labs knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

299. Griffith Labs had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others living and working in the area surrounding the facilities.

300. Griffith Labs breached its duty and was guilty of willful and wanton conduct with respect to one or more of the following:

   a. Locating, and for then for next 16 years, operating, controlling and/or maintaining, an EtO sterilization facility in the residential community of Willowbrook despite knowing that all times that EtO is very dangerous to human health and that area residents, workers, and schoolchildren would be unknowingly breathing daily the facility's EtO emissions, significantly increasing their risk of contracting cancer and other serious illnesses;

   b. Operating the Willowbrook facility with virtually no emission control equipment designed to remove or eliminate EtO from emissions for its first four years of operation (1984-1988), even though Griffith Labs knew that this violated the standard of care and would result in its neighbors being unnecessarily exposed to more than 500,000 pounds of EtO emissions during that time;

   c. Operating the Willowbrook facility for the entirety of the 1984 – 1999 time period without any control designed to remove or eliminate EtO from

emissions from the facility's back-vents and aeration rooms, even though Griffith Labs knew that this too violated the standard of care and would result in its neighbors being unnecessarily exposed to at least 400,000 pounds of EtO emissions (in addition to those alleged in subparagraph (b), above) during that time;

d.  Designing and requiring the use of a sterilization/emissions process that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

e.  Purchasing, using, and authorizing the use of sterilization and emission control equipment that Griffith Labs knew violated the standard of care and was inadequate to protect the health of its neighbors against EtO emissions from the facility;

f.  Failing to use emission control equipment in Willowbrook and otherwise comply with the standard of care that Griffith Labs was in fact using in its other EtO facilities in the United States and other countries, which resulted in EtO emissions from the Willowbrook facilities that were sometimes hundreds of times higher, and more dangerous, than those at Griffith Labs' other facilities;

g.  Failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

h.  Using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

i.  Conducting operations which exposed Plaintiffs, their decedents, and others to unsafe levels EtO and a heightened cancer risk;

j.  Emitting massive and unnecessary amounts of EtO into the air from the facilities;

k.  Failing to heed IEPA's warning that emissions into the Willowbrook community based on Griffith's operational design would be "several magnitudes higher than desirable";

l.  Failing to heed IEPA's advisement that steps "can be taken to minimize emissions in order to reduce the ambient impacts to an acceptable level";

FILED DATE: 4/16/2021 2:00 PM     2018L010475

FILED DATE: 4/16/2021 2:00 PM    2018L010475

m.  Failing to warn the Willowbrook community, including Plaintiffs, that the toxicity data reviewed by the IEPA and communicated to Griffith "provides evidence of human cancers of the pancreas, bladder, brain, central nervous system and stomach associated with EtO exposure";

n.  Failing to warn the Willowbrook community, including Plaintiffs, that "various animal studies have shown carcinogenic, mutagenic, leukogenic and teratogenic effects" of EtO exposure;

o.  Failing to warn its neighbors that they were in danger because of the Willowbrook facility's EtO emissions, even though Griffith Labs: (A) knew that the emissions threatened its neighbors' health and that its neighbors had no idea that EtO was even being emitted into their community, and (B) provided warnings to residents living near some of Griffith Labs' *other* EtO sterilization facilities outside of Illinois;

p.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

q.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

r.  Failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

s.  Failing to test the air outside the Willowbrook facility (ambient air) to determine the concentrations of EtO that had been emitted from the facility and would be inhaled by Griffith Labs' neighbors, even though Griffith Labs was specifically required to conduct extensive ambient air testing in 1984-1986 as a special condition for its permit to operate the Willowbrook facility;

t.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air;

u.  Failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

v.   Misleading the State's regulator, Illinois EPA, by, *inter alia*, failing to inform the agency as to what Griffith Labs knew about the dangers of EtO to human health; planning to emit more EtO from the Willowbrook facility than it had represented to induce IEPA into granting Griffith Labs the initial Willowbrook permit; failing to advise IEPA that it was not using the same caliber equipment and processes in Willowbrook that it was using at its other facilities; and reporting to IEPA EtO emissions from Willowbrook that were based on assumptions which Griffith Labs knew had no basis or were false;

w.   Failing to train its employees and failing to audit the Willowbrook facility to ensure that the facility's operations were not endangering its neighbors even though such training and auditing were Griffith Labs' responsibilities;

x.   Placing its own economic interests above the health and well-being of those who lived or worked near the facilities;

y.   Failing to provide the Operators with capital to invest in reasonable emission control systems even though such capital was available;

z.   Failing to provide the Operators with capital to invest in reasonable equipment upgrades and maintenance even though such capital was available;

aa.  Working independently and through an EtO industry lobbyist to improperly dispute conclusions concerning the health dangers of EtO that had been reached by independent scientists and health agencies with the purpose of understating those health dangers and ultimately creating a justification for emissions that endangered the health of those living near the Willowbrook (and other) sterilization facilities;

bb.  Emitting EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area; and

cc.  deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on Plaintiffs, their decedents, and others who lived or worked near the facilities.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

301.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 16
### Ultrahazardous Activity / Strict Liability – Griffith Foods International, Inc. (Griffith Labs)

302.     Plaintiffs incorporate by reference all allegations contained herein.

303.     The use and emission of EtO from the facilities constitutes an ultrahazardous activity.

304.     The use and emission of EtO created a high degree of risk to Plaintiffs, their decedents, and others who lived or worked near the facilities such that the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

305.     The use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

306.     While the activities conducted at the facilities are exceedingly dangerous, they offer little to no value to the surrounding community.

307.     Griffith Labs is strictly liable for any injuries proximately resulting therefrom.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

308.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 17
### Civil Battery – Griffith Foods International, Inc. (Griffith Labs)

309.     Plaintiffs incorporate by reference all allegations contained herein.

310.     At all relevant times, Griffith Labs knew that EtO emitted from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

311.     Notwithstanding this knowledge, Griffith Labs caused and/or set in motion events that caused EtO to come in contact with Plaintiffs and their decedents.

312.     Plaintiffs and their decedents' contact with EtO was offensive and harmful.

313.     Griffith Labs intentionally emitted EtO into the air despite its knowledge that it would contact people who lived or worked near the facilities.

314.     Plaintiffs and their decedents did not consent to contact with EtO emitted from the facilities.

102

FILED DATE: 4/16/2021 2:00 PM    2018L010475

315.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 18
### Public Nuisance – Griffith Foods International, Inc. (Griffith Labs)

316.     Plaintiffs incorporate by reference all allegations contained herein.

317.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

318.    The activities of Griffith Labs as described above unreasonably infringed upon and/or transgressed this public right by causing those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

319.    Griffith Labs' use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

320.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

## COUNT 19
### In Concert Liability – Griffith Foods International, Inc. (Griffith Labs)

321.    Plaintiffs incorporate by reference all allegations contained herein.

322.    Illinois law has adopted section 876 of the Restatement (Second) of Torts, entitled "Persons Acting In Concert," which holds liable persons who act "in concert" with another tortfeasor to cause harm. *E.g.*, *Woods v. Cole*, 181 Ill.2d 512 (1998).

323.    Specifically, for harm resulting to a third person for the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant

FILED DATE: 4/16/2021 2:00 PM   2018L010475

to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

324.     The activities of Griffith Labs as described above, including those occurring subsequent to its October 1984 asset transfer to Micro-Biotrol Company: (a) were done in concert with the operators of the Willowbrook facility or pursuant to a common design with the operators, namely, to operate an ethylene oxide sterilization facility in a residential community with insufficient pollution controls and without warning to the community; (b) gave substantial assistance or encouragement to the Willowbrook facility operators knowing that such operators were breaching duties to Plaintiffs; and (c) gave substantial assistance to the Willowbrook facility operators to accomplish such tortious result and, when separately considered, Griffith Labs' conduct constituted an independent breach of duty to Plaintiffs.

325.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Griffith Foods International, Inc. in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

## COUNT 20
### Negligence – Bob Novak

326.     Plaintiffs incorporate by reference all allegations contained herein.

327.     Beginning in August 2003, Mr. Novak was the Operations Manager at the Willowbrook facilities.

328.     In that capacity, Mr. Novak was responsible for the operation of the facilities, coordinating and overseeing all activities in facility operations, which included testing and analysis to determine the nature and extent of EtO emissions.

329.     At all relevant times, Mr. Novak had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

330.     At all relevant times, Mr. Novak knew or should have known that the EtO emitted from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

331.     Mr. Novak breached his duty and failed to exercise ordinary care in one or more of the following ways:

  a. by permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of EtO to escape the chamber area in the facilities;

  b. by permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the facilities;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

c. by allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the facilities;

d. by allowing exterior doors to remain open for unreasonable lengths of time in the facilities;

e. by failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of EtO emissions therefrom in the facilities;

f. by failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the facilities;

g. by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

h. by permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the facilities;

i. by subjecting Plaintiffs, their decedents, and others who lived and worked near the facilities to an elevated cancer risk;

j. by failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer; and

k. by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer.

332.    As a direct and proximate result of one or more of the foregoing acts or omissions,

Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

conditions identified in their Short Form Complaints and, as a result, have been caused to incur

FILED DATE: 4/16/2021 2:00 PM    2018L010475

and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Bob Novak in an amount to be determined by a trier of fact.

## COUNT 21
### Willful and Wanton Conduct – Bob Novak

333.    Plaintiffs incorporate by reference all allegations contained herein.

334.    At all relevant times, Mr. Novak had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

335.    At all relevant times, Mr. Novak knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

336.    Mr. Novak breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

   a.  by approving test results and/or monitoring systems which provided misleading and inaccurate report on pollution relating to the facilities;

   b.  by permitting emissions of massive and unnecessary amounts of EtO into the air from the Facility notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   c.  by failing to warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were being exposed

FILED DATE: 4/16/2021 2:00 PM    2018L010475

to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d.  by failing to a warn or advise Plaintiffs, their decedents, and others who lived and worked in the Willowbrook area that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e.  by deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure has on people who lived or worked near the facilities; and

f.  by subjecting Plaintiffs, their decedents, and others who lived and worked near the facilities to an elevated cancer risk without warning them of the same.

337.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Bob Novak in an amount to be determined by a trier of fact.

**COUNT 22**
**Negligence – Roger Clark**

338.    Plaintiffs incorporate by reference all allegations contained herein.

339.     Mr. Clark was the Maintenance Supervisor at the Willowbrook facilities from the late 1980s until approximately 2015.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

340.    In that capacity, Mr. Clark was responsible for calibrating the internal EtO monitors and overseeing the sterilization process at the facilities.

341.    At all relevant times, Mr. Clark had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

342.    At all relevant times, Mr. Clark knew or should have known that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

343.    Mr. Clark breached his duty and failed to exercise ordinary care in one or more of the following ways:

a.  by inaccurately calibrating and/or manipulating internal EtO monitors to allow for erroneous monitoring results and excessive levels of EtO in the facilities;

b.  by failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the facilities;

c.  by permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of EtO to escape the chamber area in the facilities;

d.  by permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the facilities;

e.  by allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the facilities;

FILED DATE: 4/16/2021 2:00 PM    2018L010475

f.   by allowing exterior doors in the warehouse to remain open for unreasonable lengths of time in the facilities;

g.   by failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of EtO emissions therefrom in the facilities;

h.   by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

i.   by permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the facilities;

j.   by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk;

k.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer; and

l.   by failing to a warn or advise Plaintiffs, decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer.

344.   As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Roger Clark in an amount to be determined by a trier of fact.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

**COUNT 23**
**Willful and Wanton Conduct – Roger Clark**

345.     Plaintiffs incorporate by reference all allegations contained herein.

346.     At all relevant times, Mr. Clark had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and others who lived and worked in the area surrounding the facilities.

347.     At all relevant times, Mr. Clark knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

348.     Mr. Clark breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

  a.  by deliberately falsifying test results and/or inaccurately calibrating and/or manipulating the monitoring systems to provide a misleading and inaccurate report on pollution relating to the facilities;

  b.  by permitting emissions of EtO into the air from the facilities notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

  c.  by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

  d.  by failing to a warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

FILED DATE: 4/16/2021 2:00 PM   2018L010475

    e.    by deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure had on people who lived or worked near the facilities; and

    f.    by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk without warning them of the same.

349.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against Roger Clark in an amount to be determined by a trier of fact.

## COUNT 24
## Negligence – GTCR

350.    Plaintiffs incorporate by reference all allegations contained herein.

351.    Along with Sterigenics, GTCR owned and operated the facilities since 2011.

352.    In that capacity, GTCR had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiffs, the decedents, and all those living and working in the area surrounding the facilities.

353.    At all relevant times, GTCR knew or should have known that the EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

FILED DATE: 4/16/2021 2:00 PM    2018L010475

354.    GTCR breached its duty and failed to exercise ordinary care in one or more of the following ways:

    a.   by emitting massive and unnecessary amounts of EtO into air from the facilities;

    b.   by using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

    c.   by placing its own economic interests above the health and well-being of Plaintiffs, their decedents, and others who lived or worked near the facilities;

    d.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO;

    e.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO;

    f.   by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that it was emitting a known carcinogen into the air from the facilities;

    g.   by failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from the facilities;

    h.   by failing to adequately study and test the effect of its EtO emissions from the facilities on the quality of air;

    i.   by failing to adequately study and test the effect of its EtO emissions from the facilities on the health and well-being of people who lived or worked near the facilities; and

    j.   by subjecting Plaintiffs, their decedents, and others who lived and worked near the facilities to an elevated cancer risk.

355.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR, LLC in an amount to be determined by a trier of fact.

### COUNT 25
### Willful and Wanton Conduct – GTCR

356.    Plaintiffs incorporate by reference all allegations contained herein.

357.    At all relevant times, GTCR had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs, their decedents, and all those living and working in the area surrounding the facilities.

358.    At all relevant times, GTCR knew that EtO emitting from the facilities would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons inhaling it.

359.    GTCR breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

    a. by permitting emissions of massive and unnecessary amounts of EtO into the air from the facilities notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

    b. by failing to warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were being exposed to EtO

FILED DATE: 4/16/2021 2:00 PM    2018L010475

notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c.   by failing to a warn or advise Plaintiffs, their decedents, and others who lived or worked near the facilities that they were inhaling EtO notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d.   by permitting emissions of EtO, a known carcinogen, into the air from the facilities before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area;

e.   by deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on people who lived or worked near the facilities; and

f.   by subjecting Plaintiffs, their decedents, and others who lived or worked near the facilities to an elevated cancer risk without warning them of the same.

360.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR, LLC in an amount to be determined by a trier of fact.

**COUNT 26**
**Public Nuisance - GTCR**

361.    Plaintiffs incorporate by reference all allegations contained herein.

FILED DATE: 4/16/2021 2:00 PM   2018L010475

362.     The general public has a common right to breathe in clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

363.     GTCR's use and emission of EtO from the facilities substantially and unreasonably infringed upon and/or transgresses this public right. In particular, the activities of GTCR caused those who lived and worked in the area surrounding the facilities to inhale high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

364.     GTCR's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area.

365.     As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and their decedents inhaled dangerous amounts of EtO and developed the diseases and

FILED DATE: 4/16/2021 2:00 PM   2018L010475

conditions identified in their Short Form Complaints and, as a result, have been caused to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, loss of normal life, and death.

WHEREFORE Plaintiffs respectfully request that judgment be entered in their favor and against GTCR in an amount to be determined by a trier of fact.

Date:   April 16, 2021                                        Respectfully submitted,

                                                              /s/ *Antonio M. Romanucci*
                                                              Antonio M. Romanucci

Antonio M. Romanucci, *Lead Counsel*
Bryce T. Hensley, *Liaison Counsel*
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
(312) 458-1000
aromanucci@rblaw.net
bhensley@rblaw.net

FILED DATE: 4/16/2021 2:00 PM  2018L010475

Steven A. Hart
Brian H. Eldridge
John S. Marrese
**HART MCLAUGHLIN & ELDRIDGE**
22 W. Washington Street, Suite 1600
Chicago, Illinois 60602
(312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com

Patrick A. Salvi II
Lance Northcutt
Jennifer M. Cascio
**SALVI, SCHOSTOK & PRITCHARD P.C**.
161 North Clark Street, Suite 4700
Chicago, IL 60601
(312) 372-1227
psalvi2@salvilaw.com
lnorthcutt@salvilaw.com
jcascio@salvilaw.com

Todd Smith
Brian LaCien
**SMITH LACIEN LLP**
70 West Madison, Suite 5770
Chicago, Illinois
(312) 236-9381
tsmith@smithlacien.com
blacien@smithlacien.com

Scott A. Entin
Sarah Siskind
Deanna Pihos
**MINER, BARNHILL & GALLAND, P.C.**
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
(312) 751-1170
sentin@lawmbg.com
ssiskind@lawmbg.com
dpihos@lawmbg.com

Daniel M. Kotin
Shawn K. Kasserman
Loren Legorreta
**TOMASIK KOTIN KASSERMAN, LLC**
161 North Clark Street, Suite 3050
Chicago, Illinois 60601
(312) 605-8800
dan@ttklaw.com
skasserman@tkklaw.com
loren@tkkkaw.com

Shawn Collins
Edward J. Manzke
Margaret Galka
**THE COLLINS LAW FIRM, P.C**.
1770 Park St., Ste. 200
Naperville, IL 60563
(630) 537-1595
shawn@collinslaw.com
ejmanzke@collinslaw.com
mgalka@collinslaw.com